# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

### No. 12-3504

---

**SCOTT MCMAHON**,
**individually and on behalf of a class,**

**Plaintiff-Appellant,**

**v.**

**LVNV FUNDING, LLC,**
**RESURGENT CAPITAL SERVICES, L.P.**
**ALEGIS GROUP, LLC,**
**and TATE & KIRLIN ASSOCIATES, INC.,**

**Defendants-Appellees.**

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
The Honorable Charles P. Kocoras, Judge

No. 12 C 1410

---

# SHORT APPENDIX (7th Cir. R. 30)

---

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tiffany N. Hardy
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## SHORT APPENDIX - TABLE OF CONTENTS

July 5, 2012 Memorandum Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-11

August 13, 2012 Memorandum Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-19

October 31, 2012 Memorandum Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-26

December 19, 2011 Collection Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

December 29, 2011 Verification Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

January 13, 2012 Collection Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-31

August 13, 2012 Settlement Offer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33

*United States of America v. Asset Acceptance, LLC*
      Complaint, dated January 30, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-64

*United States of America v. Asset Acceptance, LLC*
      Consent Decree, dated January 31, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65-92

*United States of America v. Asset Acceptance, LLC*
      Order, dated January 31, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

FTC News Release, dated January 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94-95

FTC Notice to Debt Collectors, dated January 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . 96-98

*American Express Centurion Bank*, 2012-CFPB-0002
      Joint Consent Order, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99-133

*American Express Centurion Bank*, 2012-CFPB-0003
      Consent Order, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134-161

*American Express Centurion Bank*, 2012-CFPB-0004
      Consent Order, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162-169

CFPB News Release, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170-172

FDIC News Release, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173-174

FRB News Release, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

OCC News Release, dated October 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

FTC Annual Report 2010: FDCPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177-194

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT MCMAHON, on behalf of plaintiff )
and classes defined herein, )
                                   )
                     Plaintiff, )
                                     )
      vs. )            12 C 1410
                                     )
LVNV FUNDING, LLC, RESURGENT )
CAPITAL SERVICES, L.P., ALEGIS )
GROUP, LLC, and TATE & KIRLIN )
ASSOCIATES, INC., )
                                     )
                  Defendants. )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on Defendants LVNV Funding, LLC,
Resurgent Capital Services, L.P. ("Resurgent"), Alegis Group, LLC, and Tate & Kirlin
Associates, Inc.'s ("Tate & Kirlin") (collectively, "Defendants") motion to dismiss
Plaintiff Scott McMahon's ("McMahon") complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). For the reasons set forth below, Defendants' motion is granted in
part and denied in part.

## BACKGROUND

In 1997, McMahon incurred a debt to an Illinois gas utility company. Sometime
thereafter, Defendant LVNV purchased McMahon's debt. LVNV and Resurgent are

under common ownership and management, and Alegis Group is Resurgent's sole general partner. Resurgent retained Tate & Kirlin to collect McMahon's debt.

On December 19, 2011, Tate & Kirlin sent McMahon a letter seeking to collect the debt. McMahon requested verification of the debt, to which Resurgent responded with a letter dated January 13, 2012. Resurgent's response indicated that McMahon's account "was previously sold by Nicor Gas on or about 09-23-2011 and at that time the balance on this account was $584.98." The letter did not disclose that the debt was approximately fifteen years old. Because the debt was incurred in 1997, the four year statute of limitations on collecting gas bills had lapsed. *See* 810 ILCS 5/2-725.

On February 28, 2012, McMahon filed a class-action complaint against Defendants alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e, 1692f. McMahon alleges that Defendants violated the FDCPA by sending dunning letters that failed to disclose that the debts were time-barred. Defendants seek dismissal of both McMahon's individual and class-wide claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

---

[1] Generally, a court may not consider documents outside of the pleadings in deciding a motion to dismiss under Rule 12(b)(6) without converting the motion into one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). However, a court may consider such documents if they are central to a plaintiff's claims, are attached to the complaint, or are matters of public record. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *Palay v. United States*, 349 F.3d 418, 425 (7th Cir. 2003). The Court will therefore consider additional evidence that was attached to the complaint or that is a matter of public record without converting Defendants' motion to dismiss into a motion for summary judgment.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss is used to test the legal sufficiency of a complaint. To state a claim, the allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While detailed factual allegations are not required, a plaintiff must provide enough factual support to raise his right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice;" rather, a claim must provide sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 570). In ruling on a motion to dismiss, a court accepts all well-pleaded facts and allegations as true and draws all reasonable inferences in the plaintiff's favor. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009).

## DISCUSSION

### I.    Class Allegations

The FDCPA prohibits a debt collector from using any "false, deceptive, or misleading representation" to collect a debt. 15 U.S.C. § 1692e. Specifically, a debt collector may not: (1) falsely represent "the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A); (2) threaten "any action that cannot legally be taken

- 3 -

or that is not intended to be taken," 15 U.S.C. § 1692e(5); (3) "use any false representation or deceptive means to . . . attempt to collect any debt," 15 U.S.C. § 1692e(10); or (4) use unfair or unconscionable means to collect" on a debt, 15 U.S.C. § 1692f.

Notably, the FDCPA does not explicitly require a debt collector attempting to recover on a time-barred debt to disclose that the debt is time-barred. Moreover, several courts in this district and two federal circuit courts have concluded that such attempts are not actionable under the FDCPA unless accompanied by a threat of litigation. *See e.g.*, *Murray v. CCB Credit Servs., Inc.*, 2004 WL 2943656 at *2 (N.D. Ill. Dec. 15, 2004); *Walker v. Cash Flow Consultants, Inc.*, 200 F.R.D. 613, 616 (N.D. Ill. 2001); *accord Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 33 (3rd Cir. 2011); *Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767, 771 (8th Cir. 2001). The courts reasoned that because the statute of limitations merely limits the judicial remedies available to the creditor and does not eliminate the underlying debt, attempting to collect on a time-barred debt without disclosing as much is not deceptive under the FDCPA unless a dunning letter threatens litigation. As McMahon does not allege that Defendants' letters implicitly or explicitly threaten litigation,[2] the Court is inclined to accept the sound reasoning of its sister courts and dismiss McMahon's complaint.

---

[2] In his sur-reply, McMahon explicitly states that he is not alleging that the letters contain an express or implied threat of litigation.

- 4 -

McMahon invites us to stray from existing judicial precedent in light of a recent lawsuit filed by the Federal Trade Commission ("FTC") in the Middle District of Florida. On January 30, 2012, the FTC filed suit against a debt collection agency, Asset Acceptance, LLC ("Asset Acceptance"), alleging several violations of the FDCPA and Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). *United States of America v. Asset Acceptance, LLC*, No. 8:12-cv-182-T-27EAJ (M.D. Fla. 2012). The FTC, charged with enforcing the FDCPA,[3] alleged that Asset Acceptance's failure to disclose that a debt was time-barred was deceptive under the FDCPA. The same day that the complaint was filed, Asset Acceptance and the FTC entered into a Consent Decree pursuant to which Asset Acceptance was required to pay $2.5 million and include the following language in all subsequent collection letters in which Asset Acceptance knew that the statute of limitations on the debt had expired: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it."

At the time that the FTC filed suit against Asset Acceptance, it held "some interpretive and enforcement authority with respect to the FDCPA." *Carter v. AMC, LLC*, 645 F.3d 840, 843 (7th Cir. 2011); *see* 15 U.S.C. § 1692l(d) (2011). We must therefore determine what weight, if any, to afford the FTC's position. McMahon

---

[3] The responsibility of enforcing the FDCPA has since been transferred to the Consumer Financial Protection Bureau.

SHORT APPENDIX 5

contends that the FTC's position is entitled to *Chevron* deference or, in the alternative, *Skidmore* deference.

### A. *Chevron* Deference

In *Chevron U.S.A. Inc. v. Natural Res. Def. Counsel, Inc.*, the Supreme Court held that if a statute is silent or ambiguous in a particular respect, a court will defer to an agency's reasonable interpretation of the statute. 467 U.S. 837, 843 (1984). *Chevron* deference is mandatory when "Congress has expressly or implicitly indicated that it intended an agency to speak with the force of law on a matter, and the agency's position on that matter is reasonable." *Matz v. Household Int'l Tax Reduction Inv. Plan*, 265 F.3d 572, 574 (7th Cir. 2001) (citing *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001)). Even absent explicit rule-making authority, Congress may implicitly confer such authority "when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Mead*, 533 U.S. at 230. Such formal procedures typically include "notice-and-comment rulemaking or formal adjudication." *Id.* (collecting cases).

In enacting the FDCPA, Congress expressly denied the FTC rule-making authority. 15 U.S.C. § 1692l(d) (2011). Additionally, the FTC's suit against Asset Acceptance does not constitute a formal adjudication. *See* 5 U.S.C. 551(7) (defining an "adjudication" as "an agency process for the formulation of an order"). Morover, the

- 6 -

Consent Decree explicitly states that the parties settled the matter "without adjudication of any issue of fact or law." McMahon nevertheless maintains that the Consent Decree should be afforded the same deference as a formal administrative adjudication or an administrative rule. However, McMahon has not cited to any case law in which a court granted *Chevron* deference to an agency's consent decree with an unrelated party.[4] Therefore, the FTC's position as evinced by the Asset Acceptance Consent Decree is not entitled to *Chevron* deference.

**B.    *Skidmore* Deference**

McMahon alternatively asserts that the FTC's position is entitled to *Skidmore* deference. In *Skidmore v. Swift*, the Supreme Court afforded limited deference to an agency's interpretation of a statute due to the "specialized experience and broader investigations and information" available to the agency. 323 U.S. 134, 139 (1944). The degree of deference depends on the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later

---

[4] McMahon cites to *Commonwealth v. Fremont Inv. & Loan*, in which the Supreme Court of Massachusetts considered the Federal Deposit Insurance Corporation's ("FDIC") position on what constitutes "unfair practices" under a Massachusetts consumer protection law. 897 N.E.2d 548, 559 (Mass. 2008). However, the *Fremont* court did not indicate what level of deference it gave to the FDIC's position. McMahon also cites to *State of Alaska v. O'Neill Investigations*, in which the Alaska Supreme Court gave deference to the FTC's interpretation of "unfair and deceptive acts" under the Federal Trade Commission Act. Just as in *Fremont*, the *O'Neill* court did not indicate what level of deference it gave. Moreover, in granting deference to the FTC's position, the court noted that the FTC has administrative rule-making powers under the Federal Trade Commission Act. Under the FDCPA, the FTC lacks any rule-making authority.

pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140. Generally, "an agency's position may be accorded respect depending on its persuasiveness." *Matz*, 265 F.3d at 574.

The FTC has extensive experience in investigating and prosecuting debt collectors under the FDCPA and has conducted extensive studies of debt collection practices. Notably, however, the FTC has not issued an official commentary or advisory opinion on this matter. Still, McMahon urges this Court to adopt the FTC's position as expressed through the filing of the complaint against Asset Acceptance and the accompanying Consent Decree.

Neither the Asset Acceptance complaint nor the Consent Decree constitute a definitive policy statement by the FTC. Neither outlines the reasoning, methodology, or factual predicate for McMahon's assertion that sending dunning letters to collect on time-barred debt is deceptive under the FDCPA. Moreover, neither document discusses the existing case law addressing this issue and the perceived deficiencies therein. As such, neither the Consent Decree nor the Asset Acceptance complaint are persuasive.

The clearest position taken by the FTC is expressed in a 2010 FTC Report (the "Report"). FTC, 2010 Debt Collection and Arbitration Roundtables Report, *Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration* (July 2010), available at http://www.ftc.gov/os/2010/07/ debtcollectionreport.pdf. The

- 8 -

Report was the culmination of several conferences, multiple workshops, and the FTC's extensive experience in addressing debtor complaints under the FDCPA. The FTC notified industry participants of these discussions and invited their comments. While this suggests that the FTC's findings may be entitled to some deference, the Report's conclusions are ambiguous at best. For example, the FTC concluded that "*in many circumstances*, [attempting to collect on a time-barred debt] *may* create a misleading impression that the collector can sue the consumer in court to collect the debt, in violation of . . . the FDCPA" (emphasis added). The FTC did not specify which circumstances such a collection attempt would constitute a deceptive practice under the FDCPA.

In light of the foregoing, the Court affords little deference to the FTC's position as outlined in the Asset Acceptance complaint, the Consent Decree, and the Report. This is particularly so in light of the well-reasoned and sound judicial decisions that run contrary to the FTC's ambiguous position. Therefore, McMahon's class allegations, which seek to impose liability for Defendants' attempts to collect time-barred debts without disclosing that the debts are time-barred, are dismissed.

## II.    Individual Allegations

McMahon's class allegations differ in a material respect from his individual allegations. Whereas McMahon's class allegations seek to broadly impose liability on

- 9 -

debt collectors for not disclosing that debts are time-barred, the individual allegations contain greater factual detail worthy of additional consideration. Particularly, McMahon alleges that Resurgent's response to McMahon's request for validation of the debt was deceptive because it did not disclose the date upon which the debt accrued.

In evaluating allegations of deceptive practices under the FDCPA, a court applies the "unsophisticated consumer" standard. *Zemeckis v. Global Credit & Collection Corp.*, No. 11-2334, slip op. at 5 (7th Cir. May 11, 2012) (citation omitted). The unsophisticated consumer is "uninformed, naive, or trusting," and "statements are not confusing or misleading unless a significant fraction of the population would be similarly misled." *Veach v. Sheeks*, 316 F.3d 690, 693 (7th Cir. 2003) (internal quotation and citation omitted). Generally, courts "view the confusing nature of a dunning letter as a question of fact, that, if well-pleaded, avoids dismissal on a Rule 12(b)(6) motion." *Zemeckis*, slip op. at 6 (citations omitted).

McMahon maintains that Resurgent's letter was misleading because it suggested that the debt was recent and therefore actionable at law. When McMahon requested validation of the debt, Resurgent did not disclose the date that McMahon incurred the debt. Rather, Resurgent only stated that the "account was previously sold by Nicor Gas on or about 09-23-11" without disclosing that the debt was approximately fifteen years old. Because Resurgent disclosed the more recent date upon which it purchased

- 10 -

McMahon's account from Nicor Gas while excluding any mention of the date upon which McMahon incurred the debt, it is plausible that an unsophisticated consumer would be misled into believing that the debt was recent. This affirmative statement, coupled with Defendants' omission of the accrual date of the debt, plausibly suggests that McMahon is entitled to relief under the FDCPA. Accordingly, Defendants' motion to dismiss McMahon's individual allegations is denied.

## CONCLUSION

Based on the foregoing, Defendant's motion to dismiss McMahon's class-wide allegations is granted, and Defendants' motion to dismiss McMahon's individual allegations is denied.

_____
Charles P. Kocoras
United States District Judge

Dated: ___July 5, 2012_____

- 11 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT MCMAHON, on behalf of plaintiff and the classes defined herein, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 12 C 1410 |
| LVNV FUNDING, LLC, RESURGENT CAPITAL SERVICES, L.P.; ALEGIS GROUP, LLC; and TATE & KIRLIN ASSOCIATES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on Plaintiff Scott McMahon's ("McMahon") motion for leave to file additional authority and motion to reconsider our prior order dismissing his class-wide claims. For the reasons set forth below, McMahon's motion for leave to file additional authority is granted, though his motion to reconsider is denied. The Court grants McMahon leave to amend his complaint in a manner consistent with this Opinion.

## BACKGROUND

On February 28, 2012, McMahon filed a class-action complaint against Defendants LVNV Funding, LLC, ("LVNV"), Resurgent Capital Services, L.P.

("Resurgent"), Alegis Group, LLC, and Tate & Kirlin Associates Inc. ("Tate & Kirlin") (collectively, "Defendants"), alleging that they violated the Fair Debt Collection Practices Act ("FDCPA") by sending dunning letters to collect a time-barred debt. On September 23, 2011, Defendants purchased McMahon's fourteen year old debt from an Illinois utility company. On December 19, 2011, Tate & Kirlin sent McMahon a letter offering to "settle [his] account in full" for 40% of the balance. McMahon requested validation of the debt, and Resurgent responded that McMahon's account "was previously sold by Nicor Gas on or about 09-23-2011" without disclosing that the debt had been incurred in 1997. The four-year statute of limitations for the collection of McMahon's debt had long since lapsed. *See* 810 ILCS 5/2-725.

On July 5, 2012, the Court issued a Memorandum Opinion (the "July 5th Opinion") dismissing McMahon's class-wide claims. *McMahon v. LVNV Funding, LLC*, No. 12 C 1410, 2012 WL 2597933, at *4 (N.D. Ill. July 5, 2012). We held that attempting to collect a time-barred debt without disclosing that the statute of limitations had expired, without more, did not constitute a violation of the FDCPA as a matter of law. *Id.* However, the Court allowed McMahon to proceed on his individual FDCPA claims. *Id.* The Court found that Resurgent's letter, which indicated the date that Defendants purchased the debt while omitting that the debt had been incurred nearly fifteen years earlier, plausibly suggested that Defendants had misrepresented the status

- 2 -

or character of McMahon's debt in violation of the FDCPA. *Id.* McMahon's class-wide claims did not contain similar allegations, but rather only alleged that Defendants' attempts to collect on a time-barred debt without disclosing that the statute of limitations had expired violated the FDCPA.

McMahon now invites the court to reconsider its holding with respect to the dismissal of the class-wide allegations and seeks leave to introduce additional authority to support his position.

## LEGAL STANDARD

A motion to reconsider a non-final order is properly brought pursuant to Federal Rule of Civil Procedure 54(b), which provides that such orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see Galvan v. Norberg*, No. 11-2319, slip op. at 13 n.3 (7th Cir. May 7, 2012). The decision to reconsider a previous ruling under Rule 54(b) is governed by the "law of the case" doctrine, whereby "a court generally should not reopen issues decided in earlier stages of the same litigation" absent a "compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008) (citations omitted); *see Minch v. City of Chi.*, 486 F.3d 294, 301 (7th Cir. 2007).

- 3 -

Although a court maintains the discretion to revisit its prior holdings, it does so with a presumption against reopening matters already decided. *Minch*, 486 F.3d at 301.

## DISCUSSION

McMahon identifies two perceived deficiencies with the Court's July 5th Opinion. First, McMahon maintains that the Court erred by not granting deference to a complaint and consent decree entered into by the Federal Trade Commission (the "FTC") and Asset Acceptance, LLC ("Asset Acceptance"), an unrelated debt collector, in the Middle District of Florida. *See United States of America v. Asset Acceptance, LLC*, No. 8:12-cv-182-T-27EAJ (M.D. Fla. 2012). The Court declined to grant deference to the complaint or the consent decree because the FTC did not outline the reasoning, methodology, or factual predicate of its position in the litigation. *See Arobelidze v. Holder*, 653 F.3d 513 (7th Cir. 2011) (explaining that the persuasiveness of an agency's position is based upon "'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The *Asset Acceptance* complaint and the consent decree merely delineated the FTC's stance on the conduct of Asset Acceptance, a single non-party defendant. The FTC's position regarding the conduct of a non-party defendant in a different jurisdiction is unpersuasive in a private suit

- 4 -

against a wholly unrelated debt collector, particularly when the current state of the law in this district is well-settled. *See e.g., Murray v. CCB Credit Servs., Inc.*, 2004 WL 2943656, at *2 (N.D. Ill. Dec. 15, 2004) (stating that attempting to collect on a time-barred debt without disclosing that the statute of limitations has expired is not a violation of the FDCPA absent an accompanying threat of litigation); *Walker v. Cash Flow Consultants, Inc.*, 200 F.R.D. 613, 616 (N.D. Ill. 2001) (same).

McMahon correctly points out that other courts have granted deference to agency interpretations of statutes as expressed in consent decrees and requests that the Court reconsider its interpretation of two such cases. First, in *Ramson v. Layne*, the court was confronted with whether advertisement endorsers could be held liable under the Illinois Consumer Fraud and Deceptive Practices Act. 668 F. Supp. 1162, 1165-69 (N.D. Ill. 1987). In the absence of any clear case law to guide its analysis, the Court granted some deference to the FTC's position regarding the liability of endorsers under the Federal Trade Commission Act ("FTC Act"). *Id.* at 1168. The court observed that the FTC had filed several complaints against endorsers under the FTC Act and entered into consent orders in every such case. *Id.* Here, in contrast, McMahon asks us to stray from well-settled case law based upon a single consent decree filed in a different jurisdiction without a sufficient legal justification for the FTC's position. Next, McMahon cites to *United States SEC v. Blackwell*, where the court granted deference to a consent order entered into between the SEC and an unrelated party. 291 F. Supp.

- 5 -

2d 674, 694 (S.D. Ohio 2003). In doing so, the court observed that there was "a paucity of jurisprudence that squarely addresse[d]" the issue before the court. *Id.* Here, courts in this district (and two circuit courts) have spoken directly on the issue McMahon seeks to raise in his lawsuit. Therefore, the Court remains unpersuaded by McMahon's legal authority.

McMahon also seeks leave to bolster his argument with more recently decided case law, which the Court now considers. In *Kline v. Mortg. Elec. Registration Sys., Inc.*, a district court in Ohio granted deference to the FTC and the Consumer Financial Protection Bureau's interpretation of the FDCPA. No. 3:08cv408, 2012 WL 1376995 (S.D. Ohio Apr. 19, 2012). The agencies' position was expressed in an *amicus curiae* brief in an unrelated case before the Supreme Court. *Id.* at *2-3. The *amicus* brief set forth the statutory and precedential justification for the agencies' position. *Id.* at *3. Here, on the other hand, neither the *Asset Acceptance* consent decree nor the complaint provide any insight into the legal basis for the FTC's position on the very narrow issue presented by McMahon. Moreover, McMahon's additional authority from the Southern District of Ohio does not suggest a change in the controlling law sufficient to override the presumption against revisiting an earlier decision under the law of the case doctrine. Accordingly, the Court is not persuaded that it erred in declining to give deference to the *Asset Acceptance* complaint and consent decree.

Second, McMahon requests that the Court alter the portion of the July 5th Opinion dismissing his class-wide allegations. McMahon's complaint sought to include a class composed entirely of those individuals to whom Defendants sent dunning letters to collect on time-barred debt. The Court held that without more, this conduct does not violate the FDCPA as a matter of law. *McMahon*, 2012 WL 2597933 at *4. McMahon now asks the Court to reconsider this decision, claiming that there may exist a class of persons to whom Defendants sent letters similar to the one Resurgent sent to McMahon: a letter citing the date that Defendants purchased the debt while omitting the date that the debt was incurred. As discussed in the July 5th Opinion, such allegations are sufficient to survive a motion to dismiss. *See id.* However, McMahon's class-wide claims make no such allegations, and the Court declines to disturb its prior Order dismissing those claims as they were pleaded. Nevertheless, the Court grants McMahon leave to amend his complaint to include class-wide allegations that incorporate this theory of liability.

McMahon also seeks leave to pursue his class claims on the theory that it is misleading for a debt collector to send a dunning letter offering a "settlement" that represents a "savings . . . off your balance" on a time-barred debt. McMahon contends that Defendants offer of a "settlement" implied that McMahon had a legally enforceable obligation to pay the debt. McMahon alleges that this was misleading because the statute of limitations on the debt had expired and Defendants had no cognizable claim

SHORT APPENDIX 18

to recover on the debt. Whether a settlement offer in a dunning letter is deceptive is a fact-intensive question that is generally not resolvable at the pleadings stage of a lawsuit. *See DeKoven v. Plaza Associates*, 599 F.3d 578, 580 (7th Cir. 2010); *Evory v. RJM Acquisitions Funding, L.L.C*, 505 F.3d 769, 775-76 (7th Cir. 2007). In this case, an unsophisticated consumer may be deceived into believing that the offer of a "settlement" implies that there is a legally enforceable obligation to pay the debt. The lack of any case law to the contrary, coupled with the Seventh Circuit's reticence to resolve questions concerning the confusing nature of a dunning letter at the pleadings stage, plausibly suggests that the offer of settlement on a time-barred debt may violate the FDCPA.

## CONCLUSION

In light of the foregoing, McMahon's motion for leave to file supplemental authority is granted, although his motion to reconsider our earlier dismissal of his class-wide claims is denied. McMahon is granted leave to amend his complaint in a manner consistent with this Opinion.

Charles P. Kocoras
United States District Judge

Dated:  August 13, 2012

- 8 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT MCMAHON, on behalf of plaintiff )
and the classes defined herein, )
)
Plaintiff, )
)
vs. )                12 C 1410
)
LVNV FUNDING, LLC, RESURGENT )
CAPITAL SERVICES, L.P., ALEGIS )
GROUP, LLC, and TATE & KIRLIN )
ASSOCIATES, INC., )
)
Defendants. )

## ORDER

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on the motion to dismiss brought by Defendants LVNV Funding, LLC's ("LVNV"), Resurgent Capital Services, L.P.'s ("Resurgent"), Alegis Group, LLC's ("Alegis"), and Tate & Kirlin Associates, Inc.'s ("T&K") (together "Defendants") pursuant to Federal Rules of Civil Procedure 12(b)(1) and, in the alternative, 12(b)(6). For the following reasons, the Court grants Defendants' motion to dismiss under Rule 12(b)(1).

In 1997, Plaintiff Scott McMahon ("McMahon") incurred a debt to an Illinois gas utility company. Sometime thereafter, Defendant LVNV purchased McMahon's debt. LVNV and Resurgent are under common ownership and

management, and Alegis Group is Resurgent's sole general partner. Resurgent retained T&K to collect McMahon's debt.

On December 19, 2011, T&K sent McMahon a letter seeking to collect the debt. The letter presented McMahon an "opportunity" to settle his account in full for $233.99. McMahon responded with a request for verification of the debt. In a letter dated January 13, 2012, Resurgent's indicated that McMahon's account "was previously sold by Nicor Gas on or about 09-23-2011 and at that time the balance on this account was $584.98." The letter did not disclose that the debt was approximately fifteen years old. Because the debt was incurred in 1997, the four year statute of limitations on collecting gas bills had lapsed. *See* 810 ILCS 5/2-725.

On February 28, 2012, McMahon filed a class-action complaint alleging that Defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e, 1692f, by sending dunning letters that failed to disclose that the debts were time-barred. McMahon filed a motion for class certification contemporaneously with the complaint, which the Court entered and continued on March 13, 2012. Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6). On July 6, 2012, the Court dismissed McMahon's class claims and allowed his individual claim to proceed. *See McMahon v. LVNV Funding, LLC*, 12 C 1410, 2012 U.S. Dist. LEXIS 92655 (N.D. Ill. July 5, 2012). On August 13, 2012, the Court denied McMahon's motion to reconsider,

- 2 -

but allowed him leave to amend the complaint. *See McMahon v. LVNV Funding, LLC,* 12 C 1410, 2012 U.S. Dist. LEXIS 113576 (N.D. Ill. August 13, 2012). Later that day, Defendants' attorney sent a facsimile ("fax") to McMahon's attorney offering to settle the lawsuit ("August 13th fax"). Specifically, in exchange for McMahon dropping his class claims, Defendants offered to pay McMahon (1) statutory damages in the amount of $1000 to satisfy his remaining individual claim under the FDCPA; (2) costs incurred related to his individual claims; and (3) reasonable attorney fees; and (4) "any other reasonable relief" in the event that the Court determines such relief necessary. McMahon did not respond. Two days later, on August 15, 2012, McMahon filed the instant amended class-action complaint along with an amended motion for class certification. Defendants' attorney again faxed a letter to McMahon's attorney with an offer identical to the one made on the August 13th. McMahon did not respond to this fax either.

Now before the Court is Defendants' motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Because McMahon's claim is moot, we need not reach Defendants' Rule 12(b)(6) motion.

In considering a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing that the Court has jurisdiction over his claim. *United Phosphorous, Ltd.*

- 3 -

*v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc). The Court may consider matters outside of the complaint in ruling on a motion to dismiss for lack of subject-matter jurisdiction. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

Defendants argue that the August 13th fax offered McMahon complete recovery for his individual FDCPA claim, that it was made prior to McMahon's motion for class certification, and that this mooted McMahon's claim because it deprived him of a personal stake in the matter. The mootness doctrine arises from Article III of the Constitution, which limits a federal court's jurisdiction to "cases" or "controversies." *Damasco v. Clearwire Corporation*, 662 F.3d 891, 894 (7th Cir. 2011) (*citing Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). The doctrine requires parties to maintain a personal stake in a lawsuit's outcome at all stages of the litigation. *Damasco*, 662 F.3d at 895 (citations omitted). A defendant's offer to satisfy the plaintiff's entire demand negates any dispute over which to litigate, whether or not the plaintiff accepts the offer, thus depriving the plaintiff of a personal stake in the lawsuit. *Rand v. Monsanto Co.*, 926 F.2d 596, 598 (7th Cir. 1991). In the context of a class-action lawsuit, a defendant's offer to satisfy the named plaintiff's claim in full moots the lawsuit so long as the offer is made prior to the plaintiff's motion for class certification. *Damasco*, 662 F.3d at 895 (collecting cases); *see also Greisz v. Household Bank, N.A.*, 176 F.3d 1012, 1015 (7th Cir. 1999) ("[B]efore the class is certified, which is to say at a time when there are

- 4 -

many potential party plaintiffs to the suit, an offer to one is not an offer of the *entire* relief sought by the suit, unless the offer comes before class certification is sought . . . .") (emphasis in original) (citations omitted).

On August 13, 2012, Defendants offered McMahon everything that he was entitled to under his remaining individual FDCPA claim: statutory damages, costs, and attorney's fees. Defendants made this offer before McMahon filed his amended class-action complaint and amended motion for class certification on August 15th. Because Defendants extended the offer before McMahon filed his amended motion for class certification, McMahon's claim is mooted.

McMahon relies on *Espenscheid v. Directsat USA, LLC*, 688 F.3d 872 (7th Cir. 2012), in arguing that Defendants' offer did not moot his claim because the offer did not seek to satisfy his award for serving as class representative. However, *Espenscheid* involved an agreement between the parties in which the plaintiffs retained their right to appeal the court's decertification ruling and to seek an incentive award for serving as class representatives in the event that the matter proceeded as a class. *Id.* at 874. The instant case lacks any such agreement between McMahon and the Defendants, and is therefore distinguishable from *Espenscheid*. Indeed, the *Espenscheid* Court recognized that a putative class representative's claim is mooted if the defendant's offer to settle

- 5 -

in full if the offer was made prior to the filing of a motion for class certification. *Id.* at 874 (*citing Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 546-47 (7th Cir. 2003).

McMahon also contends that Defendants' proffer of "any other reasonable relief that is deemed by the Court to be necessary to fully satisfy all of [McMahon's] individual claims" is too vague to constitute a valid offer. Determining whether an offer is valid requires application of contract law principles. *Webb v. James*, 147 F.3d 617, 620 (7th Cir. 1998). "A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991). Defendants' willingness to pay McMahon "reasonable relief" in accordance with the Court's recommendation is not so uncertain as to belie the legal significance of Defendants' proposal. Accordingly, the term is sufficiently definite to constitute a valid offer.

Although McMahon and his counsel may understandably regard our ruling as harsh, McMahon has not put forth any argument that compels a different result. This is especially so in view of Seventh Circuit precedent, which has unequivocally eschewed recognizing an exception to the mootness doctrine where a defendant's offer to satisfy a putative class representative's individual claim in full is tendered prior to

- 6 -

a motion for class certification.  *See Damasco*, 662 F.3d at 895-97.  In light of Seventh

Circuit precedent, dismissal here is appropriate.

For the foregoing reasons, Defendants' motion to dismiss is granted.

Charles P. Kocoras
United States District Judge

Dated:   October 31, 2012



2810 Southampton Road
Philadelphia, PA 19154-1207

7910                     22 0000 0388
                         946332

# TATE & KIRLIN ASSOCIATES

*2810 Southampton Road*
*Philadelphia, PA 19154-1207*
Toll Free (866) 520-3790 • (215) 554-6482
*www.navtka.com*

Scott MC Mahon

Redacted

December 19, 2011

Creditor:                    LVNV FUNDING LLC
Previous Creditor:           NICOR GAS
Client Ref #:                3231
Account#:                    7910
Total Due:                   $584.98

This account has been listed with our office for collection. This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

## An Opportunity:

We are pleased to extend to you an offer to settle your account in full for $233.99. This represents a savings of 60% off your balance.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of this office in writing within 30 days after receiving this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.

Yours truly,

*Thomas McNamee*

### PLEASE SEE ADDITIONAL PAGE(S) FOR IMPORTANT PRIVACY NOTICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please detach and return bottom portion with your payment in the envelope supplied; be sure the address below shows through the return envelope window.

December 19, 2011
Scott MC Mahon

Creditor:                    LVNV FUNDING LLC
Previous Creditor:           NICOR GAS
Client Ref #:                3231
Account#:                    7910
Total Due:                   $584.98

**Please indicate any address changes below:**

Address: _____
City, State, Zip _____
Home Phone #: _____
Business Phone #: _____



Tate & Kirlin Associates
2810 Southampton Road
Philadelphia, PA  19154-1207

| IF PAYING BY CREDIT CARD, PLEASE FILL OUT BELOW : | | |
|---|---|---|
| **VISA** | CARD NUMBER | EXP DATE |
| | SIGNATURE | |
| *MasterCard* | AMOUNT | CVV/CID (3-Digit Verification Code on Back of Card) |

G311-S40
TNK.wfd
946332

SHORT APPENDIX 27

December 29, 2011

Thomas McNamee
**TATE & KIRLIN ASSOCIATES**
2810 Southampton Rd
Philadelphia PA 19154-1207

*Redacted*

Subject: Acct # ███7910

Dear Mr McNamee:

This is a response to your correspondence dated 12/19/2011 regarding a bill for $584.98 (acct #██7910) and an opportunity to settle that bill for $233.99. A copy of that correspondence is included with this letter.

If you send me verification of the debt and evidence your company is authorized to collect it, we can settle this quickly.

Thank you.

Sincerely,

Scott A. McMahon
████████
████████

Encl: Bill for $233.99

15 S. MAIN ST., SUITE 600
GREENVILLE, SC 29601



**RESURGENT**
*Capital Services*

| | |
|---|---|
| Toll Free Phone: | 1-866-464-1187 |
| Toll Free Fax: | 1-866-467-0960 |

http://www.resurgent.com/

*Hours of Operation*
8AM-7PM EST Monday - Thursday
8AM-5PM EST Friday

472664646

January 13, 2012

Previous Creditor: Nicor Gas .
Current Creditor: LVNV Funding LLC
Account Number: ▮▮▮▮3231
Balance: $584.98 .

VALVOD-CS-1        *A-01-VSA-AM-14173-41

SCOTT MC MAHON

*Redacted*

Dear Scott Mc Mahon:

This account has been placed with Resurgent Capital Services L.P.

Enclosed please find validation of debt that verifies the debt.

If you have any further questions, please contact one of our Customer Service Representatives toll-free at 1-866-464-1187.

Si usted no entiende el contenido de esta carta o tiene mas preguntas, por favor contacte a uno de nuestros representantes que hablan español al numero 1-866-464-1187.

For your convenience, you may submit your payment online at www.rcspay.com.

You may also send your payment to the address listed below:

Resurgent Capital Services L.P.
PO Box 10466
Greenville, SC 29603

Sincerely,

Customer Service Department
Resurgent Capital Services L.P.

---

This communication is sent to you by Resurgent Capital Services L.P., a professional debt collector.

### INFORMATION REGARDING YOUR LEGAL RIGHTS

Unless you notify us within 30 days after receiving this notice that you dispute the validity of this debt, or any portion of it, we will assume this debt is valid. If you notify us in writing within 30 days after receiving this notice that you dispute the validity of this debt, or any portion of it, we will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of us in writing, within 30 days after receiving this notice, we will provide you with the name and address of the original creditor, if different from the current creditor.

This is an attempt to collect a debt and any information obtained will be used for that purpose. This communication is from a debt collector.

The following is a Spanish translation of the information previously provided.

*Lea por favor las siguientes avisos importantes que puedan afectar sus derechos.*

A menos que usted nos notifique dentro de los 30 días después de recibir este aviso que usted cuestiona la validez de esta deuda, o cualquier porción de la misma, asumiremos que esta deuda es válida. Si usted nos notifica por escrito dentro de los 30 días después de recibir este aviso que cuestiona la validez de esta deuda, o cualquier porción de la misma, obtendremos la verificación de la deuda u obtendremos la copia de la sentencia y le enviaremos la copia de la sentencia o verificación. Si nos lo pide por escrito, dentro de los 30 días después de recibir este aviso, le facilitaremos el nombre y la dirección del acreedor original, si no coincide con el acreedor actual.

El objeto de la presente notificación es gestionar el cobro de la deuda, y toda información obtenida será utilizada a tal fin. La presente comunicación proviene de un agente de cobro de deudas.

SEE THE FOLLOWING PAGE FOR IMPORTANT CONSUMER INFORMATION

VALVOD-CS  A-01-VSA-AM-14173-41   2 of 3 PAGES

**Validation of Debt**

**January 12, 2012**

**Scott Mc Mahon**

LVNV Funding LLC currently owns account number ███3231.  The account was previously sold by Nicor Gas on or about 09-23-2011 and at that time the balance on this account was $584.98. As of the date of this communication, the account balance is $584.98.  Because interest, payments, credits, fees, and/or other permissible charges can continue to cause the account balance to vary from day to day, you should contact us at 1-866-464-1187 to determine the exact balance.

SEE THE FOLLOWING PAGE FOR IMPORTANT CONSUMER INFORMATION

# PRIVACY NOTICE

This Privacy Notice is being given on behalf of each of the following related companies (the "Sherman Companies"). It describes the general policy of the Sherman Companies regarding the personal information of customers and former customers.

| | | |
|---|---|---|
| Anson Street LLC | Limestone Asset Management LLC | SFG REO, LLC |
| Ascent Card Services II LLC | LVNV Funding, LLC | Sherman Acquisition II Limited Partnership |
| Ascent Card Services, LLC | PYOD LLC | Sherman Acquisition L.L.C. |
| Ashley Funding Services LLC | Resurgent Capital Services L.P. | Sherman Acquisition Limited Partnership |
| Granite Asset Management LLC | Resurgent Capital Services PR LLC | |

**Information We May Collect.** The Sherman Companies may collect the following personal information: (1) information that we receive from your account file at the time we purchase or begin to service your account, such as your name, address, social security number, and assets; (2) information that you may give us through discussion with you, or that we may obtain through your transactions with us, such as your income and payment history; (3) information that we receive from consumer reporting agencies, such as your creditworthiness and credit history, and (4) information that we obtain from other third party information providers, such as public records and databases that contain publicly available data about you, such as bankruptcy and mortgage filings. All of the personal information that we collect is referred to in this notice as "collected information".

**Confidentiality and Security of Collected Information.** At the Sherman Companies, we restrict access to collected information about you to individuals who need to know such collected information in order to perform services in connection with your account. We maintain physical safeguards (like restricted access), electronic safeguards (like encryption and password protection), and procedural safeguards (such as authentication procedures) to protect collected information about you.

**Sharing Collected Information with Affiliates** From time to time, the Sherman Companies may share collected information about customers and former customers with each other in connection with administering and collecting accounts to the extent permitted under the Fair Debt Collection Practices Act.

**Sharing Collected Information with Third Parties.** The Sherman Companies do not share collected information about customers or former customers with third parties, except as permitted in connection with administering and collecting accounts under the Fair Debt Collection Practices Act.

030211

# HINSHAW

## & CULBERTSON LLP

ATTORNEYS AT LAW
222 North LaSalle Street
Suite 300
Chicago, IL 60601-1081

312-704-3000
312-704-3001 (fax)
www.hinshawlaw.com

August 13, 2012

**VIA FACSIMILE**

Ms. Tiffany Hardy
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, IL 60603

     Re:   McMahon v. LVNV

Dear Tiffany:

     We make the following settlement offer on behalf of all defendants ("Defendants") in this case.

     This letter is for settlement purposes only. Defendants do not admit any liability to Plaintiff McMahon and make the settlement offer below solely to avoid the expense and inconvenience of litigation. The following settlement offer is to conclusively resolve all claims that McMahon has against Defendants arising from or related to any attempts to collect a debt from McMahon.

     Defendants agree to pay $1,000 to the Plaintiff for all damages and individual claims against all Defendants, or any related entity, provided that the class claims are dismissed without prejudice and that no appeal of any order in this case is made.

     Defendants agree to pay all cost related to the individual claims of Plaintiff in this case.

     Defendants agree to pay all reasonable attorney fees related to the individual claims of Plaintiff in this case in an amount as agreed by the parties or as determined by the Court.

     The offer made to the plaintiff in this letter fully satisfies the claims and provides plaintiff with all the relief to which plaintiff as an individual would be entitled were plaintiff to prevail in this lawsuit. To the extent that the offer extended does not do so, Defendants hereby offer to provide the plaintiff with any other reasonable relief that is determined by the Court to be necessary to fully satisfy all of the individual claims that are or that could have been asserted by the plaintiff in the lawsuit.

Ms. Tiffany Hardy
August 13, 2012
Page 2

Please advise whether plaintiff accepts the settlement offer in this letter so that we may arrange for payment. We are available to discuss the offer in this letter at any time.

Very truly yours,

HINSHAW & CULBERTSON LLP

Nabil G. Foster
nfoster@hinshawlaw.com

NGF:

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case Number: |
| v. | Judge: |
| ASSET ACCEPTANCE, LLC, a Delaware limited liability company, | |
| Defendant. | |

## COMPLAINT FOR CIVIL PENALTIES, INJUNCTIVE
## AND OTHER RELIEF

Plaintiff, the United States of America, acting upon notification and authorization to the

Attorney General by the Federal Trade Commission ("Commission"), by its undersigned

attorneys, for its Complaint, alleges as follows:

### JURISDICTION AND VENUE

1.       This is an action arising under Sections 5(a), 5(m)(1)(A), 13(b), and 16(a) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a);

the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x; and the Fair Debt Collection

Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, to obtain monetary civil penalties, a

permanent injunction, restitution, disgorgement, and other equitable relief for Defendant's

violations of Section 5 of the FTC Act, the FCRA, and the FDCPA.

1

SHORT APPENDIX 34

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and under 15 U.S.C. §§ 45(a)(1), 45(m)(1)(A), 53(b), 1681s, and 1692*l*.

3. Venue is proper in the United States District Court for the Middle District of Florida under 28 U.S.C. §§ 1391(b)-(c), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. This action is brought by the **United States of America** on behalf of the **Federal Trade Commission**. The Commission is an independent agency of the United States government given statutory authority and responsibility by the FTC Act, 15 U.S.C. §§ 41-58. The Commission is charged, *inter alia*, with enforcing Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce; the FCRA, 15 U.S.C. §§ 1681-1681x, which imposes duties upon consumer reporting agencies and those who furnish information to a consumer reporting agency or use information obtained from a consumer reporting agency; and the FDCPA, 15 U.S.C. §§ 1692-1692p, which imposes duties upon debt collectors.

## DEFENDANT

5. **Asset Acceptance, LLC** ("Asset," or "Asset Acceptance"), is a Delaware limited liability company with its principal place of business located at 28405 Van Dyke Avenue, Warren, Michigan 48903. It operates four call centers, one of which is located at 2840 South Falkenburg Road, Riverview, Florida 33578. Asset Acceptance is a wholly-owned subsidiary of Asset Acceptance Capital Corp. At all times relevant to this Complaint, Asset Acceptance has transacted business in this District.

2

6.   Asset Acceptance is a "debt collector" as defined in Section 803(6) of the FDCPA 15 U.S.C. § 1692a(6). As part of its debt collection activities, Asset Acceptance furnishes information to consumer reporting agencies. As such, Asset Acceptance is a person or entity subject to Section 623 of the FCRA, 15 U.S.C. § 1681s-2, which imposes a series of duties and prohibitions upon any person or entity that furnishes information to a consumer reporting agency.

7.   The term "consumer" as used in this Complaint means any natural person obligated or allegedly obligated to pay any debt, as "debt" is defined in Section 803(5) of the FDCPA, 15 U.S.C. § 1692a(5).

## COMMERCE

8.   At all times material to this Complaint, Asset Acceptance has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS PRACTICES

### Background on Defendant's Collection Practices

9.   Colloquially known as a "debt buyer," Asset Acceptance purchases and collects on portfolios of charged-off consumer debts from credit originators such as credit card issuers, consumer finance companies, health clubs, and telecommunications and utilities providers. As of September 30, 2010, Asset Acceptance held more than 34 million individual accounts with an original value of more than $42 billion, purchased for an aggregate of 2.54% of face value.

10.   Asset Acceptance specializes in purchasing and collecting on portfolios of older accounts that have previously been placed with one or more third party collectors and are more

3

than 360 days past due. Its strategy for successful collection of such debts includes pursuing consumers for ten years or longer.

11.   Asset typically receives the portfolio account data from sellers in electronic databases. Although the data provided varies by portfolio, it typically includes the consumer account holder's name, last known address and telephone number, the account number and balance (including any interest and fees), the last payment date and/or the charge-off date, and, if known, the account holder's Social Security number. Some portfolios may include a significant number of accounts with no Social Security numbers, while other portfolios may include a significant number of accounts with inaccurate addresses. The portfolio account data does not include account documents such as contracts signed by the consumer or monthly billing statements.

12.   Asset Acceptance's contracts with portfolio sellers include representations and warranties regarding the validity and integrity of the account information it purchases. Such representations and warranties vary with the portfolio seller and the portfolio purchased. In some instances, however, the contracts specifically disclaim the warranties about the accuracy of the account data. For example, a contract to purchase debts from a major national retailer contains the following disclaimer: "Seller has not represented, warranted, or covenanted the number, nature, accuracy, completeness, enforceability or validity of any accounts or accounts [sic] information." In other instances, contracts may warrant the accuracy of only certain information or specify that some of the data may be inaccurate (e.g., contracts for certain telecommunications portfolios stating that the addresses in the account data may not be correct).

4

Case 8:12-cv-00182-JDW-EAJ   Document 18   Filed 11/20/2013   Page 5 of 30   Page

13.     Individual account documents such as credit applications and account statements that may substantiate the portfolio's data do not exist for some portfolios or for some accounts within a portfolio.  Documents are less likely to be available for accounts in portfolios of older debt, portfolios from credit originators that have gone out of business, or portfolios purchased from other debt buyers (as distinguished from credit originators).  Asset advises its collectors that documents are likely unavailable for accounts with charged-off dates older than seven years.

14.     Although Asset does not usually choose to acquire account documents with a portfolio purchase, Asset's contracts with credit originators allow Asset to order a small number or percentage of available documents for free for a short period of time.  After that, Asset must pay the portfolio's seller for additional account documents, if they are available.  That document fee can range from $5 to as much as $55 per item.  It can take as long as three to six months for Asset to receive documents ordered from a credit originator.

15.     After purchasing a portfolio, Asset loads the new portfolio's data into its collection system, updates consumers' address information by cross-referencing account data with a national change-of-address database, sends initial collection notices to consumers, and reports eligible accounts to the national consumer reporting agencies.  Thirty days after sending the initial notice to consumers, Asset assigns accounts to account representatives who attempt to collect the debts by contacting consumers directly by telephone.  Through available commercial databases, including credit reporting databases, Asset routinely obtains new address and contact information about consumers it cannot locate (this process is known as "skip-tracing").

5

16.     Asset's electronic collection system provides account representatives with information about the debt, including the charge-off date, whether account documents are available, and, if so, whether they are in-house or must be ordered from the creditor. The system also indicates whether Asset has determined that the debt is past the statute of limitations. Asset trains its account representatives to document in its electronic system each contact, or attempted contact, with a consumer.

### Defendant's Notice to Consumers of Reporting Negative Information to Consumer Reporting Agencies

17.     The initial collection notice Asset sends to consumers typically discloses that Asset may report information about the consumer to consumer reporting agencies. Section 623(a)(7) of the FCRA requires that this disclosure be provided to consumers no later than thirty days after Asset reports negative information about the consumer to a consumer reporting agency.

18.     Some initial collection notices with the required FCRA disclosure are returned to Asset as undeliverable. In numerous instances, these notices are not re-mailed to consumers. As a result, in numerous instances consumers whose initial collection notices are returned to Asset do not receive the disclosure required by Section 623(a)(7) of the FCRA.

19.     Many consumers who do not receive the initial disclosure from Asset are unaware that Asset is furnishing negative information about them to consumer reporting agencies. Notice of the debt and that Asset is reporting it is particularly important when debt buyers like Asset are involved. Because Asset purchased the consumers' debt after it was in default, consumers have no idea who Asset is or that they allegedly owe Asset any money. Additionally, where Asset

6

purchases older debt, consumers are less likely to know about or remember a defaulted

obligation, especially if the debt has not previously been reported to a consumer reporting

agency. Moreover, where Asset has identified the wrong person as the account holder, either

because of errors in the original data or because of inaccuracies introduced through skip-tracing,

consumers who do not receive the initial disclosure have no idea that negative information is

being reported about them.

20.     Some consumers who do not receive an initial notice from Asset first learn that the

alleged debt appears on their credit report when they apply for new credit, such as a mortgage or

auto loan. In order to obtain credit, some consumers who question the validity of the debt may

pay it, even if they believe they do not owe it, because disputing the debt can be a lengthy process

without guaranteed results. Other consumers may pay higher interest rates or fees for credit, or

may be denied credit.

### Defendant's Handling of Written Disputes Sent Within 30 Days of the Initial Notice

21.     The initial collection notice sent to consumers by Asset includes the name of the

original creditor, the original account number, and the balance past due. Asset uses the

information loaded into its collection system to generate the initial collection notice.

22.     Some consumers who receive an initial collection notice from Asset send Asset,

within thirty days of receipt of Asset's initial communication, a written notice disputing the debt.

Section 809(b) of the FDCPA requires that debt collectors who receive such a written dispute

cease collecting the debt "until the debt collector obtains verification of the debt" and mails the

7

verification to the consumer. Asset temporarily stops collection action on the debt after it receives such a dispute.

23. Asset sends consumers who dispute the debt as described in Section 809(b) of the FDCPA a form letter stating, "Enclosed please find an account statement prepared with information provided to us by the prior creditor." Attached to the form letter is a form document titled "debt validation." Asset generates the information in the form from the portfolio data it purchased and loaded into its collection system – the same information that was the basis for the initial collection notice. The debt validation form includes the name of the original creditor, the original account number, and the balance past due, as well as the consumer's name, address and the last four digits of his or her Social Security number. Asset resumes collection activity on the debt once the form letter is mailed to the consumer.

24. Asset sends the debt validation form to consumers who dispute the validity of the debt regardless of the nature or specifics of the consumer's dispute. In most cases, Asset does not obtain additional information about the debt from the original creditor or any other source or take other steps to reasonably investigate the consumer's dispute. Providing the consumer with the same information from the same database is not obtaining "verification of the debt" for purposes of Section 809 of the FDCPA.

### Defendant's Repeated Calls to Third Parties

25. In the course of attempting to collect a debt, in numerous instances Asset collectors telephone individuals who are not the consumers who allegedly owe the debts that Asset is attempting to collect. Asset identifies these wrong parties' phone numbers either because the

8

original account data Asset purchase is outdated and inaccurate, or because the skip-tracing databases it uses to update consumer information are inaccurate.

26. In numerous instances, individuals who repeatedly received such erroneous phone calls have complained to Asset about these calls and have informed Asset that the phone number does not belong to the debtor that Asset is seeking.

27. Even after the individual wrongly called has told Asset that it has called the wrong party, in numerous instances, Asset calls the individual repeatedly. In these calls, Asset has represented that the person called owes the debt or has information concerning the person who actually owes the debt, even though that is not the case. Asset's electronic collection system has allowed such wrong party calls even after the collector has marked the phone number as incorrect.

28. Having received notice that it has contacted the wrong party, Asset has no reasonable basis to call that telephone number again unless and until it possesses additional information showing that the telephone number belongs to the consumer who allegedly owes the debt or to a person it has reason to believe possesses location information about that consumer.

29. In other instances, Asset collectors have called the same third party multiple times to request location information about a consumer. In some cases, these calls have been made to individuals whom Asset believed were the consumer's family members or friends. In other cases, the calls were to wrong parties who did not know the consumer at all. Asset makes such calls even though the third party has not requested additional calls, and it is not reasonable for

9

Asset to believe that the third party's earlier response was erroneous or incomplete or that the third party has correct or complete location information that he or she previously did not have.

**Defendant's Practices When Collecting Debts Beyond the Statute of Limitations**

30.     Because Asset Acceptance regularly collects older debt, and because its business strategy includes holding the debt it purchases for several years, a large percentage of the individual accounts it collects are past the statute of limitations.

31.     The statute of limitations for any given debt can vary from as short as two to three years to as long as fifteen or more years, and depends on several factors, including the date that the debt was last paid or went into default, the law governing the limitations period for the type of debt (e.g., telecommunications, credit card, health club, etc.), whether the debt is based on an oral or written contract, and whether the debt is the result of a judgment. A debt that is past the statute of limitations can be revived in many states if the consumer either makes a payment on the debt or states, in writing, an intention to pay it.

32.     A past-statute debt remains a valid obligation owed by the consumer in every state except Mississippi and Wisconsin. Consumers, however, have a dispositive affirmative defense to any legal action initiated to collect a past statute debt.

33.     Asset tracks the date that it believes any given account will go past the statute of limitations. Collectors are trained how to collect past-statute debts, and are taught that the debt will be revived if the consumer makes a partial payment on such a debt. When a consumer cannot pay a debt in full, but can pay something, Asset will enter into a payment plan with that consumer.

10

34.     Many consumers do not know if the accounts that Asset is attempting to collect are beyond the statute of limitations.  Consumers also do not realize that making a partial payment on a debt, or making a written promise to pay will, in many instances, revive the debt.  When Asset contacts consumers to collect on a debt, many consumers believe they could experience serious negative consequences, including being sued, if they fail to pay the debt.  Similarly, many consumers believe that making a partial payment on a debt in response to Asset's collection efforts is a positive action that can avert the negative consequences of nonpayment.  If consumers knew, in connection with a past-statute debt, that Asset had no legal means to enforce collection of the debt, or understood that making a partial payment or a written to promise to pay would revive it, some consumers would likely choose not to make a payment or a written promise to pay.

### Defendant's Handling of Consumer Disputes

35.     Asset Acceptance routinely receives written and telephonic complaints from consumers who state they do not owe the debt that Asset Acceptance is attempting to collect. Complaints include claims that the debt that Asset seeks to collect does not belong to the individual that Asset has contacted, that the debt is the result of fraud or identity theft, or that the debt has already been paid.

36.     Notwithstanding the nature of the consumer's dispute, Asset typically requires disputing consumers to provide evidence substantiating claims that they do not owe the debt.  For example, in numerous instances Asset requires consumers who claim that a debt is not theirs to send in a police report or a notarized affidavit swearing that the debt was the result of fraud.

11

These consumers, who in many instances have simply been wrongly identified as debtors by Asset, may have no reason to believe that they are victims of fraud or identity theft, and are likely unwilling or unable to secure a police report or sign a sworn statement claiming otherwise.

37.    Even consumers who do claim that the debt is the result of fraud or identity theft may be unable to provide a police report or a notarized statement, especially if the debt is very old or the fraud occurred elsewhere.  Police may be unwilling to take a report regarding fraudulent reporting of debts that are many years old or originated out of state, and many consumers cannot freely or easily obtain a notary's services.  Similarly, consumers who assert that they previously paid a debt may not be able to provide Asset with a cancelled check or a "payment in full" letter, especially if the alleged debt is many years old and records have been lost or destroyed.  If consumers do not provide the requested documentation, Asset considers the dispute resolved and resumes its collection efforts.

38.    Asset does not take independent steps to verify the accuracy of disputed account information.  Even when the original creditor has documents available, Asset does not routinely purchase them.  And even when such documents have been purchased and are available for collectors to review, in numerous instances collectors do not review the documents during the course of a typical collection call.  Collectors are expected or strongly encouraged to make at least 200 collections calls every day, leaving them with limited time and incentive to respond to specific consumer disputes and review scanned images of account documents.

39.    Additionally, in numerous instances, collectors do not routinely review the original account data to see if account information such as the consumer's Social Security number,

12

address or telephone number was obtained from the original creditor or merely updated via commercial databases. The information obtained from these databases is not always accurate or current. Individuals with names the same as or similar to debtors in Asset's database may be wrongly identified or individuals whose phone numbers or addresses were previously associated with one of Asset's debtors may be wrongly targeted. These individuals are erroneously subjected to collection efforts.

40.     When Asset continues to collect on debts disputed by consumers without adequately investigating the consumers' disputes, it lacks a reasonable basis for such continued collection. In many instances consumers are harmed by Asset's ongoing collection efforts on debts that they do not owe. These consumers suffer impaired credit, ongoing collection calls, and even lawsuits.

### Defendant's Handling of Disputes Received from Consumer Reporting Agencies

41.     Asset Acceptance regularly and in the ordinary course of business furnishes information about its transactions or experiences with its consumers to one or more consumer reporting agencies.

42.     In numerous instances, consumers have notified consumer reporting agencies that Asset-related account information appearing on their credit reports is wrong. The consumer reporting agencies forward Asset Acceptance most such disputes in an electronic format, through automated consumer dispute verification ("ACDV") forms. Asset received more than 500,000 ACDVs each year in 2008 and 2009.

13

43.     Pursuant to Section 623(b)(1) of the FCRA, Asset Acceptance, as a furnisher of information to consumer reporting agencies, is required to conduct a reasonable investigation of the disputed account information upon receipt of an ACDV from a consumer reporting agency.

44.     Asset processes many ACDVs through "batch processing," an automated system in which certain "identifiers" in Asset's electronic account records are automatically compared with the information provided on the ACDV forms. When the Social Security number and consumer name on the ACDV match the information in Asset's database, Asset reports to the consumer reporting agency that it has verified the disputed information. In addition, many ACDVs that are batch processed have more information about the consumers' written disputes to the consumer reporting agencies in a generalized "comments" field. Asset does not review these comments for ACDVs that it batch processes.

45.     The batching process of comparing a consumer's name and Social Security number often does not adequately respond to the consumer's dispute and is not a reasonable investigation. Because Asset originally reported the consumer's name and Social Security number to the consumer reporting agencies, in numerous instances these identifiers match. Asset does not investigate the particular merits of the consumer's claim by, for example, reviewing individual account documents, contacting the original portfolio seller to verify the accuracy of the information, asking the consumer reporting agency for more information, or reviewing its own internal notes.

46.     Asset ACDV "specialists" individually review some ACDV disputes, including some classified by the consumer reporting agencies as involving claims of fraud, identity theft, or

14

"paid prior." Such individual review is limited, since Asset employs only 14 to 20 ACDV specialists and expects them to process at least 18-20 ACDVs per hour.

47. To investigate some ACDV disputes classified by consumer reporting agencies as involving fraud or identity theft allegations, Asset sends a letter to the consumer requesting proof of fraud or identity theft. Similarly, Asset may seek to investigate some consumer disputes by reviewing account documents. If such documentation is not available internally, Asset may try to order documents from the original creditor. When available, it can take up to six months for Asset to obtain the requested documents. Likewise, in numerous instances, it can take several weeks for Asset to receive and review documents it requested from consumers. In these circumstances, Asset is unable to complete its investigation in the time allowed for investigations by Sections 623(b)(2) and 611(a)(1) of the FCRA. For these ACDVs, Asset marks the negative information as disputed but continues to report it. Because Asset has not completed its investigation and therefore cannot at that time reasonably verify the information it reported to the CRA, Section 623(b)(1)(E) of the FCRA requires that Asset modify, delete, or permanently block the information.

48. Consumers are harmed by Asset's inadequate investigation of ACDV disputes. Many consumers have been denied credit or charged higher rates or fees for credit because Asset continues to report inaccurate negative information to their credit files.

SHORT APPENDIX 48

## Portfolios with Suspect Account Data

49.     Asset relies on the credit originator's contractual representations and warranties about the accuracy and validity of the account data it purchases when it initiates collection on new portfolios. In some instances, however, Asset learns that an acquired portfolio contains a significant amount of unreliable account data. For example, Asset may learn that some portfolios have inaccurate Social Security numbers or other faulty data that leads to the mistaken identification of debtors. In other instances, a pattern of similar consumer disputes regarding accounts within a particular portfolio alerts Asset to potential problems with the business practices of the original creditor and the validity of the credit agreement establishing the debt. In addition, some portfolios may be missing Social Security numbers, addresses, or other identification information, causing Asset to augment the data it received from the portfolio seller with information from commercially available databases. In these instances, it is not reasonable for Asset to continue to rely solely on the creditor's contractual representations and warranties about the accuracy of the account data.

50.     In particular, Asset has reason to doubt the reliability of some account data purchased from Bally Total Fitness. Many Bally accounts lack Social Security numbers or include incorrect Social Security numbers. Many consumers have disputed Bally's debts that Asset attempts to collect, claiming that Asset is dunning the wrong person, or that they did not agree to contract with Bally for a monthly service, but rather signed up for a free trial membership or cancelled the contract. This pattern of incomplete or erroneous data coupled with

16

numerous disputes calls into question the validity of the account information on which Asset relies to collect these debts.

51. Asset's policies and practices regarding Bally portfolios show that Asset is aware that collecting these accounts without additional substantiation may be problematic. Asset collectors receive special training on handling certain Bally disputes. Moreover, Bally accounts are handled differently from other debts. For example, when Asset collectors call consumers about Bally accounts, the collectors have greater discretion to accept lower payments as satisfaction of the debt than would be sufficient to satisfy other types of debts.

52. Where, as in the case of collections for Bally accounts, Asset has reason to know that the initial account data purchased from a creditor is unreliable in numerous instances, Asset lacks a reasonable basis to rely solely on the original creditor's contractual warranties of accuracy when it represents to consumers that they owe debts for such accounts.

## SECTION 5 OF THE FTC ACT

53. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

## COUNT I

### Lack of Reasonable Basis

54. In numerous instances, through the means described in Paragraphs 9-52, in connection with collecting or attempting to collect debts from consumers, Asset Acceptance has

17

represented to consumers, directly or indirectly, expressly or by implication, that the debts are

valid and that consumers have an obligation to pay the debts, including but not limited to

circumstances where:

    a.    The consumer has disputed the validity or accuracy of the alleged

        debt and Asset failed to review information substantiating the

        accuracy of the debt or the identity of the debtor prior to continuing

        collection on that account; or

    b.    Asset has reason to believe that a specific portfolio of accounts

        contained unreliable data and failed to obtain and review

        information substantiating the accuracy of individual account data

        prior to collecting or attempting to collect on individual accounts in

        that portfolio.

    55.    In truth and in fact, the material representations set forth in Paragraph 54 are false

or misleading, or Asset Acceptance did not have a reasonable basis for the representations at the

time the representations were made.  Therefore, the representations set forth in Paragraph 54 are

false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the

FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Failure to Disclose

    56.    In numerous instances, through the means described in Paragraphs 9-52, in

connection with collecting or attempting to collect debts from consumers, Asset Acceptance has

18

demanded that consumers pay, in full or in part, debts that are beyond the statute of limitations. By demanding that consumers pay these debts, Asset has represented, expressly or by implication, that consumers owe these debts in the amounts demanded.

57.    Asset Acceptance has failed to disclose, or failed to disclose adequately, that, in many instances, (a) it cannot require through a lawsuit that consumers pay debts beyond the statute of limitations, and (b) if consumers make partial payments on these debts, the statute of limitations period will be renewed and Asset could again require through a lawsuit that consumers pay the total outstanding amount of these debts. These facts would be material to consumers in deciding whether to pay these debts in full or in part.

58.    Asset's failure to disclose the material information described in Paragraph 57, in light of the representations and practices in Paragraph 56, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE FAIR CREDIT REPORTING ACT

59.    The FCRA was enacted in 1970 and became effective on April 25, 1971, and has been in force since that date. In 1996, the FCRA was amended extensively by Congress. Among other things, Congress added Section 623 of the Act, which became effective on October 1, 1997.

60.    Section 621 of the FCRA, 15 U.S.C. § 1681s, authorizes the Commission to use all of its functions and powers under the FTC Act to enforce compliance with the FCRA by all persons subject thereto except to the extent that enforcement specifically is committed to some other governmental agency, irrespective of whether the person is engaged in commerce or meets any other jurisdictional tests set forth by the FTC Act.

19

61.     For purposes of Section 623(a)(7) of the FCRA, 15 U.S.C. § 1681s-2(a)(7), "negative information" means "information concerning a customer's delinquencies, late payments, insolvency, or any form of default," 15 U.S.C. § 1681s-2(a)(7)(G)(i), and the terms "financial institution" and "customer" have the same meanings as in Section 509 Public Law 106-102, 15 U.S.C. § 6809(3). 15 U.S.C. § 1681s-2(a)(7)(G)(ii).

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

## COUNT III

### Violations of Section 623(a)(1)(A)

62.     Section 623(a)(1)(A) of the FCRA prohibits furnishers of information to consumer reporting agencies from furnishing any information relating to a consumer to any consumer reporting agency if the furnisher knows or has reasonable cause to believe that the information is inaccurate.  15 U.S.C. § 1681s-2(a)(1)(A).

63.     In numerous instances, through the means described in Paragraphs 9-52, in connection with furnishing information relating to a consumer to a consumer reporting agency, Asset Acceptance has furnished such information while knowing or having reasonable cause to believe that the information was inaccurate.

64.     The acts and practices alleged in Paragraph 63 constitute violations of Section 623(a)(1)(A) of the FCRA, 15 U.S.C. §1681s-2(a)(1)(A).  Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), the acts and practices alleged in Paragraph 63 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

20

## COUNT IV

### Violations of Section 623(a)(7)

65. Section 623(a)(7) of the FCRA requires that, if any financial institution that extends credit to customers and regularly and in the ordinary course of business furnishes information to a consumer reporting agency furnishes negative information about a customer to a consumer reporting agency, the financial institution shall provide the customer with a clear and conspicuous written notice about the furnishing of such negative information no later than thirty days after the financial institution furnishes the negative information to the consumer reporting agency. 15 U.S.C. § 1681s-2(a)(7).

66. Asset Acceptance is a "financial institution" with "customers" as defined by Section 623(a)(7)(G)(ii) of the FCRA, 15 U.S.C. § 1681s-2(a)(7)(G)(ii).

67. Asset Acceptance furnishes "negative information" about its customers regarding credit extended to customers to consumer reporting agencies as "negative information" is defined in Section 623(a)(7)(G)(i) of the FCRA, 15 U.S.C. § 1681s-2(a)(7)(G)(i).

68. In numerous instances, through the means described in Paragraphs 9-52, in connection with the furnishing of negative information about its customers to consumer reporting agencies, Asset Acceptance has failed to provide its customers with the written notice required by Section 623(a)(7) no later than thirty days after furnishing the negative information to the consumer reporting agency.

69. The acts and practices alleged in Paragraphs 67-68 constitute violations of Section 623(a)(7) of the FCRA, 15 U.S.C. §1681s-2(a)(7). Pursuant to Section 621(a)(1) of the

SHORT APPENDIX 54

FCRA, 15 U.S.C. § 1681s(a)(1), the acts and practices alleged in Paragraphs 67-68 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Violations of Section 623(b)(1)

70.     Section 623(b) of the FCRA requires furnishers of information to consumer reporting agencies to conduct a reasonable investigation when the furnisher receives a notice of dispute regarding the completeness or accuracy of the reported information from a consumer reporting agency in accordance with the provisions of Section 611(a)(2) of the FCRA, 15 U.S.C. § 1681i, and to report the results of the investigation to the consumer reporting agency.  15 U.S.C. § 1681s-2(b).

71.     In numerous instances, through the means described in Paragraphs 9-52, Asset Acceptance does not conduct a reasonable investigation, or any investigation, when it receives a notice of dispute from a consumer reporting agency.

72.     The acts and practices alleged in Paragraph 71 constitute violations of Section 623(b) of the FCRA, 16 U.S.C. § 1681s-2(b).  Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), the acts and practices alleged in Paragraph 71 also constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

22

## FAIR DEBT COLLECTION PRACTICES ACT

73.     In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became

effective on March 20, 1978, and has been in force since that date. Section 814 of the FDCPA,

15 U.S.C. § 1692*l*, authorizes the Commission to use all of its functions and powers under the

FTC Act to enforce compliance with the FDCPA by any debt collector, irrespective of whether

that debt collector is engaged in commerce or meets any other jurisdictional tests set by the

FTC Act. The authority of the Commission in this regard includes the power to enforce the

provisions of the FDCPA in the same manner as if the violations of the FDCPA were violations

of a Federal Trade Commission trade regulation rule.

74.     Section 803(7) of the FDCPA defines the term "location information" as meaning a

consumer's place of abode and the consumer's telephone number at such place, or the

consumer's place of employment. 15 U.S.C. § 1692a(7).

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

### COUNT VI

#### Violations of Section 804

75.     Section 804 of the FDCPA, 15 U.S.C. § 1692b, governs the manner in which debt

collectors may communicate with any person other than the consumer for purposes of acquiring

location information about the consumer. Section 804(3) prohibits debt collectors from

communicating with any person about a consumer more than once unless requested by the person

or unless the debt collector reasonably believes that the earlier response of such person is

erroneous or incomplete and that such person now has correct or complete information.

23

76. In numerous instances, through the means described in Paragraphs 9-52, in connection with the collection of debts, Asset Acceptance, directly or indirectly, has communicated more than once with persons other than the consumer for the purpose of obtaining location information about the consumer without a reasonable belief that the earlier response of the person was erroneous or incomplete and the person then had correct or complete location information.

77. The acts and practices alleged in Paragraph 76 constitute violations of Section 804(3) of the FDCPA, 15 U.S.C. § 1692b(3). Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), the acts and practices alleged in Paragraph 76 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Violations of Section 805

78. Section 805 of the FDCPA, 15 U.S.C. § 1692c, governs communications in connection with debt collection generally. Section 805(b) specifically prohibits communications about a debt with any person other than the consumer, a consumer reporting agency, the creditor, or their attorneys except as allowed by Section 804 or with the permission of the consumer, or a court of competent jurisdiction, or as reasonably necessary to effectuate postjudgment relief.

79. In numerous instances, through the means described in Paragraphs 9-52, in connection with the collection of debts, Asset Acceptance, directly or indirectly, has communicated about a debt with persons other than the consumer, a consumer reporting agency,

24

the creditor, or their attorneys without the permission of the consumer, or as otherwise allowed
by Section 804.

80.     The acts and practices alleged in Paragraph 79 constitute violations of Section
805(b) of the FDCPA, 15 U.S.C. § 1692c(b).  Pursuant to Section 814(a) of the FDCPA,
15 U.S.C. § 1692*l*(a), the acts and practices alleged in Paragraph 79 also constitute unfair or
deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VIII

### Violations of Section 807

81.     Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors from using
any false, deceptive, or misleading representation or means in connection with the collection of
any debt.  Section 807(2)(A), 15 U.S.C. § 1692e(2)(A), specifically prohibits the false
representation of the character, amount, or legal status of any debt, while Section 807(8),
15 U.S.C. § 1692e(8), prohibits communicating or threatening to communicate to any person
credit information which is known or which should be known to be false, including the failure to
communicate that a disputed debt is disputed, and Section 807(10), 16 U.S.C. 1692(e)(10),
prohibits using false representations or deceptive means to collect or attempt to collect any debt
or to obtain information concerning a consumer.

82.     In numerous instances, through the means described in Paragraphs 9-52, in
connection with the collection of debts, Asset Acceptance, directly or indirectly, has used false,
deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA,
15 U.S.C. § 1692e, including, but not limited to, the following:

25

a.  In numerous instances, Asset Acceptance, directly or indirectly, has used false representations concerning the character, amount, or legal status of a debt, in violation of Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A);

b.  In numerous instances, Asset Acceptance, directly or indirectly, has communicated credit information to consumer reporting agencies that it knew, or should have known, to be false, in violation of Section 807(8) of the FDCPA, 15 U.S.C. § 1692e(8); and

c.  In numerous instances, Asset Acceptance, directly or indirectly, has used false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10).

83.  The acts and practices alleged in Paragraph 82 constitute violations of Section 807 of the FDCPA, 15 U.S.C. § 1692e. Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), the acts and practices alleged in Paragraph 82 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IX

### Violations of Section 809

84.  Section 809(b) of the FDCPA, 15 U.S.C. § 1692g(b), provides, *inter alia,* that if a consumer notifies a debt collector in writing, within thirty days of the consumer's receipt of the initial communication from the debt collector, that the debt is disputed, the debt collector shall

26

cease collection of the debt until the debt collector obtains and provides verification of the debt to the consumer.

85.     In numerous instances, through the means described in Paragraphs 9-52, in connection with the collection of debts, when a consumer has notified Asset Acceptance, in writing within the thirty-day period described in Section 809(a) of the FDCPA, 15 U.S.C. §1692g(a), that the debt, or a portion thereof, is disputed, Asset has failed to obtain and provide verification of the debt to the consumer and has continued to attempt to collect the debt.

86.     The acts and practices alleged in Paragraph 85 constitute violations of Section 809(b) of the FDCPA, 15 U.S.C. §1692g(b).  Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), the acts and practices alleged in Paragraph 85 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### INJUNCTION FOR VIOLATIONS OF THE FTC ACT, FCRA, AND FDCPA

87.     Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), this Court is authorized to issue a permanent injunction to ensure that Asset Acceptance will not continue to violate the FTC Act, the FCRA, and the FDCPA.

### EQUITABLE RELIEF FOR VIOLATIONS OF THE FTC ACT, FCRA, AND FDCPA

88.     Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), this Court is authorized to issue all equitable and ancillary relief as it may deem appropriate in the enforcement of the FTC Act, the FCRA, and the FDCPA, including the ability to order rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement to deprive a wrongdoer of ill-gotten gain.

27

## CIVIL PENALTIES FOR VIOLATIONS OF THE FCRA

89.     Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A), authorizes the Court to award monetary civil penalties in the event of a knowing violation, which constitutes a pattern or practice of violations.  Asset Acceptance's violations of Sections 623(a)(7) and 623(b) of the FCRA, as alleged in this Complaint, were knowing and constituted a pattern or practice of violations.  As specified by the Federal Civil Penalty Inflation Adjustment Act of 1990, 28 U.S.C. § 2861, as amended, the Court is authorized to award a penalty of not more than $2,500 per violation for violations occurring before February 10, 2009, and $3,500 per violation for violations occurring on or after that date.

90.     Each instance in which Asset Acceptance has failed to comply with the FCRA in one or more of the ways described above constitutes a separate violation of the FCRA for the purpose of assessing monetary civil penalties under section 621 of the FCRA.  Plaintiff seeks monetary civil penalties for every separate violation of the FCRA.

## CIVIL PENALTIES FOR VIOLATIONS OF THE FDCPA

91.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), and Section 814(a) of the FDCPA, 15 U.S.C. § 1692l, authorize the Court to award monetary civil penalties for violations of the FDCPA when such violations were committed with actual knowledge or knowledge fairly implied on the basis of objective circumstances as set forth in Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).  Asset Acceptance's violations of the FDCPA, as alleged in this Complaint, were made with actual knowledge or knowledge fairly implied on the basis of objective circumstances.  As specified by the Federal Civil Penalty

28

Inflation Adjustment Act of 1990, 28 U.S.C. § 2861, as amended, the Court is authorized to award a penalty of not more than $11,000 for each violation of the FDCPA before February 10, 2009, and not more than $16,000 for each violation of the FDCPA after that date.

92.    Each instance in which Asset Acceptance has failed to comply with the FDCPA in one or more of the ways described above, constitutes a separate violation of the FDCPA for the purpose of assessing monetary civil penalties.  Plaintiff seeks monetary civil penalties for every separate violation of the FDCPA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, pursuant to 15 U.S.C. §§ 45(m)(1)(A), 53(b), 1692*l*, 1681s, and the Court's own equitable powers, respectfully requests that the Court:

1.    Enter a permanent injunction to prevent future violations of the FTC Act, the FCRA, and the FDCPA by Asset Acceptance;

2.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act, the FCRA, and the FDCPA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten gains;

3.    Award Plaintiff monetary civil penalties for each violation of the FCRA and FDCPA as alleged in this Complaint; and

4.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

SHORT APPENDIX 62

Dated: Jan. 30 , 2012

Of Counsel:

ROBERT J. SCHROEDER
Director, Northwest Region

TRACY S. THORLEIFSON
JULIE MAYER
Attorneys
Federal Trade Commission
Northwest Region
915 Second Ave., Suite 2896
Seattle, WA 98174
Tel: 206-220-6350
Fax: 206-220-6366
tthorleifson@ftc.gov
jmayer@ftc.gov

Respectfully submitted,

ROBERT E. O'NEILL
U.S. Attorney for the Middle District of Florida

TONY WEST
Assistant Attorney General, Civil Division

MAAME EWUSI-MENSAH FRIMPONG
Acting Deputy Assistant Attorney General

MICHAEL S. BLUME
Director, Consumer Protection Branch

KENNETH L. JOST
Deputy Director, Consumer Protection Branch

LACY R. HARWELL, JR.
Assistant United States Attorney
Chief, Civil Division
Florida Bar Number 714623
Office of the United States Attorney for the
 Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Tel. (813) 274-6000
Fax (813) 274-6200
Randy.Harwell@usdoj.gov

SANG H. LEE
ADRIENNE E. FOWLER
Trial Attorneys, Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Tel: 202-616-0219
Fax: 202-514-8742
Adrienne.E.Fowler@usdoj.gov
Sang.H.Lee@usdoj.gov

30

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America

## DEFENDANTS

Asset Acceptance, LLC, a Delaware limited liability company

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

William C. Macleod, Kelley Drye & Warren, LLP

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  ☐ 310 Airplane | **PERSONAL INJURY**  ☐ 362 Personal Injury - Med. Malpractice | ☐ 610 Agriculture  ☐ 620 Other Food & Drug | ☐ 422 Appeal 28 USC 158  ☐ 423 Withdrawal  28 USC 157 |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 400 State Reapportionment  ☐ 410 Antitrust  ☐ 430 Banks and Banking |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws  ☐ 640 R.R. & Truck | ☐ 450 Commerce  ☐ 460 Deportation |
| ☐ 140 Negotiable Instrument  ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs.  ☐ 660 Occupational Safety/Health | **PROPERTY RIGHTS**  ☐ 820 Copyrights  ☐ 830 Patent |
| ☐ 151 Medicare Act  ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine  ☐ 345 Marine Product Liability | ☐ 370 Other Fraud  ☐ 371 Truth in Lending  ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 840 Trademark  ☐ 470 Racketeer Influenced and Corrupt Organizations  ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR**  ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY**  ☐ 861 HIA (1395ff)  ☐ 490 Cable/Sat TV  ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits  ☐ 190 Other Contract  ☐ 195 Contract Product Liability  ☐ 196 Franchise | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations  ☐ 730 Labor/Mgmt.Reporting & Disclosure Act  ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923)  ☐ 863 DIWC/DIWW (405(g))  ☐ 864 SSID Title XVI  ☐ 865 RSI (405(g)) |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation  ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS**  ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 210 Land Condemnation  ☐ 220 Foreclosure  ☐ 230 Rent Lease & Ejectment  ☐ 240 Torts to Land  ☐ 245 Tort Product Liability  ☐ 290 All Other Real Property | ☐ 441 Voting  ☐ 442 Employment  ☐ 443 Housing/ Accommodations  ☐ 444 Welfare  ☐ 445 Amer. w/Disabilities - Employment  ☐ 446 Amer. w/Disabilities - Other  ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence  Habeas Corpus:  ☐ 530 General  ☐ 535 Death Penalty  ☐ 540 Mandamus & Other  ☐ 550 Civil Rights  ☐ 555 Prison Condition | **IMMIGRATION**  ☐ 462 Naturalization Application  ☐ 463 Habeas Corpus - Alien Detainee  ☐ 465 Other Immigration Actions | ☐ 871 IRS—Third Party 26 USC 7609  ☐ 875 Customer Challenge 12 USC 3410  ☐ 890 Other Statutory Actions  ☐ 891 Agricultural Acts  ☐ 892 Economic Stabilization Act  ☐ 893 Environmental Matters  ☐ 894 Energy Allocation Act  ☐ 895 Freedom of Information Act  ☐ 900 Appeal of Fee Determination Under Equal Access to Justice  ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §§ 45 (a), 45 (m)(1)(A), 53(b), 1681 1692

Brief description of cause:
Deceptive trade practices, unlawful reporting to credit agencies, unlawful debt collection

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE  1/30/12

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

SHORT APPENDIX 64

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case Number: 8:12-CV-00182-T-27EAJ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ASSET ACCEPTANCE, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CONSENT DECREE

WHEREAS, Plaintiff, the United States of America, has commenced this action by filing the Complaint herein; Defendant, Asset Acceptance, LLC, has waived service of the Summons and Complaint; the parties have been represented by the attorneys whose names appear hereafter; and the parties have agreed to settlement of this action upon the following terms and conditions, without adjudication of any issue of fact or law, to settle and resolve all matters in dispute arising from the Complaint to the date of entry of the Decree and without Defendant admitting any of the matters alleged in the Complaint other than jurisdictional facts;

THEREFORE, on the joint motion of the Plaintiff and Defendant, it is hereby ORDERED, ADJUDGED and DECREED as follows:

SHORT APPENDIX 65

## FINDINGS

1.     This Court has jurisdiction of the subject matter and of the parties.

2.     The Complaint states a claim upon which relief may be granted against the Defendant under Sections 5(a), 5(m)(1)(A), 13(b), and 16(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a); the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681u; and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p.

3.     Venue in this district is proper under 28 U.S.C. §§ 1391(b-c) and 1395(a) and 15 U.S.C. § 53(b).

4.     The activities of the Defendant are in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

5.     For purposes of this Consent Decree ("Decree"), the definitions set forth in the FCRA, 15 U.S.C. § 1681a, and the FDCPA, 15 U.S.C. § 1692a, shall apply.

6.     Defendant has entered into this Decree freely and without coercion. Defendant further acknowledges that it has read the provisions of this Decree and is prepared to abide by them.

7.     Plaintiff and Defendant, by and through their counsel, have agreed that the entry of this Decree resolves all matters of dispute between them arising from the Complaint in this action, up to the date of entry of this Decree.

8.     Defendant has not admitted any of the allegations of wrongdoing set forth in the Complaint, and entry of this Decree is not an admission of any such allegations of wrongdoing or

SHORT APPENDIX 66

violation of law. Nonetheless, Defendant stipulates and agrees to entry of this Decree in order to settle and resolve these disputes.

9.    All parties waive all rights to seek appellate review or otherwise challenge or contest the validity of this Decree. Defendant further waives and releases any claim it may have against the Federal Trade Commission, its employees, representatives, or agents.

10.    Defendant agrees that this Decree does not entitle it to seek or obtain attorneys' fees as a prevailing party under the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended by Pub. L. 104-121, 100 Stat. 847, 863-64 (1996), and further waives any right to attorneys' fees that may arise under said provision of law.

11.    This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

12.    Entry of this Decree is in the public interest.

## DEFINITIONS

For purposes of this Decree, the following definitions shall apply:

1.    **"Commission"** or **"FTC"** means the Federal Trade Commission.

2.    **"Defendant"** means Asset Acceptance, LLC, and its successors and assigns.

3.    **"Plaintiff"** means the United States of America.

4.    **"Clearly and prominently"** means:

a.    that information presented in writing shall be in a type size and location sufficient for an ordinary consumer to read and comprehend it, and shall be disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary

consumer. If the information is contained in a multi-page print document, the disclosure shall appear on the first page; and

b.      that information presented orally shall be disclosed in a volume, cadence, and syntax sufficient for an ordinary consumer to hear and comprehend.

5.      **"Debt collection"** means any activity the principal purpose of which is to collect, or attempt to collect, directly or indirectly, debts owed, or asserted to be owed, or due.

6.      **"Debt"** means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

# ORDER

## I.      CIVIL PENALTY

**IT IS ORDERED** that:

A.      For a civil penalty for violations of the FCRA and the FDCPA, Defendant shall pay to the Plaintiff, pursuant to Section 621(a) of the FCRA, 15 U.S.C. § 1681s(a), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), the amount of two million five hundred thousand dollars ($2,500,000).

B.      Defendant shall make the payment required by Part A on or before the tenth day following entry of this Decree. Such payment shall be made by electronic fund transfer in accordance with procedures specified by the Office of Consumer Protection Litigation, Civil

SHORT APPENDIX 68

Division, United States Department of Justice, Washington, D.C. 20530.

C.     In the event of any default in payment, which default continues for ten (10) days beyond the due date of payment, the entire unpaid amount, together with interest, as computed pursuant to 28 U.S.C. § 1961 from the date of default to the date of payment, shall immediately become due and payable.

D.     The judgment amount set forth in Part A represents a civil penalty owed to the United States Government, is not compensation for actual pecuniary loss, and, therefore, is not subject to discharge under the Bankruptcy Code pursuant to 11 U.S.C. § 523(a)(7).

E.     Proceedings initiated under this Part are in addition to, and not in lieu of, any other civil or criminal penalties that may be provided by law, including any other proceedings the Plaintiff may initiate to enforce this Decree.

## II.     INJUNCTION AGAINST VIOLATIONS OF THE FTC ACT

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees, and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from taking the following actions:

A.     Making any material misrepresentation, expressly or by implication, to collect or to attempt to collect a debt or to obtain information concerning a consumer; and

B.     Making any material representation, expressly or by implication, that a consumer

Consent Decree, Page 5 of 28

owes a debt or as to the amount of a debt, unless, at the time of making the representation,

Defendant has a reasonable basis for making such representation.

*Provided that*, in those instances in which Defendant (a) is required by Part III.A or B of this

Decree to conduct an investigation, (b) has done so, and (c) has reasonably concluded that the

information on which Defendant relies to collect or attempt to collect the debt is accurate and

complete, the conclusions of the investigation shall constitute a reasonable basis.

*Provided further* that, in making representations concerning a debt, Defendant can reasonably

rely on information from the original creditors of the debts to substantiate the accuracy and

completeness of the debts in the absence of a reasonable indication that such information is

incomplete, inaccurate, unreliable, or does not substantiate the claim. A "reasonable indication"

shall take into account the reliability and source of the information, but shall not require any of

the Part III investigational procedures outlined below, other than taking into account the

reliability and source of the information.

## III. DUTY TO CONDUCT A REASONABLE INVESTIGATION

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants,

employees, and all persons or entities in active concert or participation with any of them who

receive actual notice of this Decree by personal service or otherwise, whether acting directly or

through any business entity, corporation, subsidiary, division, affiliate, or other device, in

connection with collecting or attempting to collect debts, are hereby permanently restrained and

enjoined from failing to take the following actions:

      A.     In each instance in which a consumer, at any time, questions, disputes, or

challenges the accuracy or completeness of the information on which Defendant is relying to make any representation that the consumer owes a debt or as to the amount of a debt; or a person acting reasonably would consider the information on which Defendant is relying to make any representation regarding either the existence or the amount of a debt to be facially unreliable, materially inaccurate, or missing material information; Defendant shall either

    1.    Close the account, permanently terminate collection efforts with respect to the specific debt, and request deletion of that item of information from the . . . consumer's credit reporting file, or

    2.    Report that item of information as disputed to any consumer reporting agency to which the information was previously reported and conduct and complete a reasonable investigation into the accuracy or completeness of such information. If such disputes are raised during a telephone call with the consumer, Defendant may reasonably provide responsive information or pose reasonable questions to the consumer, in a manner that complies with applicable law, in an effort to resolve any such disputes raised by the consumer. If Defendant does not substantiate that the consumer owes the debt following a reasonable investigation, Defendant shall close the account, permanently terminate collection efforts with respect to the specific debt, and request deletion of that item of information from the consumer's credit reporting file. If Defendant does not complete its reasonable investigation within thirty (30) days from receipt of the dispute, Defendant shall request deletion of that item from the consumer's

SHORT APPENDIX 71

credit reporting file and cease collection activities until the reasonable

investigation is complete.

*Provided that,* if as a result of its decision to permanently terminate collection efforts or if

following a reasonable investigation, Defendant does not substantiate that the consumer owes the

debt, Defendant shall not sell the debt or provide it to any other corporate entity other than the

entity from which it acquired the debt.

*Provided further* that nothing in Parts II and III shall require Defendant to conduct an

investigation into the accuracy or completeness of the information on which Defendant is relying

if Defendant determines that the consumer's question, dispute, or challenge is frivolous or

irrelevant or, to the extent no new material evidence or information has been provided, has

already been the subject of a reasonable investigation. Notwithstanding any other provision in

this Decree, the Decree shall not restrict or prohibit Defendant from complying with any federal

or state law requirements, so long as such state law requirements are not inconsistent with federal

law.

*Provided further* that if a consumer initiates contact with Defendant by any means,

Defendant may respond to the consumer prior to the completion of the investigation.

B.      In each instance where a person acting reasonably would consider the information

in a specific portfolio of accounts, on which Defendant is relying to make any representation to a

consumer, to be facially unreliable, materially inaccurate, or missing material information,

Defendant shall terminate collection efforts on each account in the portfolio until it conducts a

reasonable investigation into the accuracy or completeness of the information relating to that

Consent Decree, Page 8 of 28

account. The factors that Defendant must consider in evaluating the material accuracy or completeness of the information on which Defendant relies include, but are not limited to, whether 1) other accounts in a particular portfolio have been disputed by consumers for similar reasons at disproportionately high rates; 2) documents from the original creditor (excluding affidavits) are not available; 3) because of age, missing data, or other characteristics, a disproportionately high number of accounts in a particular portfolio have been supplemented by data from third-party sources; or 4) any other information learned about a particular portfolio's credit originator and its methods of doing business calls into question the accuracy or completeness of the information.

*Provided that*, if, following a reasonable investigation, Defendant cannot reasonably verify the accuracy or completeness of the account data in a particular portfolio, Defendant may not sell, or provide to any other corporate entity, the portfolio or individual accounts within the portfolio other than the entity from which it acquired the debt.

C.    For purposes of this Decree, a "reasonable investigation" shall mean an investigation in which Defendant objectively evaluates and weighs the relevant information and circumstances, which may include, among other things:

1.    the reliability of the information on which Defendant relies in collecting or attempting to collect the debt, including the credibility of the source of that information;

2.    the accuracy and completeness of any information from the credit originator, taking into account the reliability and source of the information;

Consent Decree, Page 9 of 28

3.      the accuracy and completeness of any information Defendant has obtained

or may obtain from third party sources, including data aggregators, brokers or

consumer reporting agencies;

4.      the strength and credibility of any information provided by the consumer

questioning, disputing, or challenging the accuracy or completeness of such

information or otherwise obtained by Defendant and the responsiveness of the

consumer to reasonable requests for information;

5.      the nature and frequency of disputes received by Defendant about accounts

within the same portfolio;

6.      with respect to information obtained from the consumer, the methods used

by Defendant to collect the information, which shall be in compliance with

applicable laws; and

7.      any other reliable information that confirms, contradicts, or calls into

question the accuracy or completeness of such information.

D.      Subsections A, B, and C of this Part do not affect the Defendant's obligations to

comply with all applicable provisions of the FDCPA or FCRA. A "dispute" under this Part III

does not necessarily constitute a "dispute" for FDCPA or FCRA purposes.

## IV.     REQUIRED DISCLOSURES

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants,

employees, and all persons or entities in active concert or participation with any of them who

receive actual notice of this Decree by personal service or otherwise, whether acting directly or

SHORT APPENDIX 74

through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from failing to take the following actions:

A.     At the time of Defendant's initial communication with a consumer in connection with the collection of a debt, for any debt that the Defendant knows or should know may be beyond the applicable statute of limitations, Defendant shall make the disclosure(s) set forth in Part IV.D, below, in its validation notice or other written communication containing the information required by Section 809 of the FDCPA, 15 U.S.C. § 1692g.

B.     Subsequent to its initial communication with a consumer, for any debt where Defendant comes into possession of information from which the Defendant knows or should know that the debt has passed the applicable statute of limitations, Defendant shall, in its next communication with the consumer, whether oral or written, make the disclosure(s) set forth in Part IV.D, below.

*Provided that* Defendant may satisfy this provision by making the disclosure(s) set forth in Part IV.D, below, on or before the date that the debt has passed the applicable statute of limitations.

C.     In addition to making the applicable disclosure(s) required by Part IV.A or IV.B, above, in any subsequent communication in connection with collecting a debt, Defendant shall make the disclosure(s) set forth in Part IV.D, below, if failure to do so would be likely to mislead a consumer acting reasonably under the circumstances about the Defendant's ability or intent to take legal action to collect the debt and the consumer's rights in connection with such legal

Consent Decree, Page 11 of 28

action. Factors to consider when assessing whether the net impression of the communication is likely misleading to a consumer acting reasonably under the circumstances include, but are not limited to: 1) the amount of time that has lapsed since Defendant last communicated with the consumer; 2) the form of the Defendant's communication with the consumer; 3) the content of Defendant's communication with the consumer; 4) the context of Defendant's communication with the consumer; and 5) any information learned from the consumer.

*Provided that,* for purpose of this provision, if one-hundred eighty (180) days or more has elapsed since Defendant previously communicated with the consumer in connection with collecting a debt, then there shall exist a rebuttable presumption that failure to make the disclosure(s) would be likely to mislead a consumer acting reasonably under the circumstances about the Defendant's ability or intent to take legal action to collect the debt and the consumer's rights in connection with such legal action.

*Provided further that,* after one (1) year has lapsed after the date of entry of this Order, any competent and reliable evidence (including appropriate and adequate reports, studies, surveys, or other extrinsic evidence) relating to whether failure to make a subsequent disclosure(s) required under Part IV.C. of this Order is likely to mislead a consumer acting reasonably under the circumstances about the Defendant's ability or intent to take legal action to collect the debt and the consumer's rights in connection with such legal action shall constitute a change in circumstances, providing a party good cause to file a motion under Fed. R. Civ. P. 60(b) to modify or amend the terms of Part IV.C.

D.     As required by Parts IV.A, B, and C, above, Defendant shall make the following

SHORT APPENDIX 76

disclosure(s), clearly and prominently, as applicable:

  1.  When collecting on debt where the debt is not past the date for

obsolescence provided for in Section 605(a) of the Fair Credit Reporting Act, 15

U.S.C. § 1681c:

    •  The law limits how long you can be sued on a debt. Because of the

    age of your debt, we will not sue you for it. If you do not pay the

    debt, we [Asset Acceptance, LLC], may [continue to] report it to

    the credit reporting agencies [as unpaid].

  2.  When collecting on debt where the debt is passed the date for

obsolescence provided for in Section 605(a) of the Fair Credit Reporting Act, 15

U.S.C. § 1681c:

    •  The law limits how long you can be sued on a debt. Because of the

    age of your debt, we will not sue you for it, and we will not report

    it to any credit reporting agency.

  E.  Defendant shall not make any representation or statement, or take any other action

that interferes with, detracts from, contradicts, or otherwise undermines the disclosures required

in Part IV.D, above.

  F.  Defendant shall be deemed to have complied with the disclosure requirements of

Part IV A, B, and C if Defendant makes a disclosure to consumers in a specific state, county, or

city that 1) is required by the laws or regulations of that jurisdiction, 2) complies with those laws

or regulations, and 3) is substantially similar to the disclosure(s) required in Part IV.D, above.

Case: 13-3504   Document: 13   Filed: 01/28/2013   Pages: 198

G.     For any debt where the Defendant has provided the applicable disclosure(s) required by Parts IV.A, B, or C to the consumer,

1.     Defendant shall not initiate any arbitration or legal action to recover on such debt;

2.     In selling, transferring, or assigning such a debt, the Defendant shall not sell, transfer, or assign with the debt any right to commence any arbitration or legal action to recover on the debt.

3.     The Defendant shall include in all contracts to sell, transfer, or assign such debt a provision that contains a clear and prominent notification to the buyer, transferee, or assignee that:

a.     Defendant is not selling, transferring, or assigning all of its rights to collect the debt; and

b.     Defendant is expressly withholding from the sale, transfer, or assignment any rights it may have to initiate any arbitration or legal action to recover on the debt.

4.     The Defendant shall provide a copy of this Order to any person to whom Defendant sells, transfers, or assigns any such debt.

H.     Nothing in this Part shall be construed to supersede or be in lieu of any other applicable requirements, including but not limited to Section 809 of the FDCPA, or any state or local statutes.

I.     Defendant shall be responsible for the requirements in Section IV forty-five (45)

Case: 13-3504 Document: 13 Filed: 01/28/2013 Pages: 198

days after entry of this Decree.

## V. FURNISHING NEGATIVE INFORMATION TO CONSUMER REPORTING AGENCIES

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees, and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from failing to provide, to any consumer about whom Defendant reports negative information to any consumer reporting agency, a written notice no later than thirty (30) days after furnishing such negative information. For purposes of this Part, Defendant shall no longer be deemed to have provided written notice if the notice is returned to Defendant as undeliverable.

## VI. INJUNCTION AGAINST FCRA VIOLATIONS

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees and all persons or entities in active concert or participation with any of them, who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, are hereby permanently restrained and enjoined from taking the following actions:

A. Furnishing information relating to any consumer to any consumer reporting agency in violation of Section 623(a)(1) of the FCRA, 15 U.S.C. § 1681s-2(a)(1).

B. Failing to investigate consumer disputes, as required by Section 623(b) of the

FCRA, 15 U.S.C. § 1681s-2(b), when consumer reporting agencies refer disputes to it pursuant to Section 611(a)(2), 15 U.S.C. § 1681i(a)(2).

C.　Failing to investigate consumer disputes received directly from consumers, as required by the Furnisher Rule, 16 C.F.R. Part 660.

D.　Failing to comply in any other respect with the FCRA.

**VII.　INJUNCTION AGAINST FDCPA VIOLATIONS**

**IT IS FURTHER ORDERED** that Defendant, and each of its officers, agents, servants, employees and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from taking the following actions:

A.　Communicating more than once with persons other than the consumer for the purpose of obtaining location information about the consumer without the person's consent or a reasonable belief that the earlier response of the person was erroneous or incomplete and that the person now has correct or complete location information, in violation of Section 804(3) of the FDCPA, 15 U.S.C. § 1692b(3);

B.　Except as provided in Section 804 of the FDCPA, 15 U.S.C. § 1692b(3), without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, communicating in connection with the collection of any debt with any person

SHORT APPENDIX 80

other than the consumer, his or her attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector, in violation of Section 805(b) of the FDCPA, 15 U.S.C. § 1692c(b). For the purpose of this Part VII, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator;

      C.     Using any false, deceptive, or misleading representation or means in connection with the collection of any debt, in violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e, including, but not limited to, the following:

           1.     Using a false representation concerning the character, amount, or legal status of any debt, in violation of Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A); or

           2.     Communicating credit information to consumer reporting agencies that Defendant knows, or should know, to be false, in violation of Section 807(8) of the FDCPA, 15 U.S.C. § 1692e(8);

      D.     Continuing to collect on any debt without obtaining and providing to the consumer verification of the debt when the consumer has notified Defendant in writing within the thirty (30) day period described in Section 809(a) of the FDCPA, 15 U.S.C. §1692g(a), that the debt, or any portion thereof, is disputed, as prohibited by Section 809(b) of the FDCPA, 15 U.S.C. §1692g(b); and

      E.     Failing to comply in any other respect with the FDCPA, as attached and as hereafter amended.

## VIII.   NOTICE REQUIREMENTS

**IT IS FURTHER ORDERED** that:

A.      For a period of five (5) years from the date of entry of this Decree, Defendant, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, agent, servant, officer, employee, or other device, in connection with acting as a "debt collector" in the collection of a "debt" from a "consumer," as those terms are defined in Section 803(6), (5), and (3), respectively, of the FDCPA, 15 U.S.C. § 1692a(6), (5), and (3), shall make the following disclosure clearly and prominently on each written collection communication that is sent to a consumer for the purpose of collecting a debt:

> Federal law prohibits certain methods of debt collection, and requires that we treat you fairly. You can stop us from contacting you by writing a letter to us that tells us to stop the contact or that you refuse to pay the debt. Sending such a letter does not make the debt go away if you owe it. Once we receive your letter, we may not contact you again, except to let you know that there won't be any more contact or that we intend to take a specific action.

> If you have a complaint about the way we are collecting this debt, please write to us at [current physical address], email us at [current email address], or call us toll-free at [current phone number] between 9:00 A.M. and 5:00 P.M. Eastern Standard Time, Monday - Friday.

> The Federal Trade Commission enforces the Fair Debt Collection Practices Act (FDCPA). If you have a complaint about the way we are collecting your debt, please contact the FTC online at www.ftc.gov; by phone at 1-877-FTC-HELP; or by mail at 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.

The above disclosure shall be given in the language(s) that appears in such communications sent

Consent Decree, Page 18 of 28

to consumers. Defendant shall be responsible for the requirements in Part VIII.A forty-five (45) days after entry of this Decree.

    B.    Defendant, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, agent, servant, officer, employee, or other device, in connection with acting as a "debt collector" in the collection of a "debt" from a "consumer," as those terms are defined in Section 803(6), (5), and (3), respectively, of the FDCPA, 15 U.S.C. § 1692a(6), (5), and (3), shall provide a copy of the following notice to all officers, servants, agents, and employees having responsibility with respect to the collection of consumer debts, within thirty (30) days of the date of entry of this Decree, and to each officer, servant, agent, and employee hired for a period of five (5) years after that date, no later than the time the officer, servant, agent, and employee assumes responsibility with respect to the collection of such debts, and shall secure from each such person, within thirty (30) days of delivery, a signed and dated statement acknowledging receipt of a copy of the notice:

        Debt collectors must comply with the federal Fair Debt Collection Practices Act, which limits our activities in trying to collect money from consumers.

        In particular, Section 804 of the Act says that you may not contact any person other than the consumer for the purpose of acquiring location information about the consumer more than once unless you have reason to believe that the earlier response of the person was incomplete and that such person now has corrected or complete location information.

        Also, Section 805 of the Act says that you may not contact a consumer at work if you know or should know it is inconvenient for the consumer, and that you may not communicate with any person other than the consumer in connection with the collection of

Consent Decree, Page 19 of 28

a debt, for any purpose other than to obtain location information about the consumer.

In addition, Section 806 of that Act states that you may not engage in any conduct the natural consequences of which is to harass, oppress or abuse any person in connection with the collection of a debt, including, but not limited to, using language the natural consequence of which is to abuse the hearer or reader.

Furthermore, Section 807 of that Act prohibits the use of any false, deceptive or misleading representation or means in connection with the collection of any debt, including, but not limited to, communicating or threatening to communicate to a consumer reporting agency information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

**Individual debt collectors may be financially liable for their violations of the Act.**

*Provided that* for purposes of compliance with Part VIII.B of this Decree, the signature required may be in the form of an electronic signature.

## IX. DISTRIBUTION OF CONSENT DECREE, NOTICE TO FURNISHERS OF INFORMATION: OBLIGATIONS OF FURNISHERS UNDER THE FCRA, AND THE FDCPA BY DEFENDANT

**IT IS FURTHER ORDERED** that:

For a period of three (3) years from the date of entry of this Decree, Defendant shall deliver copies of the Decree, the FDCPA, and the FCRA as directed below:

A.      Defendant shall provide copies of this Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA, 16 C.F.R. Part 698, Appendix G, and the FDCPA to all of its principals, officers, directors, and managers. Defendant must also deliver copies of this Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the

SHORT APPENDIX 84

FCRA, 16 C.F.R. Part 698, Appendix G, and the FDCPA to all of its employees, agents and

representatives who engage in conduct related to the subject matter of this Decree. For current

personnel, delivery shall be within five (5) days of service of this Decree upon Defendant. For

new personnel, delivery shall occur prior to their assuming their responsibilities. For any

business entity resulting from any change in structure set forth in Subsection A.2 of the Part titled

"Compliance Reporting," delivery shall be at least ten (10) days prior to the change in structure.

B. Defendant must secure a signed and dated statement acknowledging receipt of this

Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA, 16

C.F.R. Part 698, Appendix G, and the FDCPA, within thirty (30) days of delivery, from all

persons receiving copies of such documents, pursuant to this Part.

*Provided that* for purposes of compliance with Part. IX.B of this Decree, the signature

required may be in the form of an electronic signature.

X.     **COMPLIANCE MONITORING**

**IT IS FURTHER ORDERED** that, for the purpose of monitoring and investigating

compliance with any provision of this Decree:

A.     Within thirty (30) days of receipt of written notice from a representative of the

Commission, Defendant shall submit additional written reports, which are true and accurate and

sworn to under penalty of perjury; produce documents for inspection and copying; appear for

deposition; and provide entry during normal business hours to any business location in

Defendant's possession or direct or indirect control to inspect the business operation;

B.     In addition, the Commission is authorized to use all other lawful means, including

SHORT APPENDIX 85

but not limited to:

      1.     Obtaining discovery from any person, without further leave of court, using

the procedures prescribed by Fed. R. Civ. P. 30, 31, 33, 34, 36, 45, and 69; and

      2.     Having its representatives pose as consumers and suppliers to Defendant,

their employees, or any other entity managed or controlled in whole or in part by

Defendant, without the necessity of identification or prior notice; and

    C.     Defendant shall permit representatives of the Commission to interview any

employer, consultant, independent contractor, representative, agent, or employee who has agreed

to such an interview, relating in any way to any conduct subject to this Decree.  The person

interviewed may have counsel present.

     *Provided, however,* that nothing in this Decree shall limit the Commission's lawful use of

compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to

obtain any documentary material, tangible things, testimony, or information relevant to unfair or

deceptive acts or practices in or affecting commerce (within the meaning of

15 U.S.C. § 45(a)(1)).

## XI.   COMPLIANCE REPORTING BY DEFENDANT

     **IT IS FURTHER ORDERED** that, in order that compliance with the provisions of this

Decree may be monitored:

    A.     For a period of four (4) years from the date of entry of this Decree, Defendant

shall notify the Commission of any changes in its structure or the structure of any business entity

that Defendant directly or indirectly controls, or has an ownership interest in, that may affect

SHORT APPENDIX 86

compliance obligations arising under this Decree, including but not limited to: incorporation or

other organization; a dissolution, assignment, sale, merger, or other action; the creation or

dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this

Decree; or a change in the business name or address, at least thirty (30) days prior to such

change.

*Provided that*, with respect to any such change in the business entity about which

Defendant learns less than thirty (30) days prior to the date such action is to take place, .

Defendant shall notify the Commission as soon as is practicable after obtaining such knowledge.

B.     One hundred eighty (180) days after the date of entry of this Decree and annually

thereafter for a period of four (4) years, Defendant shall provide a written report to the FTC,

which is true and accurate and sworn to under penalty of perjury, setting forth in detail the

manner and form in which they have complied and are complying with this Decree.  This report

shall include, but not be limited to:

1.     A copy of each acknowledgment of receipt of employee notice obtained

pursuant to Part VIII.B of this Decree:

2.     A copy of each acknowledgment of receipt of this Decree, Notice to

Furnishers of Information: Obligations of Furnishers Under the FCRA, 16 C.F.R.

Part 698, Appendix G, and FDCPA obtained pursuant to Section IX.B of this

Decree; and

3.     Any other changes required to be reported pursuant to subsection A of this

Part.

C.      Defendant shall notify the Commission of the filing of a bankruptcy petition by Defendant within fifteen (15) days of filing.

D.      For purposes of this Decree, Defendant shall, unless otherwise directed by the Commission's authorized representatives, send by overnight courier all reports and notifications required by this Decree to the Commission, to the following address:

> ASSOCIATE DIRECTOR FOR ENFORCEMENT
> BUREAU OF CONSUMER PROTECTION
> FEDERAL TRADE COMMISSION
> 600 PENNSYLVANIA AVENUE, N.W.
> WASHINGTON, D.C. 20580
>
> RE: *United States v. Asset Acceptance, L.L.C.*, Civil Action No.

*Provided that,* in lieu of overnight courier, Defendant may send such reports or notifications by first-class mail, but only if Defendant contemporaneously sends an electronic version of such report or notification to the Commission at: DEBrief@ftc.gov.

E.      For purposes of the compliance reporting and monitoring required by this Decree, the Commission is authorized to communicate directly with Defendant.

## XII.   RECORD KEEPING PROVISIONS

**IT IS FURTHER ORDERED** that, for a period of seven (7) years from the date of entry of this Decree, Defendant, for any of its businesses for which the primary activity is the collection of debts, is hereby restrained and enjoined from failing to create and retain the following records:

A.      Accounting records that reflect the revenues generated in connection with the collection of debts, and the disbursement of such revenues;

SHORT APPENDIX 88

B.      Personnel records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for that person's termination, if applicable;

C.      Consumer files containing the names, addresses, phone numbers, dollar amounts of debt owed, records of collection activity, and amounts collected;

D.      For every consumer complaint, whether received directly, indirectly, or through a third party, records that include:

  1.      Any complaint and the date received, and the nature of the complaint as reflected in any notes, logs, or memoranda, including a description of the conduct alleged; and

  2.      The basis of the complaint, including the names of any debt collectors or supervisors complained about; the nature of any investigation conducted concerning the validity of any complaint; all documents relating to the disposition of the complaint, including records of all contacts with the consumer, Defendant's response to the complaint and the response date, whether the complaint was resolved, the date of resolution; and any action taken to correct the conduct complained about;

E.      Copies of all scripts, training materials, form letters and emails, or other materials used in connection with communicating to consumers;

F.      Copies of all advertisements and other marketing materials; and

Consent Decree, Page 25 of 28

SHORT APPENDIX 89

G.    All records and documents necessary to demonstrate full compliance with each provision of this Decree, including, but not limited to, copies of acknowledgments of receipt of notices given to employees, required by Part VIII.B, copies of acknowledgments of receipt of this Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA, 16 C.F.R. Part 698, Appendix G, and the FDCPA, required by Part IX.B, and all reports submitted to the FTC pursuant to Part XI.

## XIII.  ACKNOWLEDGMENT OF RECEIPT OF CONSENT DECREE

**IT IS FURTHER ORDERED** that Defendant, within five (5) business of receipt of this Decree as entered by the Court, must submit to the Commission a truthful sworn statement acknowledging receipt of this Decree.

## XIV.  RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for the purposes of construction, modification, and enforcement of this Decree.

**JUDGMENT IS THEREFORE ENTERED** in favor of Plaintiff and against Defendant, pursuant to all the terms and conditions recited above.

DATED: January 31st, 2012    _____
UNITED STATES DISTRICT JUDGE

Consent Decree, Page 26 of 28

FOR PLAINTIFF UNITED STATES OF
AMERICA:


TONY WEST
Assistant Attorney General

MAAME EWUSI-MENSAH FRIMPONG
Acting Deputy Assistant Attorney General

MICHAEL S. BLUME
Director

KENNETH L. JOST
Deputy Director
Consumer Protection Branch

SANG H. LEE
ADRIENNE E. FOWLER
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
PO Box 386
Washington, DC 20044-0386
Telephone: 202-616-0219
Fax: 202-514-8742
Sang.H.Lee@usdoj.gov
Adrienne.E.Fowler@usdoj.gov


Dated: 1/30/12

FOR THE UNITED STATES
FEDERAL TRADE COMMISSION:


ROBERT J. SCHROEDER, DIRECTOR
Northwest Region
TRACY S. THORLEIFSON
JULIE MAYER
Attorneys
Federal Trade Commission
Northwest Region
915 Second Ave., Suite 2896
Seattle, WA 98174
Telephone: 206-220-630
Fax: 206-220-6366
tthorleifson@ftc.gov
jmayer@ftc.gov


Dated: 1/30/12

Consent Decree, Page 27 of 28

SHORT APPENDIX 91

FOR THE DEFENDANT:

EDWIN L. HERBERT
Vice President-General Counsel
Asset Acceptance, LLC
28405 Van Dyke
Warren, MI 48093
Telephone: 586-446-1782
eherbert@assetacceptance.com

COUNSEL FOR DEFENDANT:

WILLIAM C. MACLEOD
Kelley Drye & Warren LLP
Washington Harbour, Suite 400, 3050 K Street, NW
Washington, D.C. 20007
Telephone: (202) 342-8811
wmacleod@kelleydrye.com

Dated: 1/30/12

Consent Decree, Page 28 of 28

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

        **Plaintiff,**

v.                                                  Case No. 8:12-cv-00182-T-27EAJ

ASSET ACCEPTANCE, LLC,
a Delaware limited liability company,

        **Defendant.**

_____/

## ORDER

    **BEFORE THE COURT** is the Joint Motion for Entry of Consent Decree (Dkt. 2). Upon

consideration, it is **ORDERED AND ADJUDGED** that:

    (1)    The Joint Motion for Entry of Consent Decree (Dkt. 2) is **GRANTED.** The Court

will separately enter the Consent Decree.

    (2)    The Clerk is directed to **CLOSE** this case.

    **DONE AND ORDERED** in chambers this _31 st_ day of January, 2012.

                                   JAMES D. WHITTEMORE
                                   United States District Judge

Copies to:
Counsel of Record



**Federal Trade Commission**

Protecting America's

Consumers 01/30/2012

## Under FTC Settlement, Debt Buyer Agrees to Pay $2.5 Million for Alleged Consumer Deception

### Firm Also Will Notify Consumers with "Time-Barred" Debt That It Will Not Sue to Collect

One of the nation's largest consumer debt buyers has agreed to pay a $2.5 million civil penalty to settle Federal Trade Commission charges that it made a range of misrepresentations when trying to collect debts. In addition, the company, Asset Acceptance, LLC, has agreed to tell consumers whose debt may be too old to be legally enforceable that it will not sue to collect on that debt.

The proposed settlement order resolving the agency's charges also requires that when consumers dispute the accuracy of a debt, Asset Acceptance must investigate the dispute, ensuring that it has a reasonable basis for its claims the consumer owes the debt, before continuing its collection efforts. The proposed order also bars the company from placing debt on consumers' credit reports without notifying them about the negative report. The U.S. Department of Justice filed the proposed settlement order this week at the FTC's request.

"Most consumers do not know their legal rights with respect to collection of old debts past the statute of limitations," said David Vladeck, Director of the FTC's Bureau of Consumer Protection. "When a collector tells a consumer that she owes money and demands payment, it may create the misleading impression that the collector can sue the consumer in court to collect that debt. This FTC settlement signals that, even with old debt, the prohibitions against deceptive and unfair collection methods apply."

The FTC's action – alleging that Asset Acceptance violated the FTC Act, the Fair Debt Collection Practices Act, and the Fair Credit Reporting Act – is part of the FTC's continuing efforts to protect consumers adversely affected by the struggling economy. The agency today also issued a new publication for consumers, "Time-Barred Debts: Understanding Your Rights When It Comes to Old Debts".

Michigan-based Asset Acceptance buys unpaid debts from credit originators such as credit card companies, health clubs, and telecommunications and utilities providers, as well as other debt buyers, and attempts to collect them. Asset Acceptance has purchased tens of millions of consumer accounts for pennies on the dollar. It targets accounts that other collectors have pursued and are more than a year past due, and in some cases attempts to collect debt that is more than 10 years old. Some of this debt is too old to be legally enforceable – state statutes of limitations cut off the right to sue to collect the debt after some period of time has passed, depending on the state and the type of debt. And many consumers do not know that making a partial payment of a debt may reset the state law's clock on the collector's ability to take legal action.

The FTC's nine-count complaint charged Asset Acceptance with:

- misrepresenting that consumers owed a debt when it could not substantiate its representations;
- failing to disclose that debts are too old to be legally enforceable or that a partial payment would extend the time a debt could be legally enforceable;
- providing information to credit reporting agencies, while knowing or having reasonable cause to believe that the information was inaccurate;
- failing to notify consumers in writing that it provided negative information to a credit reporting agency;
- failing to conduct a reasonable investigation when it received a notice of dispute from a credit reporting agency;
- repeatedly calling third parties who do not owe a debt;
- informing third parties about a debt;
- using illegal debt-collection practices, including misrepresenting the character, amount, or legal status of a debt; providing inaccurate information to credit reporting agencies; and making false representations to collect a debt; and
- failing to provide verification of the debt and continuing to attempt to collect a debt when it is disputed by the consumer.

The proposed settlement requires that when Asset Acceptance knows or should know debt may not be legally enforceable under state law – often referred to as "time-barred" debt – it must disclose to the consumer that it will not sue on the debt and, if true, that it may report nonpayment to the credit reporting agencies. Once it has made that disclosure, it may not sue the consumer, even if the consumer makes a partial payment that otherwise would make the debt no longer time-barred.

The order also prohibits the company from:

- Making any material misrepresentation to consumers and making any representation that a consumer owes a particular debt, or as to the amount of the debt, unless it has a reasonable basis for the representation. To ensure it has such a basis, the order requires Asset Acceptance to investigate consumer disputes before continuing collection efforts;
- "Parking" – or placing – debt on a consumer's credit report when it has failed to notify the consumer in writing about the negative report, and;
- Violating the Fair Credit Reporting Act and the Fair Debt Collection Practices Act, in the ways alleged in the complaint.

The FTC has issued a new publication to help consumers understand how debt collectors attempt to collect old debts, along with their rights in these cases. "Time-Barred Debts: Understanding Your Rights When It Comes to Old Debts" provides information on when a debt is too old for a collector to sue, what consumers should do if a debt collector calls about a time-barred debt, and whether a consumer should pay a debt

that's considered time-barred. It also provides advice on what consumers should do if they are sued for a time-barred debt, including defending themselves in court and asserting their rights under the Fair Debt Collection Practices Act. Finally, it has links to other FTC publications and videos about dealing with debt.

The Commission vote authorizing the staff to refer the complaint to the Department of Justice was 4-1, and the vote to approve the proposed consent decree, was 3-1, with Commissioner J. Thomas Rosch voting no for both. The DOJ filed the complaint and proposed consent decree on behalf of the Commission in U.S. District Court for the Middle District of Florida today. The proposed consent decree is subject to court approval.

NOTE: The Commission authorizes the filing of a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. The complaint is not a finding or ruling that the defendant has actually violated the law. This consent decree is for settlement purposes only and does not constitute an admission by the defendant of a law violation. Consent decrees have the force of law when signed by the District Court judge.

The Federal Trade Commission works for consumers to prevent fraudulent, deceptive, and unfair business practices and to provide information to help spot, stop, and avoid them. To file a complaint in English or Spanish, visit the FTC's online Complaint Assistant or call 1-877-FTC-HELP (1-877-382-4357). The FTC enters complaints into Consumer Sentinel, a secure, online database available to more than 2,000 civil and criminal law enforcement agencies in the U.S. and abroad. The FTC's website provides free information on a variety of consumer topics. Like the FTC on Facebook and follow us on Twitter.

MEDIA CONTACT:

> Mitchell J. Katz,
> *Office of Public Affairs*
> 202-326-2161

STAFF CONTACT:

> J. Reilly Dolan,
> *Bureau of Consumer Protection*
> 202-326-3292
>
> Tracy S. Thorleifson,
> *FTC Northwest Region*
> 206-220-4481

(FTC File No. 052-3133)
(8:12-cv-182-T-27EAJ. Judge Whittemore)
(Asset Acceptance.final)

---

**E-mail this News Release**
If you send this link to someone else, the FTC will not collect any personal information about you or the recipient.

Vea este comunicado de prensa en español.

| Related Items: |
|---|

United States of America (For the Federal Trade Commission), Plaintiff, v. Asset Acceptance, LLC, Defendant
(United States District Court for the Middle District of Florida)
Case No. 8:12-cv-182-T-27EAJ
FTC File No. 0523133

**For Consumers:**

- Time-Barred Debts: Understanding Your Rights When It Comes to Old Debts
- Tick-Tock, Tick-Tock: Time-Barred Debts: What's that, and why should I care?

**For Businesses:**

- Watch what you're doing with time-barred debts

---

Last Modified: Tuesday, January 31, 2012



Federal Trade Commission
BCP Business Center

# Watch what you're doing with time-barred debts

- By Lesley Fair
- January 30, 2012 - 10:56am

Of course, people are responsible for their debts.  However, at a certain point, how much time has passed becomes an affirmative defense under state law and creditors can't prevail in court.  But what happens if a payment is made on a time-barred debt?  A consumer can really get clocked — because in many states the debt can be revived if a person makes a payment or says in writing that they intend to.  The FTC has announced a $2.5 million settlement with Asset Acceptance, LLC, for allegedly breaking the law in how it tried to collect time-barred debts.

Michigan-based Asset Acceptance buys unpaid debts from credit card companies, health clubs, companies that provide telecom or utility service, and other debt buyers.  Getting the debts for pennies on the dollar, the company targets accounts other collectors have pursued unsuccessfully and are more than a year past due.  The problem, of course, is that if a debt collector tells somebody they owe money and demands payment, it may create the misleading impression that the company can collect in court.  That's not the case with time-barred debts.

Case: 12-3504     Document: 13     Filed: 01/28/2013     Pages: 198

A law enforcement action filed by the Department of Justice on the FTC's behalf charges that Asset Acceptance pursued debts — including time-barred debts — in ways that violated the law.  Among other things, the complaint alleges that the company:

claimed that consumers owed money when Asset Acceptance didn't have proof to back it up;

failed to disclose that debts were too old to be legally enforceable or that a partial payment would restart the clock;

failed to give consumers verification of a debt when they asked for it;

provided information to credit reporting agencies it knew — or had reasonable cause to know — was inaccurate;

didn't notify consumers in writing that it passed negative information on to credit reporting agencies;

didn't conduct reasonable investigations when it got a notice of dispute from a credit reporting agency;

illegally told third parties about people's debts; and

used illegal debt collection practices.

In addition to the $2.5 million civil penalty, the settlement puts provisions in place to protect consumers going forward.  For example, when dealing with debt it knows or should know is time-barred, Asset Acceptance must disclose to the consumer that it won't sue on the debt and — assuming it's the case — it has to tell people that it may report nonpayment to the credit bureaus.  Once it has made that disclosure, Asset Acceptance can't sue, even if the consumer makes a partial payment that otherwise would restart the limitations clock.

The order also prohibits Asset Acceptance from making material misrepresentations about debts;  from "parking" debt on a consumer's credit report when it has failed to notify them in writing;  and from violating the FTC Act, the Fair Credit Reporting Act, and the Fair Debt Collection Practices Act in

Case: 12-3504     Document: 213     Filed: 01/28/2013     Pages: 198

the ways alleged in the complaint.

## 4 Comments ›› Leave a Comment ⏐ Commenting Policy

SHORT APPENDIX 98

FEDERAL DEPOSIT INSURANCE CORPORATION

CONSUMER FINANCIAL PROTECTION BUREAU

WASHINGTON, D.C.

|  |  |
|---|---|
| In the Matter of<br><br>AMERICAN EXPRESS CENTURION BANK<br>SALT LAKE CITY, UTAH<br><br><br>(INSURED STATE NONMEMBER BANK) | JOINT CONSENT ORDER,<br>JOINT ORDER FOR<br>RESTITUTION, AND<br>JOINT ORDER TO PAY<br>CIVIL MONEY PENALTY<br><br>FDIC-12-315b<br>FDIC-12-316k<br>2012-CFPB-0002 |

The Federal Deposit Insurance Corporation ("FDIC") has jurisdiction over American Express Centurion Bank, Salt Lake City, Utah ("Bank" or "AECB") under section 3(q) of the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. § 1813(q). The Consumer Financial Protection Bureau ("CFPB") has jurisdiction over the Bank pursuant to section 1002(6), 1025 and 1053(b) of the Consumer Financial Protection Act ("CFP Act"), 12 U.S.C. §§ 5481(6), 5515 and 5563(b). The term "AECB" or "Bank" shall include all institution-affiliated parties, as defined in section 3(u) of the FDI Act, 12 U.S.C. § 1813(u).

## I. OVERVIEW

The FDIC and CFPB find that the Bank has engaged in violations of various Federal consumer financial laws, including violations of:

(1)    Section 5 of the Federal Trade Commission Act ("Section 5"), 15 U.S.C. § 45(a)(1), and sections 1031 and 1036 of the CFP Act ("Sections 1031 and 1036"), 12 U.S.C. §§ 5531, 5536 for deceptive debt collection practices;

(2)     Section 5 and Sections 1031 and 1036 in connection with the Bank's use of

deceptive solicitations for the Bank's Blue Sky credit card program ("Blue Sky");

(3)     The Truth in Lending Act ("TILA"), as amended by the Credit CARD Act of

2009, 15 U.S.C. §§ 1601 et seq., and section 1026.52(b)(1) of Regulation Z,

12 C.F.R. § 1026.52(b)(1),[1] for charging unlawful late fees on certain hybrid

charge cards;

(4)     The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et seq., for failing to

report certain consumer disputes to consumer reporting agencies ("CRAs"); and

(5)     The Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 et seq., and

section 1002.6 of Regulation B, 12 C.F.R. §1002.6, in connection with the Bank's

credit scoring model for new account approvals.

The FDIC and CFPB further find, as to matters within their respective jurisdictions, that

the Bank has failed to manage its compliance with Federal consumer financial laws and

regulations adequately and has engaged in unsafe and unsound banking practices relating to the

Bank's Compliance Management System ("CMS") and the Bank's oversight of affiliate and

third-party service providers ("Service Providers").

## FINDINGS OF FACT

Based on the joint FDIC/Utah Department of Financial Institutions Compliance Report of

Examination ("Compliance ROE") dated February 22, 2011, with which the CFPB concurred,

and based on the information collected through the examination, the FDIC and CFPB find the

following facts:

---

[1] Effective December 30, 2011, the Consumer Financial Protection Bureau republished some of the existing regulations implementing Federal consumer financial laws, including Regulation Z, Regulation V and Regulation B, in Chapter X of Title 12 of the Code of Federal Regulations. All citations to these regulations will refer to the republished regulations for ease of reference.

SHORT APPENDIX 100

(1)    *Deceptive Debt Collection Practices.* In connection with the collection of consumer debt:

(a)    Unreported Debt shall mean consumer debt that has been in collections or charged off and is no longer being reported by the Bank to CRAs. AECB misrepresented to certain customers that settlement of Unreported Debt would be reflected on the consumers' credit report and that payment could improve the consumers' credit score; and

(b)    Certain debt settlement letters that stated that after settlement, the consumers' remaining debt would be "waived" or "forgiven" were misleading because the Bank failed to prominently disclose that the consumer must pay the full debt balance before the Bank would process any future credit or charge card application.

(2)    *Deceptive Blue Sky Credit Card Marketing.* In direct mail solicitations, the offer letter included a shaded box listing the benefits. The first benefit listed was a "$300 Bonus Offer." The solicitations prominently displayed "22,500 bonus points—receive a bonus $300;" or "22,500 bonus points—earn a bonus $300;" on the first page. In fact, consumers meeting the bonus qualification requirements received only the points but did not receive the $300 bonus advertised.

(3)    *Excessive Hybrid Card Late Fees.* AECB offered consumers the option of having a hybrid account for a charge card with revolving credit features that allowed the consumers to pay a portion of their outstanding balances over time ("Hybrid Card"). Under section 1026.52(b)(1) of Regulation Z, AECB is permitted to charge consumers with these accounts a late fee based on costs or based on a safe harbor provided in the regulation. Instead of basing the fees on cost or charging fees of a specified dollar amount as permitted by the safe harbor, AECB unlawfully charged consumers 2.99% of a portion of their delinquent balance.

(4)     *Discrimination on the Basis of Age.*  Between February and October 2010, AECB used a partially implemented age-split score card that functioned as an improper second look for card applicants age 35 years old and under in violation of ECOA and Regulation B ("Staged Age-Split Scorecard").

(5)     *Reporting of Credit Disputes.*  FCRA requires a creditor to report to CRAs if a consumer disputes information it reported to the CRAs.  AECB created a system that failed to report to the CRAs when a consumer disputed information.  Depending on AECB's investigation of the dispute, AECB either asked the CRAs to delete the information, or AECB reported the information to the CRAs without indicating the dispute in violation of FCRA.

(6)     *Board and Management Oversight.*  The Bank's Board of Directors ("Board") and senior management exercised ineffective oversight and control over the compliance function, particularly the oversight of AECB Service Providers.

(7)     *Compliance Program.*  The Bank's CMS is deficient, with problems in the implementation and compliance with policies and procedures.  The Bank failed to implement an effective employee training program for applicable consumer protection laws and implementing rules and regulations, regulatory guidance and statements of policy ("Consumer Protection Laws").  The failure was particularly evident in the training provided to the Bank's marketing staff regarding laws prohibiting deceptive acts and practices.  In addition, the Bank has failed to adequately monitor consumer complaints and inquiries.

(8)     *Compliance Staffing.*  The position of Chief Compliance Officer has turned over frequently, which adversely affects the Bank's compliance with Consumer Protection Laws.  Staffing for compliance monitoring is inadequate.

SHORT APPENDIX 102

(9)     *Oversight of Service Provider Agreements and Services.*  Most of the Bank's consumer operations are performed or directed by affiliates and service providers.  All violations identified in the Compliance ROE, with the exception of the ECOA violation, are attributed to deficient management oversight of the Bank's Service Providers.

(10)     *Audit.*  The audit program, which is performed by the parent company American Express Travel Related Services ("AETRS"), is not adequately independent, comprehensive, or effective in scope.

(11)     *Consumer Harm.*  Approximately a quarter million consumers were adversely impacted by the Bank's actions and at least $75,000,000 was collected or retained by the Bank in violation of applicable Consumer Protection Laws.

## STIPULATION

The Bank, by and through its duly elected and currently acting Board, has executed a Stipulation to the Issuance of a Joint Consent Order, Joint Order for Restitution, and Joint Order to Pay Civil Money Penalty ("Stipulation"), dated September 21, 2012, that is accepted by the FDIC and CFPB.  With the Stipulation, the Bank has consented, without admitting or denying any findings of fact, violations of laws or regulations or any unsafe or unsound banking practices, to the issuance of the Joint Consent Order, Joint Order for Restitution, and Joint Order to Pay Civil Money Penalty (collectively "Joint Orders") by the FDIC and CFPB.

Having determined that the requirements for issuance of an order under section 8(b) and 8(i) of the FDI Act, 12 U.S.C. §§ 1818(b) and 1818(i), and section 1053(b) of the CFP Act, 12 U.S.C. § 5553(b), have been satisfied, the FDIC and CFPB, therefore, jointly accept the Stipulation and issue the following orders:

SHORT APPENDIX 103

## II. JOINT CONSENT ORDER

## CORRECTIONS OF VIOLATIONS OF LAWS

**IT IS HEREBY ORDERED** that the Bank, its officers, agents, servants and employees immediately cease and desist and the Bank ensure that its Service Providers or other agents immediately cease and desist from engaging in unsafe or unsound banking practices and violations of law and/or regulations, as more fully set forth in the Compliance ROE, and it is further ordered that the Bank take affirmative actions as of the date of issuance of the Joint Orders ("Effective Date"), unless otherwise specified, as follows:

1. The Bank shall correct all violations of law, as more fully set forth in the Compliance ROE and as described below, and shall implement procedures to prevent their recurrence. The Bank's actions as required by this paragraph shall be satisfactory to the Regional Director of the FDIC's San Francisco Regional Office ("FDIC Regional Director") and the Regional Director, West Region, of the CFPB ("CFPB Regional Director") as determined at subsequent examinations and/or visitations.

### Deceptive Acts and Practices

2. The Bank shall take all action necessary to eliminate all violations of Section 5 and Sections 1031 and 1036. In addition, the Bank shall take all necessary steps to effect and maintain future compliance with Section 5 and Sections 1031 and 1036 as described more particularly herein.

### Debt Collection Practices

3. The Bank shall continue to provide disclosures concerning the expiration of the Bank's litigation rights when collecting debt that is barred by applicable state statutes of limitations and shall take all action necessary to ensure the revision of any and all solicitations

SHORT APPENDIX 104

and any other oral, written or electronic communications used in connection with the collection of consumer debts to remove all deceptive statements and to disclose clearly and prominently:

    (a)     All material conditions, benefits and restrictions concerning any offer of settlement; and,

    (b)     When collecting on Unreported Debt, the following language:

        The law limits how long a debt can be reported to a consumer reporting agency.  Because of the age of your debt, we cannot report it to a consumer reporting agency.  Payment or non-payment of this debt will not affect your credit score.

4.     For purposes of the Joint Consent Order, "clearly and prominently" shall mean:

    (a)     As to written information, written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer.  If the information is contained in a multi-page print document, the disclosure appears on the first page; and

    (b)     As to information presented orally, spoken and disclosed in a volume, cadence and syntax sufficient for an ordinary consumer to hear and comprehend.

5.     The Bank shall not make any representation or statement, or take any other action that interferes with, detracts from, contradicts, or otherwise obscures the disclosures required in paragraph 3.

6.     The Bank shall maintain accurate and complete information on each consumer debt that the Bank collects or attempts to collect.  Such information shall include, at a minimum:

    (a)     consumer agreements and any subsequent amendments and

(b)      documentation evidencing the debt and each transaction or activity on the debt. The Bank shall make such information and/or documentation available upon request to a consumer inquiring about his/her debt.

For debts incurred prior to the Effective Date, the Bank may collect or attempt to collect such debts if the Bank has evidence to verify the debt, but must immediately cease such collection efforts if the consumer disputes the debt and the Bank is unable to provide the documentation in subparagraphs 6(a) and (b) above.

7.      The Bank shall provide a copy of the Joint Consent Order to any person to whom the Bank sells, transfers, or assigns any debt which would require the disclosures in paragraph 3 and/or be subject to the provisions of paragraph 6 and shall require in all contracts to sell, transfer, or assign such debt a provision that contains a clear and prominent notification to the buyer, transferee, or assignee that the Bank is expressly requiring that the disclosures in paragraph 3 be given by any person collecting such debt and requiring that the provisions of paragraph 6 apply to the debt.

8.      For any Unreported Debt, the Bank shall not in the future report any activity to the CRAs.

**Blue Sky Credit Card Marketing**

9.      The Bank shall take all action necessary to ensure the revision of any and all solicitations and any other oral, written or electronic communications used in connection with the marketing of Blue Sky credit cards, or any other card with a "rebate" or "points" feature, to disclose clearly and prominently all material conditions, benefits and restrictions concerning any offer.

SHORT APPENDIX 106

10.     The Bank shall remove all deceptive statements from all solicitations for Blue Sky credit cards, or any other card with a "rebate" or "points" feature, including, but not limited to, removing from certain solicitations language indicating a $300 bonus or any credit equivalent in the benefit box on the solicitation if there is not an actual cash bonus or credit equivalent being offered.

## Truth in Lending

11.     The Bank shall take all action necessary to eliminate all violations of TILA and Regulation Z.  In addition, the Bank shall take all necessary steps to effect and maintain future compliance with TILA and Regulation Z as described more particularly herein.

## Hybrid Card Late Fees

12.     The Bank shall take all action necessary to ensure that it is complying with the limitations on late fees set forth in Regulation Z section 1026.52(b)(1) for any charge card account that also contains a revolving credit feature.

## Equal Credit Opportunity Act

## Age-Split Scorecard

13.     The Bank shall take all action necessary to eliminate all violations of ECOA and Regulation B.

14.     Within 30 days from the Effective Date, the Bank shall take all action necessary to ensure that all credit scoring models applied to card applicants are:

        (a)     Fully compliant with ECOA and Regulation B;

        (b)     Empirically derived, demonstrably and statistically sound as defined in Regulation B's section 1002.2(p), to the extent required by section 1002.6(b); and

SHORT APPENDIX 107

(c)    Otherwise compliant with the specific requirements set forth in section 1002.6(b) of Regulation B.

15.    The Bank shall take all necessary steps to effect and maintain future compliance with ECOA and Regulation B as described more particularly herein.

16.    Within 30 days from the Effective Date, the Bank shall develop and implement procedures to ensure compliance with ECOA and Regulation B governing the evaluation of credit and charge card applications ("ECOA Procedures"). Particular attention should be paid to compliance with section 1002.6(b) of Regulation B, including model validations. The ECOA Procedures shall include, at a minimum:

(a)    Procedures that ensure compliance with section 1002.6(b) of Regulation B;

(b)    Procedures that ensure that any purportedly empirically derived, demonstrably and statistically sound credit scoring systems are in compliance with section 1002.2(p) of Regulation B;

(c)    Procedures that set forth and ensure compliance with document and data retention requirements regarding compliance with these provisions, including specific documentation of all validation, analysis, and testing; and

(d)    Procedures that ensure the prohibition of the staged implementation of any age-split credit scoring models, as required by Regulation B.

### Remediation Plan for Age-Split Scorecard

17.    Within 30 days from the Effective Date, the Bank shall provide the CFPB Regional Director with a detailed, formal certification of the remedial efforts the Bank has taken to date as to eligible consumers ("Age-Split Scorecard Eligible Consumer") regarding the Staged

SHORT APPENDIX 108

Age-Split Scorecard. Age-Split Scorecard Eligible Consumer is defined as a card applicant over 35 years old who was denied credit under the Staged Age-Split Scorecard, who would have been approved for credit under the age-split scorecard that was fully implemented in October 2010. This includes but is not limited to certifying the following:

(a)     The procedures used to identify the Age-Split Scorecard Eligible Consumers; the number of Age-Split Scorecard Eligible Consumers; and that each Age-Split Scorecard Eligible Consumer was sent an invitation to reapply;

(b)     The number of Age-Split Scorecard Eligible Consumers who responded to the Bank's invitation to reapply and that each such Age-Split Scorecard Eligible Consumer was reevaluated for credit;

(c)     The number of Age-Split Scorecard Eligible Consumers who qualified for credit on reapplication and that each such Age-Split Scorecard Eligible Consumer was offered credit on reapplication; and

(d)     The number of Age-Split Scorecard Eligible Consumers who were denied credit on reapplication and the specific reasons for each such denial.

18.     Within 30 days from the Effective Date, the Bank shall confirm withdrawal and removal of all credit inquiries by the Bank to Age-Split Scorecard Eligible Consumers' credit profiles as a result of the Staged Age-Split Scorecard. The Bank shall include in its formal certification of remedial efforts pursuant to paragraph 17 that it has withdrawn all such inquiries and shall describe with detail the process used to complete the withdrawal.

## Fair Credit Reporting Act

### Reporting of Credit Disputes

19.    The Bank shall take all action necessary to eliminate all violations of FCRA and to maintain future compliance with FCRA.

20.    The Bank shall take all action necessary to ensure that consumer disputed information is not furnished to consumer reporting agencies without a notice of the dispute to ensure compliance with section 623(a) of FCRA.

### Remediation Plan for Reporting of Credit Disputes

21.    The Bank shall provide every consumer card holder who has an open account, who has a closed account with a balance that the Bank reports to a CRA, or who has a closed account with no balance but for whom the Bank reported negative information to a CRA within the past seven years with an advisement of rights under FCRA in a form that is acceptable to the FDIC Regional Director and the CFPB Regional Director.  This advisement of rights should be mailed or transmitted to consumers within three complete billing cycles or three months of its approval by the FDIC Regional Director and the CFPB Regional Director and shall inform consumers that they have a right to dispute inaccurate information on their credit reports, and should they dispute the information to the Bank, the Bank will report the dispute to the CRAs, as required by law.

SHORT APPENDIX 110

## COMPLIANCE MANAGEMENT SYSTEM

**IT IS FURTHER ORDERED** that the Bank take additional affirmative actions as follows:

### Compliance Program

22.    Within 60 days from the Effective Date, the Bank shall review, revise, develop and/or implement, as necessary, a sound risk-based Compliance Management System ("CMS") including a comprehensive written compliance program ("Compliance Program") to ensure that the marketing of, qualification for, sale of and operation of products and debt collection activities comply with Section 5 and Sections 1031 and 1036 and otherwise ensure compliance with all Consumer Protection Laws to which the Bank is subject. At a minimum, the Compliance Program shall provide for and include:

(a)    Comprehensive, written policies and procedures designed to prevent violations of Consumer Protection Laws and prevent associated risks of harm to consumers;

(b)    An effective training program that includes regular, specific, comprehensive training in Consumer Protection Laws commensurate with individual job functions and duties for appropriate Bank personnel, including all individuals having responsibilities that relate to Consumer Protection Laws, senior management and the Board;

(c)    An enhanced and well-documented internal CMS monitoring process incorporated into the daily work of Bank personnel that is designed to detect and promptly correct compliance weaknesses within the Bank and Service Providers, particularly weaknesses that impact consumer accounts;

(d)    An effective consumer complaint monitoring process, including the maintenance of adequate records of all written, oral, or electronic complaints or inquiries, formal

SHORT APPENDIX 111

or informal, received by the Bank and all Service Providers and the resolution of the complaints and inquiries; and

    (e)    Effective independent audit coverage of the Compliance Program and the Bank's compliance with all Consumer Protection Laws and internal policies and procedures.

23.    The Bank shall implement and comply with the written Compliance Program and/or any subsequent modification thereto upon approval of the Compliance Program by the Board.

24.    Within 15 days from the Effective Date, the Bank shall retain an independent third party ("Compliance Program Consultant"), acceptable to the FDIC Regional Director and the CFPB Regional Director, to assist in the development, revision, review and implementation of the Bank's Compliance Program. The Compliance Program Consultant shall provide a detailed written report of the Bank's adherence to the Compliance Program to the Board ("Compliance Program Report") on a monthly basis. The Board of Directors shall conduct a full and complete review of the Compliance Program Report within 30 days of receipt. This review shall be recorded and noted in the Board minutes.

25.    Within 30 days from the Effective Date, the Bank shall retain an independent third party ("Compliance Staffing Consultant"), acceptable to the FDIC Regional Director and the CFPB Regional Director, who possesses the appropriate expertise and qualifications to review, analyze and assess the Bank's compliance staffing, and determine if additional personnel are needed. The Compliance Staffing Consultant shall provide to the Board a detailed written report containing its analysis, assessments, and recommendations ("Staffing Report"). The Board of Directors shall conduct a full and complete review of the Staffing Report within 30 days of receipt. This review shall be recorded and noted in the Board minutes.

## Board Oversight

### *Compliance Management System*

26.    The Board shall participate fully in the oversight of the Bank's CMS and shall be responsible for the approval of sound policies and objectives and for the supervision of all the Bank's compliance-related activities, consistent with the role and expertise commonly expected for directors of banks of comparable size and complexity and offering comparable banking products and services.

27.    Prior to implementation, the Board shall review the written Compliance Program and/or any subsequent modification thereto.  If the Board determines that the Compliance Program and/or any subsequent modification thereto is acceptable, the Board shall approve it and record the approval in the Board minutes.

### *Compliance Committee & Staffing*

28.    Within 30 days from the Effective Date, the Board shall maintain a compliance committee comprised of at least three directors, who are not officers of the Bank, and at least one member of senior management, plus the Chief Compliance Officer ("Compliance Committee").

(a)    The Compliance Committee shall meet monthly and, at a minimum, the following areas shall be reviewed and approved:  minutes of the Compliance Committee, Chief Compliance Officer reports, Compliance Program audit reports, Compliance Program policies, and progress reports concerning compliance with the Joint Consent Order.

(b)    The Compliance Committee shall report its discussions to the Board at each regularly scheduled Board meeting, and the Board minutes shall document the review and approval of all items before the Board, including the names of any dissenting directors.  Nothing

SHORT APPENDIX 113

shall diminish the responsibility of the entire Board to ensure compliance with the provisions of the Joint Consent Order.

(c)     The Board, in conjunction with the Compliance Committee, shall allocate resources that are commensurate with the level of complexity of the Bank's operations to ensure the establishment and implementation of an adequate CMS, as described in the FDIC's Compliance Examination Manual, Section II-2.1 to 2.4, and as described in the CFPB Supervision and Examination Manual Part II and shall include specific procedures to ensure the Bank's compliance with all Consumer Protection Laws.  The allocated resources shall be sufficient to ensure the Bank's timely compliance with the Joint Consent Order.

(d)     The Board, in conjunction with the Compliance Committee, shall:

(i)     Ensure that the Bank has a qualified Chief Compliance Officer who possesses the requisite knowledge and experience to administer an effective CMS for a large bank, as defined in 12 U.S.C § 5515(a)(1);

(ii)     Within 30 days from the Effective Date, identify a designated Fair Lending Compliance Officer who possesses the requisite knowledge and experience to implement and review policies and procedures consistent with the Joint Consent Order, ECOA and Regulation B;

(iii)     Ensure that the duties and responsibilities of the Chief Compliance Officer and the Fair Lending Compliance Officer are clearly defined and provide the Chief Compliance Officer and the Fair Lending Compliance Officer access to both the Board and the Compliance Committee;

(iv)     Ensure that the Chief Compliance Officer and the Fair Lending Compliance Officer have and retain sufficient authority and independence to implement policies

SHORT APPENDIX 114

related to Consumer Protection Laws and to institute corrective action as needed.  This authority shall include the ability to cross departmental lines, have access to all areas of the Bank's operations, and effectuate corrective action upon discovering deficiencies;

(v)     Ensure that the Chief Compliance Officer, the Fair Lending Compliance Officer and all individuals with compliance oversight responsibilities receive ongoing training, sufficient time, and adequate resources to effectively oversee, coordinate, and implement the Bank's CMS;

(vi)     Require the Chief Compliance Officer, in consultation with the Fair Lending Compliance Officer, to provide to the Compliance Committee monthly written reports, including, but not limited to, reports related to the enactment and/or promulgation of new Consumer Protection Laws and changes to existing Consumer Protection Laws, training performed, monitoring and compliance audits performed, corrective action taken, and compliance with the Joint Consent Order;

(vii)     Ensure proper and timely follow-up and resolution to audit and examination findings indicating the need for corrective action(s); and

(viii)     Develop and implement an internal monitoring system of employees' performance to ensure that compliance policies, procedures and regulatory requirements are adequately followed and hold employees accountable for following adopted policies, procedures and regulatory requirements.

### Oversight of Service Provider Agreements And Services

29.     Within 60 days from the Effective Date, the Bank shall develop policies to maintain effective monitoring, training, record-keeping and audit procedures to review each aspect of the Bank's agreements with its Service Providers and the services performed for the

SHORT APPENDIX 115

Bank pursuant to these agreements ("Service Provider Agreements and Services"). The policies and procedures shall, at a minimum, provide for:

    (a)    Bank prior review and approval of copies of (i) all Bank marketing and solicitation materials, including direct mail or internet solicitations, promotional materials, advertising, telemarketing scripts ("Marketing and Solicitation Materials"), and (ii) other materials provided by the Bank to consumers generated in connection with the administration and servicing of the Service Provider Agreements and Services;

    (b)    Maintenance of records of all Service Provider agreements ("Service Provider Agreements") and approved Marketing and Solicitation Materials, including any changes or amendments with respect to such materials;

    (c)    Monitoring the performance of marketing and solicitation programs for new accounts;

    (d)    Prompt notification to the Bank by any Service Provider of all regulatory agencies' inquiries, customer complaint/inquiry correspondence, and/or legal action received by any Service Provider with respect to charge and credit card programs (other than routine requests such as requests to cease and desist collection contact), and maintenance by the Bank of all such documents;

    (e)    Procedures for promptly addressing and resolving consumer complaints and inquiries, regardless of the source;

    (f)    Procedures for monitoring and auditing of collection activities and customer service call centers;

SHORT APPENDIX 116

(g)      Bank review of all Service Provider charge and credit card program partners' credit, fraud, and risk management materials, including policy manuals and procedures, to determine compliance with all Consumer Protection Laws; and

(h)      An effective training program that includes regular, specific, and comprehensive training in Consumer Protection Laws for all employees of Service Providers having responsibilities that relate to Consumer Protection Laws, including senior management, commensurate with their individual job functions and duties.

30.      The Bank's Compliance Committee shall, on a quarterly basis, submit a written report to the Board detailing whether Service Providers are in compliance with Service Provider Agreements. The written report shall include potential violations, deficiencies, customer complaints and inquiries, or other concerns. The Board shall be responsible for ensuring that corrective actions are taken to address the findings of the written report and for assuring that a sound annual review of compliance-related Service Provider Agreements is performed.

## Management and Management Study

31.      The Bank shall have and retain qualified management. Each member of management shall have the qualifications and experience commensurate with his or her duties and responsibilities within the Bank. The Board shall provide each member of management the appropriate written authority to implement the provisions of the Joint Orders.

32.      The qualifications of individual members of management shall be assessed on each individual's ability to:

(a)      Comply with the requirements of the Joint Orders;

(b)      Operate the Bank in a safe and sound manner; and,

SHORT APPENDIX 117

(c)     Effectuate the Bank's compliance with applicable laws, rules and regulations.

33.     Within 30 days from the Effective Date, the Board shall retain an independent third party ("Management Consultant"), acceptable to the FDIC Regional Director and the CFPB Regional Director, to provide a detailed study of the Bank ("Management Study") to determine whether existing Bank management has the resources, skills and experience to return the Bank to a satisfactory compliance position. The Management Study shall include, at a minimum, a review of the duties, responsibilities, qualifications, and remuneration of the Bank's senior officers. The Management Study shall also review the authority of management to make necessary compliance changes vis-a-vis Service Providers.

34.     Within 30 days of receiving the Management Study, the Board shall adopt a plan to implement any recommendations of the Management Study or shall explain in writing signed by all Board members why a particular recommendation is not being implemented.

### Independent Audit Program

35.     Within 30 days from the effective date of the Joint Consent Order, the Bank shall schedule independent audits to be conducted at least annually to ensure compliance with Consumer Protection Laws. The audits shall be conducted by qualified personnel with experience in conducting independent audits of compliance programs of banks of comparable size. The audits identified on the schedule will assess the Bank's CMS and Compliance Program, and at a minimum, shall:

(a)     Define a comprehensive scope to include appropriate aspects of each law or regulation based on a risk analysis;

(b)     Identify the number of transactions sampled by category or product type;

SHORT APPENDIX 118

(c)    Identify deficiencies;

(d)    Provide descriptions of or suggestions for corrective actions and timeframes for correction; and

(e)    Establish follow-up procedures to verify that corrective actions are implemented and effective.

36.    Audit findings, deficiencies, and recommendations must be documented in a written report and provided to the Bank's Board and Audit Committee within 15 days after completion of the independent audit. In addition, the audit report should be thoroughly reviewed by the Bank's Board and fully documented in the Board's minutes.

37.    Within 45 days from receipt of the independent auditor's written report, the Board shall ensure that management takes action to address the audit's findings and develop and implement a plan to: (i) correct any deficiencies noted; and (ii) implement any recommendations or explain in writing signed by all Board members why a particular recommendation is not being implemented.

## III.  JOINT ORDER FOR RESTITUTION

### RESERVE ACCOUNT AND PAYMENT FLOOR

38.    Within 10 days from the effective date of the Joint Order for Restitution ("Restitution Order"), the Bank shall reserve or deposit into a segregated deposit account an amount not less than $75,000,000 ("Payment Floor") for the purpose of providing restitution as required by the Restitution Order.

39.    The Bank shall make all restitution payments required by the Restitution Order, regardless of whether the total of such payments exceeds the Payment Floor. If the total of

SHORT APPENDIX 119

payments is less than the Payment Floor, the excess shall be returned to the Bank's general funds.

## RESTITUTION PLAN FOR COLLECTION OF UNREPORTED DEBT

40.    Within 30 days from the Effective Date, the Bank shall prepare a comprehensive Restitution and Other Relief Plan ("Unreported Debt Restitution Plan") for all Unreported Debt Eligible Consumers. Unreported Debt Eligible Consumers are defined as all individuals who made payment on an Unreported Debt at any time following the receipt of a Debt Forgiveness Solicitation or an Unreported Debt Solicitation. A Debt Forgiveness Solicitation is a settlement solicitation on or after January 1, 2003 that includes: (a) the use of the words "waive," "forgiveness," or "save;" and (b) language substantially similar to a sentence stating, "No attempts will be made to collect the remaining balance which would need to be paid before American Express processes any future applications that you may choose to submit for an American Express account(s) or that an employer may submit on your behalf for an American Express Corporate Card." An Unreported Debt Solicitation shall mean a solicitation on or after January 1, 2003 that includes language substantially similar to a sentence stating, "We will report your settlement agreement to credit bureau agencies." Reimbursement shall be calculated through June 30, 2012 ("Unreported Debt Cut-Off Date"). The Bank shall submit the Unreported Debt Restitution Plan, including samples of letters to consumers, to the FDIC Regional Director and CFPB Regional Director for their review, comment and non-objection prior to implementation.

41.    The Unreported Debt Restitution Plan shall, at a minimum, require the Bank to reimburse payments made by Unreported Debt Eligible Consumers from the date the Unreported

Debt Solicitation was mailed to the Unreported Debt Eligible Consumer until the Unreported Debt Cut-Off Date plus 1.3% interest.

42. Within 90 days of receipt of non-objection from the FDIC Regional Director and the CFPB Regional Director, the Bank shall implement the Unreported Debt Restitution Plan. Any required cash restitution amount shall be provided to each of the Unreported Debt Eligible Consumers in the form of a certified or bank check. Restitution provided by the Bank shall not limit consumers' rights in any way.

43. The Bank shall retain for seven years all records pertaining to the Unreported Debt Restitution Plan, including but not limited to: documentation of the processes and procedures used to determine the Unreported Debt Eligible Consumers; the names, contact, and account information of the Unreported Debt Eligible Consumers; any mailing records; and documentation that the appropriate restitution and equitable relief were made.

44. After providing restitution on any Unreported Debt pursuant to paragraph 40 of the Joint Consent Order the Bank may resume non-deceptive collection efforts to recover such Unreported Debt in a manner compliant with this Order.

45. Providing restitution under this plan shall not create any new collection, consumer reporting or litigation rights on behalf of the Bank.

## RESTITUTION PLAN FOR DEBT FORGIVENESS SOLICITATIONS

46. Within 30 days from the Effective Date, the Bank shall prepare a comprehensive Restitution and Other Relief Plan ("Debt Forgiveness Restitution Plan") for all Debt Forgiveness Eligible Consumers. Debt Forgiveness Eligible Consumers are defined as all individuals who made payment on a consumer debt at any time following the receipt of a Debt Forgiveness Solicitation. The Bank shall submit the Debt Forgiveness Restitution Plan, including samples of

SHORT APPENDIX 121

letters to consumers, to the FDIC Regional Director and CFPB Regional Director for their review, comment and non-objection prior to implementation.

47.    The Debt Forgiveness Restitution Plan shall, at a minimum, require the following elements:

(a)    For Debt Forgiveness Eligible Consumers who settled their accounts and did not apply for a new credit or charge card, the Bank shall not deny future applications for credit because only the Settlement Amount was paid.

(b)    For Debt Forgiveness Eligible Consumers who settled their accounts, applied for and, according to Bank records, were denied a new credit or charge card, the Bank shall:

(i)    Pay $100;

(ii)    Not deny future applications for credit because only the Settlement Amount was paid; and

(iii)    Make a pre-approved offer for a new credit card with terms acceptable to the FDIC Regional Director and the CFPB Regional Director.

(c)    For Debt Forgiveness Eligible Consumers who settled their accounts and made payments in excess of the Settlement Amount, applied for and, according to Bank records, were denied a new credit or charge card, the Bank shall:

(i)    Pay $100;

(ii)    Not deny future applications for credit because only the Settlement Amount was paid;

(iii)    Make a pre-approved offer for a new credit card with terms acceptable to the FDIC Regional Director and the CFPB Regional Director; and

SHORT APPENDIX 122

(iv)    Reimburse all payments made in excess of the Settlement Amount plus 1.3% interest.

(d)    For Debt Forgiveness Eligible Consumers who settled their accounts and were subsequently issued an American Express card, the Bank shall reimburse all payments made in excess of the Settlement Amount plus 1.3% interest.

48.    Within 90 days of receipt of non-objection from the FDIC Regional Director and the CFPB Regional Director, the Bank shall implement the Debt Forgiveness Restitution Plan. Any required cash restitution amount shall be provided to each of the Debt Forgiveness Eligible Consumers in the form of a certified or bank check. Restitution provided by the Bank shall not limit consumers' rights in any way.

49.    The Bank shall retain for seven years all records pertaining to the Debt Forgiveness Restitution Plan, including but not limited to: documentation of the processes and procedures used to determine the Debt Forgiveness Eligible Consumers; the names, contact, and account information of the Debt Forgiveness Eligible Consumers; any mailing records; and documentation that the appropriate restitution and equitable relief were made.

## RESTITUTION PLAN FOR BLUE SKY

50.    Within 30 days from the Effective Date, the Bank shall prepare a comprehensive Restitution and Other Relief Plan ("Blue Sky Restitution Plan") for all eligible consumers ("Blue Sky Eligible Consumers"). Blue Sky Eligible Consumers are defined as all individuals who opened a Blue Sky credit card account with the Bank following receipt of a Blue Sky Solicitation and met the applicable requirements to earn the advertised bonus. A Blue Sky Solicitation shall mean a Blue Sky credit card solicitation letter that includes both the language "22,500 bonus points—receive a bonus $300;" or "22,500 bonus points—earn a bonus $300;" and a box entitled

SHORT APPENDIX 123

"Benefits" and the words "$300 bonus offer" in the box.  The Bank shall submit the Blue Sky Restitution Plan, including samples of letters to consumers, to the FDIC Regional Director and the CFPB Regional Director for their review, comment and non-objection prior to implementation.

51.     The Blue Sky Restitution Plan shall require the Bank to make a payment of $300 to Blue Sky Eligible Consumers.

52.     Within 90 days of receipt of non-objection from the FDIC Regional Director and the CFPB Regional Director, the Bank shall implement the Blue Sky Restitution Plan.  Any required cash restitution amount shall be provided to each of the Blue Sky Eligible Consumers in the form of a statement credit if the account remains open or a certified or bank check if the account is closed.  Restitution provided by the Bank shall not limit consumers' rights in any way.

53.     The Bank shall retain for seven years all records pertaining to the Blue Sky Restitution Plan, including but not limited to:  documentation of the processes and procedures used to determine the Blue Sky Eligible Consumers; the names, contact, and account information of the Blue Sky Eligible Consumers; any mailing records; and documentation that the appropriate restitution and equitable relief were made.

## RESTITUTION PLAN FOR HYBRID CARD LATE FEES

54.     Within 30 days from the Effective Date, the Bank shall prepare a comprehensive Restitution and Other Relief Plan ("Hybrid Card Late Fees Restitution Plan") for all eligible consumers ("Hybrid Card Late Fees Eligible Consumers").  Hybrid Card Late Fees Consumers are defined as all individuals who paid a 2.99% late fee on a Hybrid Card.  Reimbursement shall be calculated through December 10, 2011 ("Hybrid Card Late Fees Cut-Off Date").  The Bank shall submit the Hybrid Card Late Fees Restitution Plan, including samples of letters to

consumers, to the FDIC Regional Director and CFPB Regional Director for their review, comment and non-objection prior to implementation.

55.    The Hybrid Card Late Fees Restitution Plan shall, at a minimum, require the Bank to reimburse to Hybrid Card Late Fees Eligible Consumers payments from August 22, 2010 to December 10, 2011 of late fees in excess of $35 per late fee plus 1.3% interest calculated from the date the fee was charged until the date of reimbursement.

56.    Within 90 days of receipt of non-objection from the FDIC Regional Director and CFPB Regional Director, the Bank shall implement the Hybrid Card Late Fees Restitution Plan. Any required cash restitution amount shall be provided to each of the Hybrid Card Late Fees Eligible Consumers in the form of an account credit up to the amount of the account's outstanding balance, and a certified or bank check for any restitution that exceeds the outstanding balance. Restitution provided by the Bank shall not limit consumers' rights in any way.

57.    The Bank shall retain for seven years all records pertaining to the Hybrid Card Late Fees Restitution Plan, including but not limited to: documentation of the processes and procedures used to determine the Hybrid Card Late Fees Eligible Consumers; the names, contact, and account information of the Hybrid Card Late Fees Eligible Consumers; any mailing records; and documentation that the appropriate restitution and equitable relief were made.

## REVIEW OF RESTITUTION PLANS

58.    Prior to submission to the FDIC Regional Director and the CFPB Regional Director, the Unreported Debt Restitution Plan, Debt Forgiveness Restitution Plan, and the Hybrid Card Late Fees Restitution Plan (collectively, "Restitution Plans") shall be reviewed by the Compliance Program Consultant retained in paragraph 24 of the Joint Consent Order.

## MAILING REFUNDS

59.     Within 30 days from the effective date of the Restitution Order, the Bank shall submit to the FDIC Regional Director and the CFPB Regional Director for review a plan for mailing refunds, including the proposed text of letters that shall be sent to Eligible Consumers regarding restitution checks or account credits.  Such letters shall include satisfactory language explaining the reason the Bank is sending a restitution check or crediting an account, including that the Bank is sending the check or crediting an account as the result of an enforcement action by the FDIC and CFPB.  The letters shall also include reference to and the web addresses for any FDIC and CFPB press releases related to the Restitution Order.  The Bank shall then address any comments of the FDIC Regional Director and the CFPB Regional Director, making such changes as may be required to the proposed letters.  The letters, incorporating any changes that may be required in response to comments by the FDIC Regional Director and the CFPB Regional Director, shall be sent by mail to all Eligible Consumers entitled to receive restitution checks and/or credits to their accounts in accordance with the Restitution Order.

60.     When the Bank makes cash restitution by certified or bank check made payable to any consumer receiving restitution under the Restitution Order ("Eligible Consumer"), AECB shall send the certified or bank check by United States Postal Service first-class mail, address correction service requested, to the Eligible Consumer's last address as maintained by the Bank's records.  The Bank shall make reasonable attempts to obtain a current address for any Eligible Consumer whose notification letter and/or restitution check is returned for any reason, using standard address search methodologies, and shall promptly re-mail all returned letters and/or restitution checks to current addresses, if any.  If the certified or bank check for any eligible consumer is returned to the Bank after such second mailing by the Bank, or if a current mailing

SHORT APPENDIX 126

address cannot be identified using standard address search methodologies, the Bank shall retain the restitution amount of such Eligible Consumer for a period of three-hundred sixty (360) days from the date the restitution check was originally mailed, during which period such amount may be claimed by such Eligible Consumer upon appropriate proof of identity. After such time these monies will be disposed of in accordance with the applicable Restitution Plan in the Restitution Order.

## INDEPENDENT CERTIFIED ACCOUNTING FIRM

### Engagement of Firm

61.     Within 45 days from the Effective Date, the Bank shall retain, at its expense, an independent certified accounting firm ("Firm") acceptable to the FDIC Regional Director and the CFPB Regional Director to determine compliance with the Restitution Plans. The Firm shall determine compliance in accordance with the attestation standards established by the American Institute of Certified Public Accountants for agreed-upon procedures for engagements.

62.     Prior to the engagement of the Firm, and no later than 30 days from the issuance of the Restitution Order, the Bank shall submit the name and qualifications of the Firm, together with the proposed engagement letter with the Firm and the proposed agreed-upon procedures, to the FDIC Regional Director and the CFPB Regional Director for non-objection.

63.     The engagement letter between the Bank and the Firm shall grant the FDIC and CFPB access to the Firm's staff, work-papers, and materials prepared in the course of the Firm's engagement and preparation of the reports required by the Restitution Order.

64.     To be acceptable to the FDIC Regional Director and the CFPB Regional Director, the Firm must be an objective and unaffiliated third party and, at a minimum, comply with the Code of Conduct of the appropriate State Board of Accountancy.

SHORT APPENDIX 127

65.     Within 15 days after submission of the Firm's name, the FDIC Regional Director and the CFPB Regional Director shall notify the Bank in writing of the FDIC's and CFPB's objection or non-objection thereto.

66.     The Firm shall submit the reports called for in paragraphs 67 to 75 to the FDIC Regional Director and the CFPB Regional Director for review, comment, and non-objection within 30 days after the Bank completed implementation of each restitution plan.

### Report on Unreported Debt Restitution

67.     The Firm shall review and verify that the Bank accurately identified the Unreported Debt Eligible Consumers and correctly made cash refunds to the appropriate Unreported Debt Eligible Consumers.

68.     The Firm shall prepare a detailed written report of its assessment of the Bank's compliance with the Unreported Debt Restitution Plan ("Unreported Debt Restitution Report"). The Unreported Debt Restitution Report shall also include the following:

(i)     The processes and procedures by which the Bank determined the restitution amounts described in paragraph 40;

(ii)     The total number of Unreported Debt Eligible Consumers; and

(iii)     The total amount of restitution made under the Unreported Debt Restitution Plan.

### Report on Debt Forgiveness Restitution

69.     The Firm shall review and verify that the Bank accurately identified the Debt Forgiveness Eligible Consumers and correctly made cash refunds to the appropriate Debt Forgiveness Eligible Consumers.

70. The Firm shall prepare a detailed written report of its assessment of the Bank's compliance with the Debt Forgiveness Restitution Plan ("Debt Forgiveness Restitution Report").

71. The Debt Forgiveness Restitution Report shall also include the following:

    (i) The processes and procedures by which the Bank determined the restitution amounts described in paragraph 46;

    (ii) The total number of Debt Forgiveness Eligible Consumers; and

    (iii) The total amount of restitution made under the Debt Forgiveness Restitution Plan.

## Report on Blue Sky Restitution

72. The Firm shall review and verify that the Bank accurately identified the Blue Sky Eligible Consumers and correctly credited the accounts of or made cash refunds to the appropriate Blue Sky Eligible Consumers.

73. The Firm shall prepare a detailed written report of its assessment of the Bank's compliance with the Blue Sky Restitution Plan ("Blue Sky Restitution Report"). The Blue Sky Restitution Report shall also include the following:

    (i) The processes and procedures by which the Bank determined the restitution amounts described in paragraph 50;

    (ii) The total number of Blue Sky Eligible Consumers; and

    (iii) The total amount of restitution made under the Blue Sky Restitution Plan.

## Report on Hybrid Card Late Fees Restitution

74. The Firm shall review and verify that the Bank accurately identified the Hybrid Card Late Fees Eligible Consumers and correctly made cash refunds to the appropriate Hybrid Card Late Fees Eligible Consumers.

75.    The Firm shall prepare a detailed written report of its assessment of the Bank's compliance with the Hybrid Card late Fees Restitution Plan ("Hybrid Card Late Fees Restitution Report"). The Hybrid Card Late Fees Restitution Report shall also include the following:

(i)    The processes and procedures by which the Bank determined the restitution amounts described in paragraph 54;

(ii)    The total number of Hybrid Card Late Fees Eligible Consumers;

(iii)    The total amount of restitution made under the Hybrid Card Late Fees Restitution Plan; and

(iv)    The total amount of interest paid.

## IV.  JOINT ORDER TO PAY CIVIL MONEY PENALTY

76.    **IT IS FURTHER ORDERED** that by reason of the alleged violations of law and/or regulations as set forth in the Findings of Fact, and after taking into account the Stipulation, the appropriateness of the penalty with respect to the financial resources and good faith of the Bank, the gravity of the conduct by the Bank, the severity of the risks to and losses of consumers, the history of previous conduct by the Bank, and such other matters as justice may require, pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2), and section 1055(c) of the CFP Act, 12 U.S.C. § 5565(c): The Bank shall pay a total civil money penalty of $7,800,000. The Bank shall pay civil money penalties of $3,900,000 to the Treasury of the United States, as directed by the FDIC, and civil money penalties of $3,900,000 to the CFPB, in accordance with section 1017(d) of the CFP Act, 12 U.S.C. § 5497(d), as directed by the CFPB. The Bank shall pay such civil money penalty itself, and is prohibited from seeking or accepting indemnification from such payment from any third party.

SHORT APPENDIX 130

## V. NOTIFICATION AND REPORTING REQUIREMENTS

### PROGRESS REPORTS AND CERTIFICATIONS OF COMPLIANCE

77.    Within 30 days from the end of each calendar quarter following the Effective Date, the Bank shall provide a written progress report addressing each provision of the Joint Orders and detailing the form, manner, results and dates of any actions taken to secure compliance with the provisions of the Joint Orders to the FDIC Regional Director and the CFPB Regional Director. All progress reports and other written responses to the Joint Orders shall be reviewed by the Board and made a part of the Board minutes. The progress reports shall be true and accurate and accompanied by a certification of compliance signed by the Chairman of the Board and the Bank President. The certification of compliance shall include the following:

(a)    A statement confirming that the Bank is in compliance with all provisions of the Joint Orders; or

(b)    If the Bank is not in compliance with all provisions of the Joint Orders, the Bank must provide:

(i)    A list of the provisions with which the Bank is not yet in compliance, an explanation of why the Bank is not yet in compliance with each specific provision, and a description of the actions the Bank has taken to comply with the provision; and

(ii)    A statement as to when the Bank will be in full compliance with the Joint Orders.

### SHAREHOLDERS

78.    The Bank shall either provide a copy of the Joint Orders to its shareholder AETRS or otherwise furnish a description of the Order in conjunction with the next board of directors meeting of AETRS, in which case such description shall fully describe the Joint Orders

SHORT APPENDIX 131

in all material respects. The description and any accompanying communication, statement, or notice shall be sent to the FDIC, Disclosure and Securities Section, 550 17th Street, N.W., Washington, D.C. 20429 and to the CFPB, Office of Enforcement, 1700 G Street, N.W., Washington, D.C. 20552, for non-objection or comment prior to dissemination to shareholders. Any changes requested to be made by the FDIC or CFPB shall be made prior to dissemination of the description, communication, notice, or statement. This description shall be disseminated in conjunction with the Bank's next shareholder communication and in conjunction with its notice or proxy statement preceding the Bank's next shareholder meeting. The terms "next shareholder communication" and "next shareholder meeting" mean the next shareholder communication and next shareholder meeting immediately after the FDIC and CFPB provide the Bank with either non-objection of or comments about the description.

## VI. SAVINGS CLAUSE AND EFFECTIVE DATE OF THE JOINT ORDERS

The provisions of the Joint Orders shall not bar, estop or otherwise prevent the FDIC, the CFPB, or any other federal or state agency or department from taking any other action against the Bank.

The Joint Orders shall be effective on the date of issuance.

Calculation of time limitations for compliance with the terms of the Joint Orders shall be based on calendar days, unless otherwise noted.

The provisions of the Joint Orders shall be binding on the Bank, its officers, agents, servants, employees, other institution-affiliated parties, and any successors and assigns thereof.

The provisions of the Joint Orders shall remain effective and enforceable except to the extent that and until such time as any provision has been modified, terminated, suspended, or set aside by the FDIC and CFPB.

SHORT APPENDIX 132

Any violation of the Joint Orders may result in the imposition by the FDIC or the CFPB of the maximum amount of civil money penalties allowed under section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2), or section 1055(c) of the CFP Act, 12 U.S.C. §5565(c), respectively.

The provisions of the Joint Orders shall be enforceable by either the FDIC or the CFPB. Issued pursuant to delegated authority this _1st_ day of _October_, 2012.

_____
Sylvia H. Plunkett
Senior Deputy Director
Division of Depositor and Consumer Protection

Issued this _1st_ day of _October_, 2012.

_____
Richard Cordray
Director
Consumer Financial Protection Bureau

SHORT APPENDIX 133

UNITED STATES OF AMERICA
Before the
CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2012-CFPB-0003

| | |
|---|---|
| In the Matter of:<br><br>AMERICAN EXPRESS BANK, FSB<br>SALT LAKE CITY, UTAH | CONSENT ORDER,<br>ORDER FOR<br>RESTITUTION, AND<br>ORDER TO PAY<br>CIVIL MONEY PENALTY |

The Consumer Financial Protection Bureau ("CFPB") has jurisdiction over American Express Bank, FSB ("AEBFSB" or "the Bank") pursuant to section 1002(6), 1025 and 1053(b) of the Consumer Financial Protection Act ("CFP Act"), 12 U.S.C. §§ 5481(6), 5515 and 5563(b).

## I.  OVERVIEW

The CFPB finds that AEBFSB has engaged in violations of various federal consumer financial laws, including violations of:

(1)     Sections 1031 and 1036 of the CFP Act ("Sections 1031 and 1036"), 12 U.S.C. §§ 5531 and 5536, for deceptive debt collection practices;

(2)     The Truth in Lending Act ("TILA"), as amended by the Credit CARD Act of 2009, 15 U.S.C. §§ 1601 et seq., and section 1026.52(b)(1) of Regulation Z,

12 C.F.R. § 1026.52(b)(1),[1] for charging unlawful late fees on certain hybrid charge cards; and

(3)     The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et seq., for failing to report certain consumer disputes to consumer reporting agencies ("CRAs").

The CFPB further finds that the Bank has failed to manage its compliance with Federal consumer financial laws and regulations adequately relating to the Bank's Compliance Risk Management Program ("CRMP") and the Bank's oversight of affiliate and third-party service providers ("Service Providers").

## FINDINGS OF FACT

Based on the CFPB's targeted review of AEBFSB and resulting Supervisory Letter dated June 14, 2012 ("Supervisory Letter"), the CFPB finds the following facts:

(1)     *Deceptive Debt Collection Practices.* In connection with the collection of consumer debt:

(a)     Unreported Debt shall mean consumer debt that has been in collections or charged off and is no longer being reported by the Bank to CRAs. AEBFSB misrepresented to certain customers that settlement of Unreported Debt would be reflected on the consumers' credit report and that payment could improve the consumers' credit score; and

(b)     Certain debt settlement letters that stated that after settlement, the consumers' remaining debt would be "waived" or "forgiven" were misleading because the Bank

---

[1] Effective December 30, 2011, the Consumer Financial Protection Bureau republished some of the existing regulations implementing Federal consumer financial laws, including Regulation Z, in Chapter X of Title 12 of the Code of Federal Regulations. All citations to these regulations will refer to the republished regulations for ease of reference.

SHORT APPENDIX 135

failed to prominently disclose that the consumer must pay the full debt balance before the Bank would process any future credit or charge card application.

(2)    *Excessive Hybrid Card Late Fees.*  AEBFSB offered consumers the option of having a hybrid account for a charge card with revolving credit features that allowed the consumers to pay a portion of their outstanding balances over time ("Hybrid Card").  Under section 1026.52(b)(1) of Regulation Z, AEBFSB is permitted to charge consumers with these accounts a late fee based on costs or based on a safe harbor provided in the regulation.  Instead of basing the fees on cost or charging fees of a specified dollar amount as permitted by the safe harbor, AEBFSB unlawfully charged consumers 2.99% of a portion of their delinquent balance.

(3)    *Reporting of Credit Disputes.*  FCRA requires a creditor to report to CRAs if a consumer disputes information it reported to the CRAs.  AEBFSB created a system that failed to report to the CRAs when a consumer disputed information.  Depending on AEBFSB's investigation of the dispute, AEBFSB either asked the CRAs to delete the information, or AEBFSB reported the information to the CRAs without indicating the dispute in violation of FCRA.

(4)    *Board and Management Oversight.*  The Bank's Board of Directors ("Board") and senior management exercised ineffective oversight and control over the compliance function, particularly the oversight of AEBFSB Service Providers.

(5)    *Compliance Program.*  The Bank's CRMP is deficient, with problems in the implementation and compliance with policies and procedures.  The Bank failed to implement an effective employee training program for applicable consumer protection laws and implementing rules and regulations, regulatory guidance and statements of policy ("Consumer Protection

SHORT APPENDIX 136

Laws"). In addition, the Bank has failed to adequately monitor consumer complaints and inquiries.

(6)    *Compliance Staffing.* The position of Chief Compliance Officer has turned over frequently, which adversely affects the Bank's compliance with Consumer Protection Laws. Staffing for compliance monitoring is inadequate.

(7)    *Oversight of Service Provider Agreements and Services.* Most of the Bank's consumer operations are performed or directed by affiliates and service providers. All violations identified in the Supervisory Letter are attributed to deficient management oversight of the Bank's Service Providers.

(8)    *Consumer Harm.* Approximately 20,000 consumers were adversely impacted by the Bank's actions and at least $10,000,000 was collected by the Bank in violation of applicable Consumer Protection Laws.

## STIPULATION

The Bank, by and through its duly elected and currently acting Board, has executed a Stipulation to the Issuance of a Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty ("Stipulation"), dated September 27, 2012, that is accepted by the CFPB. With the Stipulation, the Bank has consented, without admitting or denying any findings of fact, violations of laws or regulations, to the issuance of the Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty (collectively "Orders") by the CFPB.

Having determined that the requirements for issuance of an order under section 1053(b) of the CFP Act, 12 U.S.C. § 5553(b) has been satisfied, the CFPB, therefore, accepts the Stipulation and issue the following orders:

## II.     CONSENT ORDER

## CORRECTIONS OF VIOLATIONS OF LAWS

**IT IS HEREBY ORDERED** that the Bank, its officers, agents, servants and employees immediately cease and desist and the Bank ensure that its Service Providers or other agents immediately cease and desist from engaging violations of law and/or regulations, as more fully set forth in the Supervisory Letter, and it is further ordered that the Bank take affirmative actions as of the date of issuance of the Orders ("Effective Date"), unless otherwise specified, as follows:

1.     The Bank shall correct all violations of law, as more fully set forth in the Supervisory Letter and as described below, and shall implement procedures to prevent their recurrence. The Bank's actions as required by this paragraph shall be satisfactory to the Regional Director, West Region, of the CFPB ("CFPB Regional Director") as determined at subsequent examinations and/or visitations.

### Deceptive Acts and Practices

2.     The Bank shall take all action necessary to eliminate all violations of Sections 1031 and 1036. In addition, the Bank shall take all necessary steps to effect and maintain future compliance with Sections 1031 and 1036 as described more particularly herein.

### Debt Collection Practices

3.     The Bank shall continue to provide disclosures concerning the expiration of the Bank's litigation rights when collecting debt that is barred by applicable state statutes of limitations and shall take all action necessary to ensure the revision of any and all solicitations and any other oral, written or electronic communications used in connection with the collection of consumer debts to remove all deceptive statements and to disclose clearly and prominently:

SHORT APPENDIX 138

(a)     All material conditions, benefits and restrictions concerning any offer of settlement; and

(b)     When collecting on Unreported Debt, the following language:

The law limits how long a debt can be reported to a consumer reporting agency. Because of the age of your debt, we cannot report it to a consumer reporting agency. Payment or non-payment of this debt will not affect your credit score.

4.     For purposes of the Consent Order, "clearly and prominently" shall mean:

(a)     As to written information, written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer. If the information is contained in a multi-page print document, the disclosure appears on the first page; and

(b)     As to information presented orally, spoken and disclosed in a volume, cadence and syntax sufficient for an ordinary consumer to hear and comprehend.

5.     The Bank shall not make any representation or statement, or take any other action that interferes with, detracts from, contradicts, or otherwise obscures the disclosures required in paragraph 3.

6.     The Bank shall maintain accurate and complete information on each consumer debt that the Bank collects or attempts to collect. Such information shall include, at a minimum:

(a)     consumer agreements and any subsequent amendments and

(b)     documentation evidencing the debt and each transaction or activity on the debt. The Bank shall make such information and/or documentation available upon request to a consumer inquiring about his/her debt.

SHORT APPENDIX 139

For debts incurred prior to the Effective Date, the Bank may collect or attempt to collect such debts if the Bank has evidence to verify the debt, but must immediately cease such collection efforts if the consumer disputes the debt and the Bank is unable to provide the documentation in subparagraphs 6(a) and (b) above.

7.     The Bank shall provide a copy of the Orders to any person to whom the Bank sells, transfers, or assigns any debt which would require the disclosures in paragraph 3 and/or be subject to the provisions of paragraph 6 and shall require in all contracts to sell, transfer, or assign such debt a provision that contains a clear and prominent notification to the buyer, transferee, or assignee that the Bank is expressly requiring that the disclosures in paragraph 3 be given by any person collecting such debt and requiring that the provisions of paragraph 6 apply to the debt.

8.     For any Unreported Debt, the Bank shall not in the future report any activity to the CRAs.

### Truth in Lending

9.     The Bank shall take all action necessary to eliminate all violations of TILA and Regulation Z. In addition, the Bank shall take all necessary steps to effect and maintain future compliance with TILA and Regulation Z as described more particularly herein.

### Hybrid Card Late Fees

10.     The Bank shall take all action necessary to ensure that it is complying with the limitations on late fees set forth in Regulation Z section 1026.52(b)(1) for any charge card account that also contains a revolving credit feature.

SHORT APPENDIX 140

## Fair Credit Reporting Act

### Reporting of Credit Disputes

11.     The Bank shall take all action necessary to eliminate all violations of FCRA and to maintain future compliance with FCRA.

12.     The Bank shall take all action necessary to ensure that consumer disputed information is not furnished to consumer reporting agencies without a notice of the dispute to ensure compliance with section 623(a) of FCRA.

### Remediation Plan for Reporting of Credit Disputes

13.     The Bank shall provide every consumer card holder who has an open account, who has a closed account with a balance that the Bank reports to a CRA, or who has a closed account with no balance but for whom the Bank reported negative information to a CRA within the past seven years with an advisement of rights under FCRA in a form that is acceptable to the CFPB Regional Director.  This advisement of rights should be mailed or transmitted to consumers within three complete billing cycles or three months of its approval by the CFPB Regional Director and shall inform consumers that they have a right to dispute inaccurate information on their credit reports, and should they dispute the information to the Bank, the Bank will report the dispute to the CRAs, as required by law.

## COMPLIANCE MANAGEMENT SYSTEM

**IT IS FURTHER ORDERED** that the Bank take additional affirmative actions as follows:

14.     Within 60 days from the Effective Date, the Bank shall review, revise, develop and/or implement, as necessary, a sound risk-based Compliance Risk Management Program

SHORT APPENDIX 141

("CRMP") including a comprehensive written compliance program ("Compliance Program") to ensure that its activities comply with Sections 1031 and 1036 and otherwise ensure compliance with all Consumer Protection Laws to which the Bank is subject. At a minimum, the Compliance Program shall provide for and include:

      (a)    Comprehensive, written policies and procedures designed to prevent violations of Consumer Protection Laws and prevent associated risks of harm to consumers;

      (b)    An effective training program that includes regular, specific, comprehensive training in Consumer Protection Laws commensurate with individual job functions and duties for appropriate Bank personnel, including all individuals having responsibilities that relate to Consumer Protection Laws, senior management and the Board;

      (c)    An enhanced and well-documented internal CRMP monitoring process incorporated into the daily work of Bank personnel that is designed to detect and promptly correct compliance weaknesses within the Bank and Service Providers, particularly weaknesses that impact consumer accounts;

      (d)    An effective consumer complaint monitoring process, including the maintenance of adequate records of all written, oral, or electronic complaints or inquiries, formal or informal, received by the Bank and all Service Providers and the resolution of the complaints and inquiries; and

      (e)    Effective independent audit coverage of the Compliance Program and the Bank's compliance with all Consumer Protection Laws and internal policies and procedures.

    15.    The Bank shall implement and comply with the written Compliance Program and/or any subsequent modification thereto upon approval of the Compliance Program by the Board.

16.    Within 15 days from the Effective Date, the Bank shall retain an independent

third party ("Compliance Program Consultant"), acceptable to the CFPB Regional Director, to

assist in the development, revision, review and implementation of the Bank's Compliance

Program.  The Compliance Program Consultant shall provide a detailed written report of the

Bank's adherence to the Compliance Program to the Board ("Compliance Program Report") on a

monthly basis.  The Board of Directors shall conduct a full and complete review of the

Compliance Program Report within 30 days of receipt.  This review shall be recorded and noted

in the Board minutes.

17.    Within 30 days from the Effective Date, the Bank shall retain an independent

third party ("Compliance Staffing Consultant"), acceptable to the CFPB Regional Director, who

possesses the appropriate expertise and qualifications to review, analyze and assess the Bank's

compliance staffing, and determine if additional personnel are needed.  The Compliance Staffing

Consultant shall provide to the Board a detailed written report containing its analysis,

assessments, and recommendations ("Staffing Report").  The Board of Directors shall conduct a

full and complete review of the Staffing Report within 30 days of receipt.  This review shall be

recorded and noted in the Board minutes.

### Board Oversight

*Compliance Risk Management Program*

18.    The Board shall participate fully in the oversight of the Bank's CRMP and shall

be responsible for the approval of sound policies and objectives and for the supervision of all the

Bank's compliance-related activities, consistent with the role and expertise commonly expected

for directors of banks of comparable size and complexity and offering comparable banking

products and services.

SHORT APPENDIX 143

19.     Prior to implementation, the Board shall review the written Compliance Program and/or any subsequent modification thereto. If the Board determines that the Compliance Program and/or any subsequent modification thereto is acceptable, the Board shall approve it and record the approval in the Board minutes.

*Compliance Committee & Staffing*

20.     Within 30 days from the Effective Date, the Board shall maintain a compliance committee comprised of at least three directors, who are not officers of the Bank, and at least one member of senior management, plus the Chief Compliance Officer ("Compliance Committee").

(a)     The Compliance Committee shall meet monthly and, at a minimum, the following areas shall be reviewed and approved: minutes of the Compliance Committee, Chief Compliance Officer reports, Compliance Program audit reports, Compliance Program policies, and progress reports concerning compliance with the Consent Order.

(b)     The Compliance Committee shall report its discussions to the Board at each regularly scheduled Board meeting, and the Board minutes shall document the review and approval of all items before the Board, including the names of any dissenting directors. Nothing shall diminish the responsibility of the entire Board to ensure compliance with the provisions of the Consent Order.

(c)     The Board, in conjunction with the Compliance Committee, shall allocate resources that are commensurate with the level of complexity of the Bank's operations to ensure the establishment and implementation of an adequate CRMP, as described in the CFPB Supervision and Examination Manual Part II, and shall include specific procedures to ensure the Bank's compliance with all Consumer Protection Laws. The allocated resources shall be sufficient to ensure the Bank's timely compliance with the Consent Order.

SHORT APPENDIX 144

(d)    The Board, in conjunction with the Compliance Committee, shall:

(i)    Ensure that the Bank has a qualified Chief Compliance Officer who possesses the requisite knowledge and experience to administer an effective CRMP for a large bank, as defined in 12 U.S.C § 5515(a)(1);

(ii)    Ensure that the duties and responsibilities of the Chief Compliance Officer are clearly defined and provide the Chief Compliance Officer access to both the Board and the Compliance Committee;

(iii)    Ensure that the Chief Compliance Officer have and retain sufficient authority and independence to implement policies related to Consumer Protection Laws and to institute corrective action as needed.  This authority shall include the ability to cross departmental lines, have access to all areas of the Bank's operations, and effectuate corrective action upon discovering deficiencies;

(iv)    Ensure that the Chief Compliance Officer and all individuals with compliance oversight responsibilities receive ongoing training, sufficient time, and adequate resources to effectively oversee, coordinate, and implement the Bank's CRMP;

(v)    Require the Chief Compliance Officer to provide to the Compliance Committee monthly written reports, including, but not limited to, reports related to the enactment and/or promulgation of new Consumer Protection Laws and changes to existing Consumer Protection Laws, training performed, monitoring and compliance audits performed, corrective action taken, and compliance with the Consent Order;

(vi)    Ensure proper and timely follow-up and resolution to audit and examination findings indicating the need for corrective action(s); and

(vii)    Develop and implement an internal monitoring system of employees' performance to ensure that compliance policies, procedures and regulatory requirements are adequately followed and hold employees accountable for following adopted policies, procedures and regulatory requirements.

## Oversight of Service Provider Agreements And Services

21.    Within 60 days from the Effective Date, the Bank shall develop policies to maintain effective monitoring, training, record-keeping and audit procedures to review each aspect of the Bank's agreements with its Service Providers and the services performed for the Bank pursuant to these agreements ("Service Provider Agreements and Services"). The policies and procedures shall, at a minimum, provide for:

(a)    Bank prior review and approval of copies of (i) all Bank marketing and solicitation materials, including direct mail or internet solicitations, promotional materials, advertising, telemarketing scripts ("Marketing and Solicitation Materials"), and (ii) other materials provided by the Bank to consumers generated in connection with the administration and servicing of the Service Provider Agreements and Services;

(b)    Maintenance of records of all Service Provider agreements ("Service Provider Agreements") and approved Marketing and Solicitation Materials, including any changes or amendments with respect to such materials;

(c)    Monitoring the performance of marketing and solicitation programs for new accounts;

(d)    Prompt notification to the Bank by any Service Provider of all regulatory agencies' inquiries, customer complaint/inquiry correspondence, and/or legal action received by any Service Provider with respect to charge and credit card programs (other than routine requests

such as requests to cease and desist collection contact), and maintenance by the Bank of all such documents;

(e)     Procedures for promptly addressing and resolving consumer complaints and inquiries, regardless of the source;

(f)     Procedures for monitoring and auditing of collection activities and customer service call centers;

(g)     Bank review of all Service Provider charge and credit card program partners' credit, fraud, and risk management materials, including policy manuals and procedures, to determine compliance with all Consumer Protection Laws; and

(h)     An effective training program that includes regular, specific, and comprehensive training in Consumer Protection Laws for all employees of Service Providers having responsibilities that relate to Consumer Protection Laws, including senior management, commensurate with their individual job functions and duties.

22.     The Bank's Compliance Committee shall, on a quarterly basis, submit a written report to the Board detailing whether Service Providers are in compliance with Service Provider Agreements. The written report shall include potential violations, deficiencies, customer complaints and inquiries, or other concerns. The Board shall be responsible for ensuring that corrective actions are taken to address the findings of the written report and for assuring that a sound annual review of compliance-related Service Provider Agreements is performed.

### Management and Management Study

23.     The Bank shall have and retain qualified management. Each member of management shall have the qualifications and experience commensurate with his or her duties

and responsibilities within the Bank. The Board shall provide each member of management the appropriate written authority to implement the provisions of the Orders.

24.     The qualifications of individual members of management shall be assessed on each individual's ability to:

      (a)     Comply with the requirements of the Orders and

      (b)     Effectuate the Bank's compliance with applicable laws, rules and regulations.

25.     Within 30 days from the Effective Date, the Board shall retain an independent third party ("Management Consultant"), acceptable to the CFPB Regional Director, to provide a detailed study of the Bank ("Management Study") to determine whether existing Bank management has the resources, skills and experience to return the Bank to a satisfactory compliance position. The Management Study shall include, at a minimum, a review of the duties, responsibilities, qualifications, and remuneration of the Bank's senior officers. The Management Study shall also review the authority of management to make necessary compliance changes vis-a-vis Service Providers.

26.     Within 30 days of receiving the Management Study, the Board shall adopt a plan to implement any recommendations of the Management Study or shall explain in writing signed by all Board members why a particular recommendation is not being implemented.

### Independent Audit Program

27.     Within 30 days from the effective date of the Consent Order, the Bank shall schedule independent audits to be conducted at least annually to ensure compliance with Consumer Protection Laws. The audits shall be conducted by qualified personnel with experience in conducting independent audits of compliance programs of banks of comparable

SHORT APPENDIX 148

size. The audits identified on the schedule will assess the Bank's CRMP and Compliance Program, and at a minimum, shall:

      (a)    Define a comprehensive scope to include appropriate aspects of each law or regulation based on a risk analysis;

      (b)    Identify the number of transactions sampled by category or product type;

      (c)    Identify deficiencies;

      (d)    Provide descriptions of or suggestions for corrective actions and timeframes for correction; and

      (e)    Establish follow-up procedures to verify that corrective actions are implemented and effective.

28.    Audit findings, deficiencies, and recommendations must be documented in a written report and provided to the Bank's Board and Audit Committee within 15 days after completion of the independent audit. In addition, the audit report should be thoroughly reviewed by the Bank's Board and fully documented in the Board's minutes.

29.    Within 45 days from receipt of the independent auditor's written report, the Board shall ensure that management takes action to address the audit's findings and develop and implement a plan to: (i) correct any deficiencies noted; and (ii) implement any recommendations or explain in writing signed by all Board members why a particular recommendation is not being implemented.

### III.    ORDER FOR RESTITUTION

### RESERVE ACCOUNT AND PAYMENT FLOOR

30.    Within 10 days from the effective date of the Order for Restitution ("Restitution Order"), the Bank shall reserve or deposit into a segregated deposit account an amount not less

SHORT APPENDIX 149

than $10,000,000 ("Payment Floor") for the purpose of providing restitution as required by the Restitution Order.

31.    The Bank shall make all restitution payments required by the Restitution Order, regardless of whether the total of such payments exceeds the Payment Floor. If the total of payments is less than the Payment Floor, the excess shall be returned to the Bank's general funds.

## RESTITUTION PLAN FOR COLLECTION OF UNREPORTED DEBT

32.    Within 30 days from the Effective Date, the Bank shall prepare a comprehensive Restitution and Other Relief Plan ("Unreported Debt Restitution Plan") for all Unreported Debt Eligible Consumers. Unreported Debt Eligible Consumers are defined as all individuals who made payment on an Unreported Debt at any time following the receipt of a Debt Forgiveness Solicitation or an Unreported Debt Solicitation. A Debt Forgiveness Solicitation is a settlement solicitation on or after January 1, 2003 that includes: (a) the use of the words "waive," "forgiveness," or "save;" and (b) language substantially similar to a sentence stating, "No attempts will be made to collect the remaining balance which would need to be paid before American Express processes any future applications that you may choose to submit for an American Express account(s) or that an employer may submit on your behalf for an American Express Corporate Card." An Unreported Debt Solicitation shall mean a solicitation on or after January 1, 2003 that includes language substantially similar to a sentence stating, "We will report your settlement agreement to credit bureau agencies." Reimbursement shall be calculated through June 30, 2012 ("Unreported Debt Cut-Off Date"). The Bank shall submit the Unreported Debt Restitution Plan, including samples of letters to consumers, to the CFPB Regional Director for review, comment and non-objection prior to implementation.

33.    The Unreported Debt Restitution Plan shall, at a minimum, require the Bank to reimburse payments made by Unreported Debt Eligible Consumers from the date the Unreported Debt Solicitation was mailed to the Unreported Debt Eligible Consumer until the Unreported Debt Cut-Off Date plus 1.3% interest.

34.    Within 90 days of receipt of non-objection from the CFPB Regional Director, the Bank shall implement the Unreported Debt Restitution Plan. Any required cash restitution amount shall be provided to each of the Unreported Debt Eligible Consumers in the form of a certified or bank check. Restitution provided by the Bank shall not limit consumers' rights in any way.

35.    The Bank shall retain for seven years all records pertaining to the Unreported Debt Restitution Plan, including but not limited to: documentation of the processes and procedures used to determine the Unreported Debt Eligible Consumers; the names, contact, and account information of the Unreported Debt Eligible Consumers; any mailing records; and documentation that the appropriate restitution and equitable relief were made.

36.    After providing restitution on any Unreported Debt pursuant to paragraph 32 of the Consent Order the Bank may resume non-deceptive collection efforts to recover such Unreported Debt in a manner compliant with this Order.

37.    Providing restitution under this plan shall not create any new collection, consumer reporting or litigation rights on behalf of the Bank.

## RESTITUTION PLAN FOR DEBT FORGIVENESS SOLICITATIONS

38.    Within 30 days from the Effective Date, the Bank shall prepare a comprehensive Restitution and Other Relief Plan ("Debt Forgiveness Restitution Plan") for all Debt Forgiveness Eligible Consumers. Debt Forgiveness Eligible Consumers are defined as all individuals who

made payment on a consumer debt at any time following the receipt of a Debt Forgiveness Solicitation. The Bank shall submit the Debt Forgiveness Restitution Plan, including samples of letters to consumers, to the CFPB Regional Director for review, comment and non-objection prior to implementation.

39.    The Debt Forgiveness Restitution Plan shall, at a minimum, require the following elements:

(a)    For Debt Forgiveness Eligible Consumers who settled their accounts and did not apply for a new credit or charge card, the Bank shall not deny future applications for credit because only the Settlement Amount was paid.

(b)    For Debt Forgiveness Eligible Consumers who settled their accounts, applied for and, according to Bank records, were denied a new credit or charge card, the Bank shall:

(i)    Pay $100;

(ii)    Not deny future applications for credit because only the Settlement Amount was paid; and

(iii)    Make a pre-approved offer for a new credit card with terms acceptable to the CFPB Regional Director.

(c)    For Debt Forgiveness Eligible Consumers who settled their accounts and made payments in excess of the Settlement Amount, applied for and, according to Bank records, were denied a new credit or charge card, the Bank shall:

(i)    Pay $100;

(ii)    Not deny future applications for credit because only the Settlement Amount was paid;

(iii)    Make a pre-approved offer for a new credit card with terms acceptable to the CFPB Regional Director; and

(iv)    Reimburse all payments made in excess of the Settlement Amount plus 1.3% interest.

(d)    For Debt Forgiveness Eligible Consumers who settled their accounts and were subsequently issued an American Express card, the Bank shall reimburse all payments made in excess of the Settlement Amount plus 1.3% interest.

40.    Within 90 days of receipt of non-objection from the CFPB Regional Director, the Bank shall implement the Debt Forgiveness Restitution Plan.  Any required cash restitution amount shall be provided to each of the Debt Forgiveness Eligible Consumers in the form of a certified or bank check.  Restitution provided by the Bank shall not limit consumers' rights in any way.

41.    The Bank shall retain for seven years all records pertaining to the Debt Forgiveness Restitution Plan, including but not limited to:  documentation of the processes and procedures used to determine the Debt Forgiveness Eligible Consumers; the names, contact, and account information of the Debt Forgiveness Eligible Consumers; any mailing records; and documentation that the appropriate restitution and equitable relief were made.

## RESTITUTION PLAN FOR HYBRID CARD LATE FEES

42.    Within 30 days from the Effective Date, the Bank shall prepare a comprehensive Restitution and Other Relief Plan ("Hybrid Card Late Fees Restitution Plan") for all eligible consumers ("Hybrid Card Late Fees Eligible Consumers").  Hybrid Card Late Fees Consumers are defined as all individuals who paid a 2.99% late fee on a Hybrid Card.  Reimbursement shall be calculated through December 10, 2011 ("Hybrid Card Late Fees Cut-Off Date").  The Bank

SHORT APPENDIX 153

shall submit the Hybrid Card Late Fees Restitution Plan, including samples of letters to consumers, to the CFPB Regional Director for review, comment and non-objection prior to implementation.

43.    The Hybrid Card Late Fees Restitution Plan shall, at a minimum, require the Bank to reimburse to Hybrid Card Late Fees Eligible Consumers payments from August 22, 2010 to December 10, 2011 of late fees in excess of $35 per late fee plus 1.3% interest calculated from the date the fee was charged until the date of reimbursement.

44.    Within 90 days of receipt of non-objection from the CFPB Regional Director, the Bank shall implement the Hybrid Card Late Fees Restitution Plan. Any required cash restitution amount shall be provided to each of the Hybrid Card Late Fees Eligible Consumers in the form of an account credit up to the amount of the account's outstanding balance, and a certified or bank check for any restitution that exceeds the outstanding balance. Restitution provided by the Bank shall not limit consumers' rights in any way.

45.    The Bank shall retain for seven years all records pertaining to the Hybrid Card Late Fees Restitution Plan, including but not limited to:  documentation of the processes and procedures used to determine the Hybrid Card Late Fees Eligible Consumers; the names, contact, and account information of the Hybrid Card Late Fees Eligible Consumers; any mailing records; and documentation that the appropriate restitution and equitable relief were made.

## REVIEW OF RESTITUTION PLANS

46.    Prior to submission to the CFPB Regional Director, the Unreported Debt Restitution Plan, Debt Forgiveness Restitution Plan, and the Hybrid Card Late Fees Restitution Plan (collectively, "Restitution Plans") shall be reviewed by the Compliance Program Consultant retained in paragraph 16 of the Consent Order.

SHORT APPENDIX 154

## MAILING REFUNDS

47.     Within 30 days from the effective date of the Restitution Order, the Bank shall submit to the CFPB Regional Director for review a plan for mailing refunds, including the proposed text of letters that shall be sent to Eligible Consumers regarding restitution checks or account credits.  Such letters shall include satisfactory language explaining the reason the Bank is sending a restitution check or crediting an account, including that the Bank is sending the check or crediting an account as the result of an enforcement action by the CFPB.  The letters shall also include reference to and the web addresses for any CFPB press releases related to the Restitution Order.  The Bank shall then address any comments of the CFPB Regional Director, making such changes as may be required to the proposed letters.  The letters, incorporating any changes that may be required in response to comments by the CFPB Regional Director, shall be sent by mail to all Eligible Consumers entitled to receive restitution checks and/or credits to their accounts in accordance with the Restitution Order.

48.     When the Bank makes cash restitution by certified or bank check made payable to any consumer receiving restitution under the Restitution Order ("Eligible Consumer"), AEBFSB shall send the certified or bank check by United States Postal Service first-class mail, address correction service requested, to the Eligible Consumer's last address as maintained by the Bank's records.  The Bank shall make reasonable attempts to obtain a current address for any Eligible Consumer whose notification letter and/or restitution check is returned for any reason, using standard address search methodologies, and shall promptly re-mail all returned letters and/or restitution checks to current addresses, if any.  If the certified or bank check for any eligible consumer is returned to the Bank after such second mailing by the Bank, or if a current mailing

SHORT APPENDIX 155

address cannot be identified using standard address search methodologies, the Bank shall retain the restitution amount of such Eligible Consumer for a period of three-hundred sixty (360) days from the date the restitution check was originally mailed, during which period such amount may be claimed by such Eligible Consumer upon appropriate proof of identity.  After such time these monies will be disposed of in accordance with the applicable Restitution Plan in the Restitution Order.

## INDEPENDENT CERTIFIED ACCOUNTING FIRM

### Engagement of Firm

49.     Within 45 days from the Effective Date, the Bank shall retain, at its expense, an independent certified accounting firm ("Firm") acceptable to the CFPB Regional Director to determine compliance with the Restitution Plans.  The Firm shall determine compliance in accordance with the attestation standards established by the American Institute of Certified Public Accountants for agreed-upon procedures for engagements.

50.     Prior to the engagement of the Firm, and no later than 30 days from the issuance of the Restitution Order, the Bank shall submit the name and qualifications of the Firm, together with the proposed engagement letter with the Firm and the proposed agreed-upon procedures, to the CFPB Regional Director for non-objection.

51.     The engagement letter between the Bank and the Firm shall grant the CFPB access to the Firm's staff, work-papers, and materials prepared in the course of the Firm's engagement and preparation of the reports required by the Restitution Order.

52.     To be acceptable to the CFPB Regional Director, the Firm must be an objective and unaffiliated third party and, at a minimum, comply with the Code of Conduct of the appropriate State Board of Accountancy.

53. Within 15 days after submission of the Firm's name, the CFPB Regional Director shall notify the Bank in writing of the CFPB's objection or non-objection thereto.

54. The Firm shall submit the reports called for in paragraphs 55 to 61 to the CFPB Regional Director for review, comment, and non-objection within 30 days after the Bank completed implementation of each restitution plan.

### Report on Unreported Debt Restitution

55. The Firm shall review and verify that the Bank accurately identified the Unreported Debt Eligible Consumers and correctly made cash refunds to the appropriate Unreported Debt Eligible Consumers.

56. The Firm shall prepare a detailed written report of its assessment of the Bank's compliance with the Unreported Debt Restitution Plan ("Unreported Debt Restitution Report"). The Unreported Debt Restitution Report shall also include the following:

(i) The processes and procedures by which the Bank determined the restitution amounts described in paragraph 32;

(ii) The total number of Unreported Debt Eligible Consumers; and

(iii) The total amount of restitution made under the Unreported Debt Restitution Plan.

### Report on Debt Forgiveness Restitution

57. The Firm shall review and verify that the Bank accurately identified the Debt Forgiveness Eligible Consumers and correctly made cash refunds to the appropriate Debt Forgiveness Eligible Consumers.

58. The Firm shall prepare a detailed written report of its assessment of the Bank's compliance with the Debt Forgiveness Restitution Plan ("Debt Forgiveness Restitution Report").

SHORT APPENDIX 157

59.     The Debt Forgiveness Restitution Report shall also include the following:

(i)     The processes and procedures by which the Bank determined the restitution amounts described in paragraph 38;

(ii)    The total number of Debt Forgiveness Eligible Consumers; and

(iii)   The total amount of restitution made under the Debt Forgiveness Restitution Plan.

### Report on Hybrid Card Late Fees Restitution

60.     The Firm shall review and verify that the Bank accurately identified the Hybrid Card Late Fees Eligible Consumers and correctly made cash refunds to the appropriate Hybrid Card Late Fees Eligible Consumers.

61.     The Firm shall prepare a detailed written report of its assessment of the Bank's compliance with the Hybrid Card late Fees Restitution Plan ("Hybrid Card Late Fees Restitution Report"). The Hybrid Card Late Fees Restitution Report shall also include the following:

(i)     The processes and procedures by which the Bank determined the restitution amounts described in paragraph 42;

(ii)    The total number of Hybrid Card Late Fees Eligible Consumers;

(iii)   The total amount of restitution made under the Hybrid Card Late Fees Restitution Plan; and

(iv)    The total amount of interest paid.

### IV.     ORDER TO PAY CIVIL MONEY PENALTY

62.     **IT IS FURTHER ORDERED** that by reason of the alleged violations of law and/or regulations as set forth in the Findings of Fact, and after taking into account the Stipulation, the appropriateness of the penalty with respect to the financial resources and good

SHORT APPENDIX 158

faith of the Bank, the gravity of the conduct by the Bank, the severity of the risks to and losses of consumers, the history of previous conduct by the Bank, and such other matters as justice may require, pursuant to section 1055(c) of the CFP Act, 12 U.S.C. § 5565(c). The Bank shall pay a total civil money penalty of $1,200,000 to the CFPB in accordance with section 1017(d) of the CFP Act, 12 U.S.C. §5497(d), as directed by the CFPB. The Bank shall pay such civil money penalty itself and is prohibited from seeking or accepting indemnification from such payment from any third party.

## V.    NOTIFICATION AND REPORTING REQUIREMENTS

## PROGRESS REPORTS AND CERTIFICATIONS OF COMPLIANCE

63.    Within 30 days from the end of each calendar quarter following the Effective Date, the Bank shall provide a written progress report addressing each provision of the Orders and detailing the form, manner, results and dates of any actions taken to secure compliance with the provisions of the Orders to the CFPB Regional Director. All progress reports and other written responses to the Orders shall be reviewed by the Board and made a part of the Board minutes. The progress reports shall be true and accurate and accompanied by a certification of compliance signed by the Chairman of the Board and the Bank President. The certification of compliance shall include the following:

(a)    A statement confirming that the Bank is in compliance with all provisions of the Orders; or

(b)    If the Bank is not in compliance with all provisions of the Orders, the Bank must provide:

SHORT APPENDIX 159

(i)    A list of the provisions with which the Bank is not yet in compliance, an explanation of why the Bank is not yet in compliance with each specific provision, and a description of the actions the Bank has taken to comply with the provision; and

(ii)    A statement as to when the Bank will be in full compliance with the Joint Orders.

## SHAREHOLDERS

64.    The Bank shall either provide a copy of the Orders to its shareholder AETRS or otherwise furnish a description of the Order in conjunction with the next board of directors meeting of AETRS, in which case such description shall fully describe the Orders in all material respects. The description and any accompanying communication, statement, or notice shall be sent to the CFPB, Office of Enforcement, 1700 G Street, N.W., Washington, D.C. 20552, for non-objection or comment prior to dissemination to shareholders. Any changes requested to be made by the CFPB shall be made prior to dissemination of the description, communication, notice, or statement. This description shall be disseminated in conjunction with the Bank's next shareholder communication and in conjunction with its notice or proxy statement preceding the Bank's next shareholder meeting. The terms "next shareholder communication" and "next shareholder meeting" mean the next shareholder communication and next shareholder meeting immediately after the CFPB provide the Bank with either non-objection of or comments about the description.

## VI.    SAVINGS CLAUSE AND EFFECTIVE DATE OF THE ORDERS

The provisions of the Orders shall not bar, estop or otherwise prevent the CFPB or any other federal or state agency or department from taking any other action against the Bank.

The Orders shall be effective on the date of issuance.

SHORT APPENDIX 160

Calculation of time limitations for compliance with the terms of the Orders shall be based on calendar days, unless otherwise noted.

The provisions of the Orders shall be binding on the Bank, its officers, agents, servants, employees, other institution-affiliated parties, and any successors and assigns thereof.

The provisions of the Orders shall remain effective and enforceable except to the extent that and until such time as any provision has been modified, terminated, suspended, or set aside by the CFPB.

Any violation of the Orders may result in the imposition by the CFPB of the maximum amount of civil money penalties allowed under section 1055(c) of the CFP Act, 12 U.S.C. §5565(c).

The provisions of the Orders shall be enforceable by the CFPB.

Issued this _1ST_ day of _October_, 2012.


_Richard Cordray_

Richard Cordray
Director
Consumer Financial Protection Bureau

SHORT APPENDIX 161

UNITED STATES OF AMERICA
Before the
CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2012-CFPB-0004

| | |
|---|---|
| In the Matter of: | CONSENT ORDER, |
| | ORDER FOR RESTITUTION, |
| | AND |
| AMERICAN EXPRESS TRAVEL | ORDER TO PAY |
| RELATED SERVICES COMPANY, INC. | CIVIL MONEY PENALTY |

The Consumer Financial Protection Bureau ("CFPB") has jurisdiction over American Express Travel Related Services Company, Inc. ("AETRS") pursuant to sections 1002(6), 1002(26), 1025, and 1053(b) of the Consumer Financial Protection Act ("CFP Act"), 12 U.S.C. §§ 5481(6), 5481(26), 5515, and 5563(b).

## I.    OVERVIEW

The CFPB finds that AETRS has engaged in violations of sections 1031 and 1036 of the CFP Act, 12 U.S.C. §§ 5531 and 5536, for deceptive debt collection practices, and, as a service provider to its subsidiary banks, American Express Centurion Bank ("AECB") and American Express Bank, FSB ("AEBFSB") for deceptive debt collection and marketing practices.

## FINDINGS OF FACT

Based on the joint FDIC/Utah Department of Financial Institutions Compliance Report of Examination issued to AECB ("ROE") dated February 22, 2012, with which the CFPB concurred, the CFPB's Supervisory Letter issued to AEBFSB ("Supervisory Letter") dated June 14, 2012, and information collected through the examination of AECB and targeted review of AEBFSB which formed the basis for the ROE and Supervisory Letter, the CFPB finds the following facts and makes the following conclusions of law:

*AETRS Card Portfolio – Deceptive Debt Collection Practices*

(1)    AETRS has issued charge and/or credit cards to consumers and continues to service and manage the accounts associated with these cards, including accounts for which debt has been charged off.

(2)    In connection with the collection of consumer debt:

(a)    Unreported Debt shall mean consumer debt that has been in collections or charged off and is no longer being reported by AETRS to consumer reporting agencies.  AETRS misrepresented to certain customers that settlement of Unreported Debt would be reflected on the consumers' credit report and that payment could improve the consumers' credit score; and

(b)    Certain debt settlement letters that stated that after settlement the consumers' remaining debt would be "waived" or "forgiven" were misleading because AETRS failed to prominently disclose that the consumer must pay the full debt balance before AETRS would process any future credit or charge card application.

(3)    These debt collection practices have been described in the Joint Consent Order issued by the CFPB and FDIC to AECB, No. 2012-CFPB-0002 ("AECB Joint Consent Order"), and the Consent Order issued by the CFPB to AEBFSB, No. 2012-CFPB-0003 ("AEBFSB

SHORT APPENDIX 163

Consent Order"). The CFPB found that AECB and AEBFSB's debt collection practices violated sections 1031 and 1036 of the CFP Act in the AECB Joint Consent Order and AEBFSB Consent Order.

(4)    By engaging in similar practices with respect to its own card portfolio, AETRS violated sections 1031 and 1036 of the CFP Act.

*AETRS as Service Provider to American Express Banking Subsidiaries AECB and AEBFSB*

(5)    AETRS acted as a service provider to American Express banking subsidiaries AECB and AEBFSB.

(6)    AETRS marketed, processed, and serviced the card portfolios at AECB and AEBFSB. AETRS also provided compliance, audit, and information technology support to AECB and AEBFSB.

(7)    AETRS developed, managed, and administered marketing and promotional programs, including a 2010 marketing campaign regarding a Blue Sky Credit Card at AECB. In the AECB Joint Consent Order the CFPB found the 2010 marketing campaign regarding AECB's Blue Sky Credit Card to be in violation of sections 1031 and 1036 of the CFP Act.

(8)    Since at least 2003, AETRS developed, managed, and administered internal and third party debt collection practices on its own behalf and on behalf of AECB and AEBFSB. The CFPB found certain debt collection practices to be in violation of sections 1031 and 1036 of the CFP Act in the AECB Joint Consent Order and AEBFSB Consent Order.

(9)    As a service provider with respect to the deceptive debt collection and deceptive marketing practices described in the AECB Joint Consent Order and in the deceptive debt

SHORT APPENDIX 164

collection practices described in the AEBFSB Consent Order, AETRS violated sections 1031 and 1036 of the CFP Act.

## STIPULATION

AETRS, by and through its duly elected and currently acting Board, has executed a Stipulation to the Issuance of a Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty ("Stipulation"), dated September 27, 2012, that is accepted by the CFPB. With the Stipulation, AETRS has consented, without admitting or denying any findings of fact or violations of laws or regulations, to the issuance of the Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty (collectively "Orders") by the CFPB.

Having determined that the requirements for issuance of an order under section 1053(b) of the CFP Act, 12 U.S.C. § 5553(b), have been satisfied, the CFPB, therefore, accepts the Stipulation and issues the following Orders:

## II.    CONSENT ORDER

## CORRECTIONS OF VIOLATIONS OF LAWS

**IT IS HEREBY ORDERED** that AETRS and its officers, agents, servants and employees immediately cease and desist from engaging in violations of the CFP Act and it is further ordered that AETRS take affirmative actions as of the date of issuance of the Order ("Effective Date"), unless otherwise specified, as follows:

1.    AETRS shall correct all violations of law, as described above, and shall implement procedures to prevent their recurrence. AETRS's actions as required by this paragraph shall be satisfactory to the Regional Director, West Region, of the CFPB ("CFPB Regional Director") as determined at subsequent examinations and/or visitations.

SHORT APPENDIX 165

2.      AETRS shall not take any actions which interfere with AECB or AEBFSB taking all action necessary to comply with the AECB Joint Consent Order and AEBFSB Consent Order.

3.      AETRS shall take all action necessary to eliminate its violations of Sections 1031 and 1036 and shall take appropriate steps to effect and maintain future compliance with Sections 1031 and 1036 as described more particularly herein.

4.      When collecting debt on its own behalf, AETRS shall follow the Debt Collection Practices described in the AECB Joint Consent Order and AEBFSB Consent Order.

### III.    ORDER FOR RESTITUTION

### RESTITUTION PLAN FOR COLLECTION OF UNREPORTED DEBT
### AND DEBT FORGIVENESS SOLICITATIONS

5.      Within 30 days from the Effective Date, AETRS shall prepare a comprehensive Restitution Plan for Deceptive Debt Collection Activities ("Restitution Plan") for consumers affected by its deceptive debt collection practices.  The plan shall include the applicable requirements of the Restitution Plans for Collection of Unreported Debt and the Restitution Plans for Debt Forgiveness Solicitations as described in AECB Joint Consent Order and AEBFSB Consent Order.  AETRS shall submit the Restitution Plan to the CFPB Regional Director for review, comment, and non-objection prior to implementation.

### MAILING REFUNDS

6.      Within 30 days from the effective date of the Order for Restitution, AETRS shall submit to the CFPB Regional Director for review a plan for mailing refunds, including the proposed text of letters that shall be sent to Eligible Consumers regarding restitution checks or account credits.  The plan for mailing refunds shall be consistent with the applicable provisions

SHORT APPENDIX 166

of the Mailing Refunds requirements described in the AECB Joint Consent Order and AEBFSB Consent Order.

### INDEPENDENT CERTIFIED ACCOUNTING FIRM

7.      Within 45 days from the Effective Date, AETRS shall retain, at its expense, an independent certified accounting firm ("Firm") acceptable to the CFPB Regional Director to determine compliance with the Restitution Plan and consistent with the applicable Independent Certified Accounting Firm requirements described in the AECB Joint Consent Order and AEBFSB Consent Order.  The Firm shall submit the report regarding the Restitution Plan as required by this order to the CFPB Regional Director.  The report regarding the Restitution Plan shall be consistent with the applicable requirements of the Reports on Unreported Debt Restitution and Reports on Debt Forgiveness Restitution described in the AECB Joint Consent Order and AEBFSB Consent Order.

### IV.   ORDER TO PAY CIVIL MONEY PENALTY

8.      **IT IS FURTHER ORDERED** that by reason of the alleged violations of law and other activity as set forth in the Agency Findings of Fact, and after taking into account the Stipulation, the appropriateness of the penalty with respect to the financial resources and good faith of AETRS, the gravity of the conduct by AETRS, the severity of the risks to and losses of consumers, the history of previous conduct by AETRS, and such other matters as justice may require, pursuant to section 1055(c) of the CFP Act, 12 U.S.C. § 5565(c):  AETRS shall pay a total civil money penalty of $9,000,000 in accordance with section 1017(d) of the CFP Act, 12 U.S.C. § 5497(d).  AETRS shall pay such civil money penalty itself and is prohibited from seeking or accepting indemnification from such payment from any third party.

SHORT APPENDIX 167

## V.    NOTIFICATION AND REPORTING REQUIREMENTS

### PROGRESS REPORTS AND CERTIFICATIONS OF COMPLIANCE

9.    Within 30 days from the end of each calendar quarter following the Effective Date, AETRS shall provide written progress reports addressing each provision of the Orders and detailing the form, manner, results and dates of any actions taken to secure compliance with the provisions of the Orders to the CFPB Regional Director.  All progress reports and other written responses to the Orders shall be reviewed by the Board of Directors of AETRS ("Board") and made a part of the Board minutes.  The progress reports shall be true and accurate and accompanied by a certification of compliance by the Chairman of the Board of AETRS and the AETRS President.  The certification of compliance shall include the following:

(a)    A statement confirming that AETRS is in compliance with all provisions of the Orders; or

(b)    If AETRS is not in compliance with all provisions of the Orders, AETRS must provide:

(i)    A list of the provisions with which AETRS is not yet in compliance, an explanation of why AETRS is not yet in compliance with each specific provision, and a description of the actions AETRS has taken to comply with the provision; and

(ii)    A statement describing when AETRS will be in full compliance with the Orders.

## VI.    SAVINGS CLAUSE AND EFFECTIVE DATE OF THE ORDERS

10.    The provisions of the Orders shall not bar, estop, or otherwise prevent the CFPB or any other federal or state agency or department from taking any other action against AETRS.

11.    The Orders shall be effective on the date of issuance.

SHORT APPENDIX 168

12.    Calculation of time limitations for compliance with the terms of the Orders shall be based on calendar days, unless otherwise noted.

13.    The provisions of the Orders shall be binding on AETRS and their officers, agents, servants, employees, and any successors and assigns thereof.

14.    The provisions of the Orders shall remain effective and enforceable except to the extent that and until such time as any provision has been modified, terminated, suspended, or set aside by the CFPB.

15.    Any violation of the Orders may result in the imposition by the CFPB of the maximum amount of civil money penalties allowed under section 1055(c) of the CFP Act, 12 U.S.C. §5565(c).

Issued this _1st_ day of _October_ , 2012.


_Richard Cordray_
Richard Cordray
Director
Consumer Financial Protection Bureau

SHORT APPENDIX 169

Case: 12-3504　　Document: 19　　Filed: 01/28/2014　　Pages: 198



**cfpb** Consumer Financial
Protection Bureau

An official website of the United States Government

(855) 411-2372



HOME | INSIDE THE CFPB | GET ASSISTANCE | PARTICIPATE | LAW & REGULATION | SUBMIT A COMPLAINT

HOME > PRESS RELEASES
> CFPB ORDERS AMERICAN EXPRESS TO PAY $85 MILLION REFUND TO CONSUMERS HARMED BY ILLEGAL CREDIT CARD PRACTICES

OCT 1 2012

# CFPB orders American Express to pay $85 million refund to consumers harmed by illegal credit card practices

*Federal Regulators Fine American Express an Additional $27.5 Million*

**WASHINGTON, D.C.** — The Consumer Financial Protection Bureau (CFPB) today announced an enforcement action with orders requiring three American Express subsidiaries to refund an estimated $85 million to approximately 250,000 customers for illegal card practices. This action is the result of a multi-part federal investigation which found that at every stage of the consumer experience, from marketing to enrollment to payment to debt collection, American Express violated consumer protection laws.

"Several American Express companies violated consumer protection laws and those laws were violated at all stages of the game – from the moment a consumer shopped for a card to the moment the consumer got a phone call about long overdue debt," said CFPB Director Richard Cordray. "Today's orders require the American Express companies to fully refund about $85 million to consumers and it requires them to make specific changes in their business practices. The American Express companies will identify the harmed customers, notify them, and make sure they get back their money."

The Federal Deposit Insurance Corporation (FDIC) together with the Utah Department of Financial Institutions discovered the illegal activities during a routine examination of an American Express subsidiary, the American Express Centurion Bank. The FDIC transferred portions of the investigation to the CFPB when the Bureau opened its doors last year and together the agencies pursued the matter. The CFPB later concluded that many of the same violations that occurred at American Express Centurion Bank also took place at American Express Travel Related Services Company, Inc. and American Express Bank, FSB.

The investigations found that the violations occurred at various points in time between 2003 and spring 2012. They occurred at every stage of the consumer experience, from shopping for cards, to applying for cards, to paying charges, and to paying off debt. More specifically, American Express subsidiaries:

- **Deceived consumers who signed up for the American Express "Blue Sky" credit card program:** Consumers were sometimes led to believe they would receive $300 in addition to bonus points if they signed up for this American Express Centurion Bank program. But consumers who met the qualifications did not receive the $300. This violates federal laws prohibiting deceptive practices.
- **Charged unlawful late fees:** American Express Centurion Bank and American Express Bank, FSB billed late fees on certain cards based on a percentage of the debt in violation of the Credit CARD Act.
- **Unlawfully discriminated against new account applicants on the basis of age:** American Express Centurion Bank used a credit scoring system that treated charge card applicants differently on the basis of age. For a period of time, the bank did not fully implement the system for applicants over the age of 35. This violated the Equal Credit Opportunity Act because it requires credit scoring systems that take age into account to be properly designed and implemented.
- **Failed to report consumer disputes to consumer reporting agencies:** American Express Centurion Bank and American Express Bank, FSB failed to report the existence of certain customer disputes to credit bureaus, which is a violation of the Fair Credit Reporting Act.
- **Misled consumers about debt collection:** All three of the American Express subsidiaries deceived consumers into believing there were certain benefits to paying off old debt. Consumers were wrongly told that if they paid off the old debt, the payment would be reported to credit bureaus and could improve their credit scores. In fact, American Express was not reporting the payments and the debts were so old that even if they had tried to report them, many of the payments would not have appeared on these consumers' credit reports or affected their credit scores. American Express also told some consumers that a portion of their debt would be waived or forgiven if they accepted certain settlement offers. But for customers who applied for a new American Express card, the company was not really forgiving or waiving the debt.

SHORT APPENDIX 170

Case: 12-3504          Document: 13          Filed: 01/28/2013          Pages: 198

### Enforcement Action

In accordance with the orders issued today, the American Express subsidiaries have agreed to correct their practices and refund consumers who were harmed by the illegal practices. Specifically, they have agreed to the following:

- **End the illegal practices:** American Express Centurion Bank will not deceive consumers with marketing for the Blue Sky credit card, or any other card, by falsely promising a rebate or points feature. The banking subsidiaries will not charge illegal late fees. They will properly report disputes to credit bureaus and will make sure that cardholders are told about their rights regarding such disputes. American Express Centurion Bank will not unlawfully discriminate based on age when it comes to credit decisions, and it will be required to certify that all qualified consumers who suffered unlawful age discrimination were given an opportunity to reapply for credit.

- **Full repayment of an estimated $85 million to approximately 250,000 consumers:** These American Express entities will be paying their customers full restitution, specifically:
  - Consumers who were misled into paying old debt because they thought it would be reported to the credit bureaus will be reimbursed the money they paid plus interest.
  - Consumers who were promised their debt would be forgiven and who were denied new credit cards because the debt was not really forgiven, will receive $100 and a pre-approved offer for a new card with terms the CFPB and the FDIC find acceptable. If the consumer already paid the waived or forgiven amount in order to get a new card, they will be refunded that amount plus interest.
  - Blue Sky customers who were promised $300 for signing up will get their $300.
  - Consumers who paid an illegal late fee will be reimbursed, with interest.

- **Convenient repayment for consumers:** These American Express companies are responsible for notifying the affected consumers. Consumers are not required to take any action to receive their credit or check. If the consumers are still American Express customers, they will see a credit in their account. If they no longer have a card account with American Express, they will receive a check in the mail. American Express expects that consumers who will be receiving payment will receive the payout by no later than March 15, 2013.

- **Inform consumers of debt collection rights:** These American Express subsidiaries will inform consumers when the debt they are seeking to collect will not be reported to a consumer reporting agency because it is too old. And they will not collect debt unless it has documentation evidencing the debt. Going forward, this will include, at a minimum, the complete terms and conditions of the account and a complete transactional history of the debt.

- **Independent audit:** These American Express subsidiaries will implement new procedures to ensure compliance with consumer financial protection laws. They will also use independent auditors to ensure compliance with the terms of today's orders.

- **Pay civil monetary penalty of $27.5 million:** Several federal government agencies seeking action against these American Express companies have ordered monetary penalties. With jurisdiction over the three subsidiaries, the CFPB's fine is $14.1 million; with jurisdiction solely over American Express Centurion Bank, the FDIC's fine is $3.9 million; with jurisdiction over American Express Travel Related Services Company, Inc. and American Express Company, the parent company, the Board of Governors of the Federal Reserve System's fine is $9 million; and with jurisdiction over American Express Bank, FSB, the Office of the Comptroller of the Currency's fine is $500,000.

More information for American Express customers who think they may be victims.

The full text of the American Express Centurion Bank Consent Order is at: http://files.consumerfinance.gov/f/2012-CFPB-0002-American-Express-Centurion-Consent-Order.pdf

The full text of the American Express Centurion Bank Stipulation is at: http://files.consumerfinance.gov/f/2012-CFPB-0002-American-Express-Centurion-Bank-Stipulation.pdf

The full text of the American Express Bank, FSB Consent Order is at: http://files.consumerfinance.gov/f/2012-CFPB-0003-American-Express-Bank-FSB-Consent-Order.pdf

The full text of the American Express Bank, FSB Stipulation is at: http://files.consumerfinance.gov/f/2012-CFPB-0003-American-Express-Bank-FSB-Stipulation-with-e-signatures.pdf

The full text of the American Express Travel Related Services Company, Inc. Consent Order is at: http://files.consumerfinance.gov/f/2012-CFPB-0004-American-Express-Travel-Related-Services-Company-Inc.-Consent-Order.pdf

The full text of the American Express Travel Related Services Company, Inc. Stipulation is at: http://files.consumerfinance.gov/f/2012-CFPB-0004-American-Express-Travel-Related-Services-Company-Inc.-Stipulation-with-e-signatures.pdf

A factsheet on the Consent Orders and Stipulations is available at:

www.consumerfinance.gov/pressreleases/cfpb-orders-american-express-to-pay-85-million-refund-to-consumers-harmed-by-illegal-credit-card-practices/          2/3

SHORT APPENDIX 171

1/23/13   CFPB orders American Express to pay $85 million refund to consumers harmed by illegal credit card practices > Consumer Financial Protection Bureau

Case: 12-3504   Document: 13   Filed: 01/28/2013   Pages: 198

http://files.consumerfinance.gov/f/201210_cfpb_AmEx_Enforcement_Factsheet.pdf

**cfpb**

**Consumer Financial Protection Bureau**

Privacy policy and legal notices

Accessibility

Plain writing

No FEAR Act

FOIA

USA.gov

Office of Inspector General

Ombudsman

Facebook

Twitter

YouTube

Flickr

Subscribe

Contact us | Newsroom | Jobs | Open government

www.consumerfinance.gov/pressreleases/cfpb-orders-american-express-to-pay-85-million-refund-to-consumers-harmed-by-illegal-credit-card-practices/   3/3

SHORT APPENDIX 172

## Press Releases

### FDIC Announces Settlement With American Express Centurion Bank for Unfair and Deceptive Practices in Debt Collection and Credit Card Marketing

**FOR IMMEDIATE RELEASE**
**October 1, 2012**

**Media Contact:**
**David Barr (202) 898-6992**
**Email: dbarr@fdic.gov**

The Federal Deposit Insurance Corporation (FDIC) and the Consumer Financial Protection Bureau (CFPB) have reached a settlement with American Express Centurion Bank (Bank), Salt Lake City, Utah, for deceptive debt collection and credit card marketing practices, in violation of section 5 of the Federal Trade Commission Act.

This action results from a FDIC and Utah Department of Financial Institutions examination, in which the Consumer Financial Protection Bureau (CFPB) joined last year. The CFPB, the Office of the Comptroller of the Currency (OCC), the Utah Department of Financial Institutions, and the Board of Governors of the Federal Reserve System took separate actions against various entities related to the Bank (collectively referred to as American Express). Under the settlements, American Express agreed to the issuance of Consent Orders, Orders for Restitution, and Orders to Pay (Orders) which result in total restitution from all entities of approximately $85 million to more than 250,000 affected consumers, and the imposition of civil money penalties totaling approximately $27 million.

The FDIC and the CFPB determined that the Bank violated federal law prohibiting unfair and deceptive practices by, among other things:

- Misrepresenting to consumers that if they entered into an agreement to settle old debt (that was no longer being reported to consumer reporting agencies), such settlement would be reported to consumer reporting agencies and thereby improve the consumers' credit scores. In fact, no such reporting occurred.
- Using settlement solicitations that implied that consumers who entered into settlement agreements to partially pay such debts would have the remaining balance of their debts forgiven, when in fact the balance remained a debt owed to American Express.
- Using solicitations that misrepresented the points and awards consumers would receive upon enrollment in one of American Express' credit card products.

In addition to restitution and CMP, the Consent Order requires the Bank to correct all violations, provide clearly written disclosures on debt collection statements, and stop using deceptive credit card solicitations. In addition, the Bank will improve its compliance management system and improve board oversight of affiliates and third-party service providers in order to adequately manage third-party risk.

In agreeing to the issuance of the Order, the Bank neither admits nor denies any liability. A copy of the Order is attached.

Attachments: Joint Consent Order, Joint Order for Restitution, and Joint Order to Pay Civil Money Penalty - PDF (PDF Help)

# # #

Case: 12-3504     Document: 13     Filed: 01/28/2013     Pages: 198

Congress created the Federal Deposit Insurance Corporation in 1933 to restore public confidence in the nation's banking system. The FDIC insures deposits at the nation's 7,246 banks and savings associations and it promotes the safety and soundness of these institutions by identifying, monitoring and addressing risks to which they are exposed. The FDIC receives no federal tax dollars – insured financial institutions fund its operations.

FDIC press releases and other information are available on the Internet at www.fdic.gov, by subscription electronically (go to www.fdic.gov/about/subscriptions/index.html) and may also be obtained through the FDIC's Public Information Center (877-275-3342 or 703-562-2200). **PR-114-2012**

# Press Release



# FEDERAL RESERVE press release

*Release Date: October 1, 2012*

**For immediate release**

The Federal Reserve Board on Monday announced a formal enforcement action, including a $9 million civil money penalty, against American Express Company (Amex) and American Express Travel Related Services Company, Inc. (TRS) to address deceptive marketing and debt collection practices and associated deficiencies in compliance risk management and internal audit. Amex and TRS are both registered bank holding companies based in New York.

TRS provides debt collection and marketing services to its subsidiary banks, American Express Centurion Bank (AECB) and American Express Bank, FSB (AEFSB), and also services its own credit card portfolio. In providing those services, TRS allegedly led customers to believe that their defaulted debt would be "waived" or "forgiven" by acting on a settlement offer without also disclosing the effect that settling for less than the full debt would have on the customers' future credit opportunities. TRS also allegedly made deceptive representations in credit card solicitations concerning the benefits customers would receive by acting on the offer. The Federal Reserve also found that deficiencies in compliance risk management and internal audit, which are firm-wide functions at Amex, allegedly allowed these practices to occur.

The Board's action was taken in coordination with the Consumer Financial Protection Bureau, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Utah Department of Financial Institutions. Each agency is announcing formal enforcement actions against entities in the American Express organization that they supervise, which include AECB and AEFSB. TRS's credit card customers affected by the allegedly deceptive practices will be compensated according to the CFPB's enforcement action against TRS.

In addition to the $9 million civil money penalty, the Board's enforcement action requires Amex and TRS to improve consumer compliance oversight and compliance risk-management and internal audit programs.

Attachment (321 KB PDF)

For media inquiries, call 202-452-2955.

Search of Federal Reserve enforcement actions.



**Office of the**
**Comptroller of the Currency**
U.S. Department of the Treasury

---

NR 2012-137

**FOR IMMEDIATE RELEASE**                Contact: Bryan Hubbard
October 1, 2012                             (202) 874-5770

### OCC Assesses Civil Money Penalty Against American Express, Orders $6 Million in Restitution

WASHINGTON – The Office of the Comptroller of the Currency (OCC) today announced a $500,000 civil money penalty against American Express Bank, FSB, for violations of section 5 of the Federal Trade Commission Act and ordered the bank to provide approximately $6 million in restitution to an estimated 17,000 affected customers.

The OCC also ordered the bank to establish an effective vendor management program to oversee the provision of products to the bank's customers.

The OCC based its penalty on the bank's failure to properly manage vendors who engaged in deceptive debt collection practices in violation of the statute. The estimated $6 million in restitution will be paid to compensate consumers for the injury suffered as the result of these violations.

The OCC is taking these actions in coordination with separate actions by the Board of Governors of the Federal Reserve System, Consumer Financial Protection Bureau (CFPB), and Federal Deposit Insurance Corporation against American Express companies under their jurisdictions. In addition to the penalty assessed by the OCC against American Express Bank, FSB, the CFPB is assessing a $1.2 million penalty which covers both violations of the Truth in Lending Act, for which the bureau has exclusive enforcement authority, and the deceptive debt collection practices addressed by the OCC penalty and order.

Restitution payments made by the bank pursuant to the OCC's order will also satisfy identical payment obligations required by the CFPB. The civil money penalties assessed by the OCC are payable to the U.S. Treasury.

**Related Links**

- Consent Cease and Desist Order (PDF)
- Consent Order for a Civil Money Penalty (PDF)

### # #

# Federal Trade Commission Annual Report 2010: Fair Debt Collection Practices Act



## INTRODUCTION

The Federal Trade Commission ("FTC") is pleased to submit to Congress this annual report summarizing the administrative and enforcement actions it has taken under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, during the past year.[1] These actions are part of the FTC's ongoing effort to curtail deceptive, unfair, and abusive debt collection practices in the marketplace. Such practices cause substantial consumer injury, including payment of amounts not owed, unintended waivers of rights, invasions of privacy, and emotional distress. In some circumstances, illegal collection practices can place consumers deeper in debt.

The FDCPA prohibits deceptive, unfair, and abusive practices by third-party collectors. For the most part, creditors are exempt when they are collecting their own debts. The FDCPA permits reasonable collection efforts that promote repayment of legitimate debts, and the FTC tries to ensure compliance without unreasonably impeding the collection process. The FTC recognizes that the timely payment of debts is important to creditors and that the debt collection industry assists creditors in collecting what they are owed. The FTC also appreciates the need to protect consumers from those debt collectors who engage in deceptive, unfair, and abusive collection practices.

The FDCPA vests the FTC with primary enforcement responsibility. It shares overall enforcement responsibility, however, with other federal agencies.[2] In addition, consumers who believe they have been victims of FDCPA violations may seek relief in state or federal court.

As in past years, the FTC took significant steps in 2009 to curtail illegal debt collection practices. This report summarizes: (1) the types of consumer complaints the FTC received in 2009; (2) recent developments in FTC law enforcement; and (3) the FTC's 2009 consumer and industry education and policy initiatives.

---

[1] Section 815 of the FDCPA, 15 U.S.C. § 1692m, requires the FTC to report annually to Congress concerning the administration of its functions under the FDCPA.

[2] Section 814 of the FDCPA, 15 U.S.C. § 1692*l*, places enforcement obligations upon seven other federal agencies for the organizations they regulate. These agencies are the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, the Department of Transportation, and the Department of Agriculture. Almost all of the collectors these agencies regulate are creditors collecting on their own debts, and, as such, largely fall outside the FDCPA's coverage. If these agencies receive complaints about debt collection firms that are not under their jurisdiction, they generally forward the complaints to the FTC or suggest that the consumer contact the FTC directly.

## CONSUMER COMPLAINTS

### BACKGROUND

The FDCPA requires the FTC to report on the level of industry compliance with the law. Historically, the FTC has received much of its information about the conduct of debt collectors directly from complaints consumers file with the FTC[3] and from its enforcement work. The FTC uses complaints for general monitoring of the industry, target selection, and preliminary analysis that might, with further factual development, reveal or help prove a law violation.

Based on the FTC's experience, many consumers never file a complaint with any organization other than the debt collector itself. Others complain only to the underlying creditor or to enforcement agencies other than the FTC. Some consumers may not be aware that the conduct they have experienced violates the FDCPA or that the FTC enforces the FDCPA. Therefore, the total number of consumer complaints the FTC receives may understate the extent to which consumers have concerns about the practices of debt collectors.

On the other hand, the FTC acknowledges that not all of the debt collection practices about which consumers complain are law violations. Certainly, many consumers do complain of conduct that, if accurately described, violates the FDCPA.[4] The FTC, however, does not verify that the information consumers provide is accurate unless the agency undertakes such an inquiry in connection with its law enforcement activities.

Even if accurately described, some conduct about which consumers complain does not violate the FDCPA. For example, consumers sometimes complain that a debt collector will not accept partial payments on the same installment terms that the original lender provided when the account was current. Although a collector's demand for accelerated payment or larger installments may be frustrating to the consumer, such a demand generally does not violate the FDCPA. Also, for example, if a consumer complains that a debt collector has threatened to file a civil lawsuit to collect a debt, the

---

[3] Consumers may file complaints with the FTC via its toll-free hotline (1-877-FTC-HELP), online complaint forms, or United States mail.

[4] Much of the conduct, as alleged, also would violate Section 5 of the FTC Act as an unfair or deceptive act or practice in or affecting commerce.

2

FTC cannot determine whether such conduct violates the FDCPA without investigating whether the debt collector had the requisite intention to file suit.[5]

Despite their limitations, the FTC believes that consumer complaint data provide useful insight into the acts and practices of debt collectors.  The FTC describes below the trends it has observed in the overall number of debt collection complaints it has received as well as the types of practices about which consumers most frequently complain.

## TOTAL NUMBER OF COMPLAINTS

Hundreds of thousands of consumers contact the FTC every year about all kinds of consumer protection issues.  With respect to debt collection, the FTC receives both consumer inquiries and complaints.  The FTC's Consumer Response Center ("CRC") makes every effort to distinguish between these two categories of contacts.  The data presented here include only consumer contacts that the CRC has identified as complaints.  When this report refers to "complaints," the term refers solely to complaints that consumers have filed directly with the FTC.

In 2009, consumer complaints to the FTC about third-party debt collectors[6] ("FDCPA complaints") increased in absolute terms, but decreased as a percentage of all complaints[7] that consumers filed directly with the FTC.  The FTC received 88,190 FDCPA complaints about third-party debt collectors in 2009.  This represents 16.8% of

---

[5]  Section 807(5) prohibits debt collectors from threatening "to take any action that cannot legally be taken or that is not intended to be taken," a prohibition that includes false threats of suit.  15 U.S.C. § 1692e(5).

[6]  "Third-party debt collectors" include contingency fee collectors and attorneys who regularly collect or attempt to collect, directly or indirectly, debts asserted to be owed or due another, as well as debt buyers collecting on debts they purchased in default.

[7]  Last year, the FTC received 524,509 complaints directly from consumers about all industries, up from the 416,284 complaints received in 2008.  As in past years, complaint numbers in this report do not include complaints about identity theft or violations of the FTC's Do Not Call Registry.

3

all complaints received directly from consumers in 2009.[8]  By comparison, in 2008,[9] the FTC received 78,925 third-party debt collector complaints, representing 19% of the complaints received directly from consumers that year.

The FTC recognizes that third-party collectors contact millions of consumers each year.  The number of consumer complaints the FTC receives about these collectors is therefore only a small percentage of the overall number of consumers contacted.  Nevertheless, the FTC receives more complaints about the debt collection industry than any other specific industry.[10]

Last year, the number of complaints the FTC received about creditors' in-house collectors increased in absolute terms but decreased slightly as a percentage of total complaints.  In 2009, the FTC received 32,076 complaints about in-house collectors, representing 6.1% of all complaints the FTC received.  In 2008, the FTC received 26,652 complaints about in-house collectors, representing 6.4% of all complaints received.

---

[8]  Because absolute numbers of complaints fluctuate from year to year, this report analyzes collection industry trends by comparing the number of debt collection complaints each year to the number of all complaints the FTC has received.  The percentage figures this analysis produces portray industry trends more accurately than would reliance on absolute numbers of complaints.

[9]  The 2008 complaint numbers identified in this year's report differ slightly from those identified in last year's report because, in connection with a continuous quality assurance review, the FTC staff reviewed and re-coded some complaints after the 2009 Annual Report was issued.

[10]  The FTC does not count any identity theft or Do Not Call Registry complaints that may involve debt collection in determining the total number of debt collection complaints.  The agency does not consider identity theft complaints and Do Not Call Registry complaints to be reports about any specific industry.  Identity theft complaints are excluded because such complaints relate to a variety of actors, rather than a single industry.  Do Not Call Registry complaints similarly are excluded because the complaints capture the actions of a variety of industries that use telemarketing as a tool to contact consumers.

Note also that, based on the FTC's law enforcement experience, some identity theft and Do Not Call Registry complaints arise out of deceptive, unfair, or abusive debt collection practices.  For example, a consumer may complain about identity theft if a debt collector is contacting him or her about a debt he or she does not owe.  To that extent, the FDCPA complaint data may under-report complaints about debt collection practices.

4

Combined, complaints about third-party debt collectors and in-house collectors in 2009 totaled 119,364 complaints[11] and accounted for 22.8% of all complaints the FTC received.  This represents an increase in absolute terms from the 2008 figure, and a decrease as a percentage of total complaints:  in 2008, the agency received 104,766 debt collection complaints, accounting for 25.2% of all complaints to the FTC.

In evaluating the complaints the FTC received in 2009 relative to those received in 2008, it is important to recognize that in June 2008 the agency substantially changed the way it processes complaints it receives over the Internet.  The agency changed from a form-based web complaint system to an interactive, question-based web complaint system.  Although both systems permit a single complaint to be coded for multiple law violations, this change in the FTC's web-based complaint system appears to have resulted in an increase in the number of law violations reported per complaint.[12]  To evaluate possible changes in underlying debt collector behavior, it is useful to compare complaint information during periods in 2008 and 2009 in which the FTC was using the same complaint system.  Accordingly, the FTC has supplemented its annual complaint comparisons by comparing complaints received from July through December 2009 with complaints received from July through December 2008.

For the July through December period, total FDCPA complaints increased slightly from 56,160 (or 24.2% of FTC complaints) in 2008 to 57,926 (or 23.5% of FTC complaints) in 2009.  For each category of complaints below, a similar comparison of the July through December data will appear in footnotes.

## COMPLAINTS BY CATEGORY

In addition to evaluating the total number of complaints about third-party debt collectors, it also is instructive to consider the specific types of debt collection practices about which consumers complain.  Because consumers frequently complain about more than one debt collection practice, the CRC historically has assigned many complaints

---

[11]  Some complaints are directed toward both third-party debt collectors and in-house creditor collectors.  Thus, the total number of complaints against all debt collectors can be less than the sum of all third-party complaints and all in-house creditor complaints.

[12]  For example, among all complaints received directly by the FTC on the web, the average number of law violations per complaint increased from 0.93 in early 2008 to 1.97 after the FTC switched to the new web complaint system in June 2008.  This increase was even greater for FDCPA complaints:  the average number of law violations per web complaint rose from approximately 0.98 under the old system to 3.5 under the new web complaint system.

more than one code. Thus, if one adds together all the complaints for each of the fifteen debt collection codes each year, the total exceeds the number of FDCPA complaints the FTC actually received in that year.

**HARASSING THE ALLEGED DEBTOR OR OTHERS:** This complaint category encompasses four distinct violation codes. Under the FDCPA, debt collectors may not harass consumers to try to collect on a debt.[13] In 2009, 46.5% of FDCPA complaints the FTC received, or 41,028 complaints, claimed that collectors harassed the complainants by calling repeatedly or continuously. This was the most frequent law violation about which consumers complained during 2009, as it was in 2008, when 27,413 complaints, representing 34.7% of FDCPA complaints, stated that collectors harassed them by calling repeatedly or continuously. Also in 2009, 14,321 complaints, or 16.2% of FDCPA complaints, claimed that a collector had used obscene, profane, or otherwise abusive language. Nine thousand, six hundred eighty-four complaints (9,684), or 11% of 2009 FDCPA complaints, said that collectors called before 8:00 a.m., after 9:00 p.m., or at other times that the collectors knew or should have known were inconvenient to the consumer. Two thousand, five hundred seventeen (2,517) complaints, or 2.9% of 2009 FDCPA complaints, reported that collectors used or threatened to use violence if consumers failed to pay.[14]

**DEMANDING A LARGER PAYMENT THAN IS PERMITTED BY LAW:** This category includes two different FDCPA law violation codes. First, the FDCPA prohibits debt collectors from misrepresenting the character, amount, or legal status of a debt.[15] The types of complaints that fall into this category include, for example, reports that a collector is attempting to collect either a debt the consumer does not owe at all or a debt larger than what the consumer actually owes. Other complaints in this category state that collectors have sought to collect on debts that have been discharged in bankruptcy. For the second consecutive year, this was the second most common category of FDCPA complaint. In

---

[13] Section 806, 15 U.S.C. § 1692d.

[14] For the July through December period, 47.8% of FDCPA complaints (20,603 total) in 2009 claimed repeated or continual harassing calls, up from 43.7% (18,018 total) in 2008; 16.3% of FDCPA complaints in 2009 (7,021 total) reported use of obscene, profane, or otherwise abusive language, down slightly from 16.7% (6,863 total) in 2008; 11.5% of complaints in 2009 (4,940 total) reported that collectors called before 8:00 a.m., after 9:00 p.m., or at other inconvenient times, up from 10.5% (4,317 total) in 2008; and the percentage of complaints reporting that collectors used or threatened to use violence increased from 2.4% (971 complaints) in 2008 to 3.2% (1,394 complaints) in 2009.

[15] Section 807(2), 15 U.S.C. § 1692e(2).

6

2009, however, there was an increase in the number but a decrease in the percentage of complaints of this law violation compared to 2008. In 2009, 31.1%, or 27,420 FDCPA complaints, described this conduct; in 2008, 32.5% of FDCPA complaints, or 25,684 complaints, reported that collectors engaged in these practices.[16]

Second, the FDCPA prohibits debt collectors from collecting any amount unless it is "expressly authorized by the agreement creating the debt or permitted by law."[17] In 2009, 10.9% of FDCPA complaints, or 9,632 complaints, asserted that collectors demanded interest, fees, or expenses that were not owed (such as collection fees, late fees, and court costs), up from 7.5% of FDCPA complaints (5,948 total) in 2008.[18]

THREATENING DIRE CONSEQUENCES IF CONSUMER FAILS TO PAY: The FDCPA bars debt collectors from making threats as to what might happen if the consumer fails to pay the debt, unless the collector has the legal authority and the intent to take the threatened action.[19] Among other things, collectors may threaten to initiate civil suit or criminal prosecution, garnish wages, seize property, cause job loss, have a consumer jailed, or damage or ruin a consumer's credit rating. In 2009, 20.9% of FDCPA complaints, or 18,438 complaints, reported that third-party collectors falsely threatened a lawsuit or some other action that they could not or did not intend to take, an increase from the 15% of complaints (11,804 total) that reported the same conduct in 2008. Also in 2009, 13% of FDCPA complaints, or 11,505 complaints, alleged that such collectors falsely threatened arrest or seizure of property, up from the 8.1% of FDCPA complaints (6,412 total) reporting such conduct in 2008.[20]

---

[16] For the July through December period, there was a small decrease in the number and the percentage of complaints received about misrepresenting the character, amount, or legal status of a debt in 2009 compared to the same period in 2008. During those months in 2009, the FTC received 12,701 such complaints, amounting to 29.5% of FDCPA complaints, while during the same months in 2008, the FTC received 12,787 complaints, or 31% of FDCPA complaints.

[17] Section 808(1), 15 U.S.C. § 1692f(1).

[18] For the July through December period, the number and percentage of consumer complaints concerning collecting unauthorized amounts held relatively steady: 4,555 complaints, or 11.1% of FDCPA complaints, in 2008; to 4,571 complaints, or 10.6% of FDCPA complaints, in 2009.

[19] Sections 807(4)-(5), 15 U.S.C. §§ 1692e(4)-(5).

[20] For the July through December period, the percentage of FDCPA complaints for false threats of lawsuits or other unintended actions rose slightly: it constituted 21.9% of FDCPA complaints in 2009 (9,434 complaints), up from 20.4% of FDCPA complaints in 2008 (8,387 (continued...)

7

**IMPERMISSIBLE CALLS TO CONSUMER'S PLACE OF EMPLOYMENT:** Under the FDCPA, a debt collector may not contact a consumer at work if the collector knows or has reason to know that the consumer's employer prohibits such contacts.[21] By continuing to contact consumers at work under these circumstances, debt collectors may put them in jeopardy of losing their jobs. In 2009, 13.6% of FDCPA complaints, or 11,973 complaints, related to calls to consumers at work. This is an increase from 10.3% of FDCPA complaints, or 8,103 complaints, in 2008.[22]

**REVEALING ALLEGED DEBT TO THIRD PARTIES:** The FDCPA generally prohibits third-party contacts for any purpose other than obtaining information about the consumer's location. Collectors calling to obtain location information also are prohibited from revealing that a consumer allegedly owes a debt.[23]

Improper third-party contacts typically embarrass or intimidate the consumer who allegedly owes the debt and are a continuing aggravation to the third parties. Contacts with consumers' employers and co-workers about consumers' alleged debts also may jeopardize continued employment or prospects for promotion. Relationships between consumers and their families, friends, or neighbors also may suffer from improper third-party contacts. In some cases, collectors reportedly have used misrepresentations as well as harassing and abusive tactics in their communications with third parties, or even have attempted to collect from the third party.

In 2009, 12.2% of all FDCPA complaints, or 10,758 complaints, reported that debt collectors illegally disclosed a purported debt to a third party, up from 8.8% of FDCPA complaints, or 6,955 complaints, in 2008. The third parties contacted included employers, relatives, children, neighbors, and friends. This past year, 19.2% of complaints, or 16,926 complaints, claimed that collectors called a third party repeatedly

---

[20](...continued)
complaints). Similarly, the percentage of FDCPA complaints during those months for false threats of arrest or seizure of property also rose from 11.6% in 2008 (4,782 complaints) to 14.2% in 2009 (6,120 complaints).

[21] Section 805(a)(3), 15 U.S.C. § 1692c(a)(3).

[22] For the July through December period, the percentage of FDCPA complaints claiming impermissible calls to consumers at work rose from 13% in 2008 (5,337 complaints) to 14.3% in 2009 (6,161 complaints).

[23] Section 804(2), 15 U.S.C. § 1692b(2).

to obtain location information about the complainant,[24] up from 16.1% of FDCPA complaints, or 12,710 complaints, in 2008.[25]

**FAILING TO SEND REQUIRED CONSUMER NOTICE:** The FDCPA requires that debt collectors send consumers a written notice that includes, among other things, the amount of the debt, the name of the creditor to whom the debt is owed, and a statement that, if within thirty days of receiving the notice the consumer disputes the debt in writing, the collector will obtain verification of the debt and mail it to the consumer.[26] Many consumers who do not receive the notice are unaware that they must dispute their debts in writing if they wish to obtain verification of the debts. Last year, 25.7% of the FDCPA complaints, or 22,708 complaints, reported that collectors did not provide the required notice, up from 15.7% of all FDCPA complaints, or 12,374 complaints, in 2008.[27]

**FAILING TO VERIFY DISPUTED DEBTS:** The FDCPA also mandates that, if a consumer submits a dispute in writing, the collector must cease collection efforts until it has provided written verification of the debt.[28] Many consumers complained that collectors ignored their written disputes, sent no verification, and continued their collection efforts. Other consumers reported that some collectors continued to contact them about the debts between the date the consumers submitted their dispute and the date the collectors provided the verification. Last year, 11.5% of all FDCPA complaints, or 10,158

---

[24] Section 804(3) prohibits a debt collector contacting a third party for location information from communicating with the third party more than once, unless the third party requests it or the collector reasonably believes the third party's earlier response was erroneous or incomplete and that the third party now has correct or complete location information.

[25] For the July through December period, the percentage of FDCPA complaints in 2009 related to third parties held steady at 2008 levels. The percentages of FDCPA complaints during those months reporting that a collector impermissibly disclosed a debt to a third party was 12.3% in both years (5,285 complaints in 2009, 5,055 complaints in 2008). The percentage of FDCPA complaints stating that collectors called a third party repeatedly to obtain location information increased from 18.1% in 2008 (7,467 complaints) to 19.7% in 2009 (8,507 complaints).

[26] Section 809(a), 15 U.S.C. § 1692g(a).

[27] For the July through December period, 26.2% of FDCPA complaints (11,272 total) in 2009 claimed that collectors did not provide the required notice, an increase from 24.2% (9,971 total) in 2008.

[28] Section 809(b), 15 U.S.C. § 1692g(b).

9

complaints, claimed that collectors failed to verify disputed debts, up from 8%, of all FDCPA complaints, or 6,345 complaints, in 2008.[29]

**CONTINUING TO CONTACT CONSUMER AFTER RECEIVING "CEASE COMMUNICATION" NOTICE:** The FDCPA requires debt collectors to cease all communications with a consumer about an alleged debt if the consumer communicates in writing that he or she wants all such communications to stop or that he or she refuses to pay the alleged debt.[30] This "cease communication" notice does not prevent collectors or creditors from filing suit against the consumer, but it does stop collectors from calling the consumer or sending dunning notices. In 2009, 8.4% of FDCPA complaints, or 7,411 complaints, reported that collectors ignored "cease communication" notices and continued their collection attempts, up from 6.4 % of complaints (5,013 complaints) reported by such complainants in 2008.[31]

## ENFORCEMENT

The FTC's debt collection program has three prongs: (1) vigorous law enforcement; (2) consumer and industry education efforts; and (3) research and policy initiatives.

The FTC's FDCPA enforcement actions begin with investigations of debt collectors identified through complaints and other sources. If an investigation reveals FDCPA violations, the FTC proceeds in one of two ways. Through its own attorneys, the FTC can file suit in federal court seeking preliminary and permanent injunctive relief, restitution for consumers, disgorgement of ill-gotten gains, and other ancillary relief under Section 13(b) of the FTC Act.[32] Alternatively, the FTC may request that the

---

[29] For the July through December period, 11.3% of FDCPA complaints (4,869 total) in 2009 reported a failure to verify a disputed debt, compared to 11.7% (4,803 total) of FDCPA complaints in 2008.

[30] Section 805(c), 15 U.S.C. § 1692c(c).

[31] For the July through December period, 8% of FDCPA complaints (3,448 total) in 2009 reported continued collector contact despite a consumer's sending a "cease contact" notice, compared to 8.9% (3,680 total) in 2008.

[32] Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to sue in federal district court to obtain a preliminary injunction against entities that the FTC has reason to believe
(continued...)

10

Department of Justice file suit in federal court on behalf of the FTC, seeking a civil penalty, other monetary relief, and injunctive relief that would prohibit the collector from continuing to violate the FDCPA.

The FTC currently is conducting a number of non-public investigations of debt collectors to determine whether they have engaged in violations of the FDCPA or the FTC Act. It has also filed or settled four public law enforcement actions in the past twelve months: two new law enforcement actions alleging FDCPA and Section 5 violations against companies collecting debts, and settlements in two previously filed cases.

In June 2009, the FTC settled an action against Oxford Collection Agency, Inc., its officers, and an attorney who acted as its agent, for collection practices allegedly in violation of the FTC Act and the FDCPA.[33] The FTC's complaint alleged that the defendants falsely threatened to garnish consumers' wages, bring lawsuits against them, or have them arrested. It also charged that the defendants used illegal and abusive collection methods such as calling consumers before 8 a.m. or after 9 p.m.; calling their workplace when the collectors knew or had reason to know that the calls were inconvenient; telling employers, co-workers, relatives, and neighbors about the consumers' debts; continuing to call after receiving consumers' written demands to stop; calling consumers repeatedly throughout the day; calling back immediately after the consumer hung up; and using profane or other abusive language. Separate FTC settlements, one with Oxford and its officers, and the other with the attorney and his law firm, each imposed a $1,060,00 civil penalty which was partially or wholly suspended based on inability to pay. Both settlements enjoin the defendants from violating the FDCPA, and from making misrepresentations in connection with the collection of a debt.

In September 2009, the FTC concluded its case against Academy Collection Service, Inc., by settling with the two remaining corporate officer defendants, Albert

---

[32](...continued)
are violating any law the FTC enforces. The court may grant a preliminary injunction or a temporary restraining order if the FTC shows that, weighing the equities and considering the FTC's likelihood of ultimate success, the action would be in the public interest. Section 13(b) also permits federal district courts to issue a permanent injunction if the FTC seeks that remedy. Section 13(b)(2) of the FTC Act, 15 U.S.C. § 53(b)(2).

[33] *U.S. v. Oxford Collection Agency, Inc.,* No. 2:09-cv-02467-LDW-AKT (E.D.N.Y. June 10, 2009). *See* Press Release, Federal Trade Commission, *Debt Collectors Settle with FTC; Abusive Practices Affected Consumers Nationwide,* available at http://www.ftc.gov/opa/2009/07/oxford.shtm.

11

Bastian and Edward Hurt III, who operated Academy's Las Vegas collection center.[34] The complaint alleged that the individual defendants "formulated, directed, participated in, controlled, or had the authority to control" the actions of Academy's collectors, which included (1) misleading, threatening, and harassing consumers; (2) depositing postdated checks early; (3) falsely threatening or implying that the company would garnish consumers' wages, seize or attach their property, or initiate lawsuits against the consumers if they failed to pay; (4) making unfair and unauthorized withdrawals from consumers' bank accounts; (5) communicating impermissibly with third parties about consumers' alleged debts; and (6) engaging in harassing or abusive behavior, such as threatening the use of physical violence, using obscene or profane language, and repeatedly or continuously causing the telephone to ring.  The settlement imposes civil money judgments against Mr. Bastian and Mr. Hurt of $375,000 and $300,000, respectively, which were partially suspended based on their inability to pay.  The consent decree enjoins them from violating the FDCPA and from, in connection with debt collection, making withdrawals from consumers' bank accounts without express informed consent and from making misrepresentations.

In October 2009, the FTC and the State of Nevada settled an action filed in November 2008 against an international Internet payday lending operation that used unfair and deceptive debt collection tactics.[35]  The defendants, ten related Internet payday lenders (including Cash Today) and their principals, operated from the United Kingdom and targeted consumers in the United States.  The FTC charged them with, among other things, violating the FTC Act by: (1) falsely threatening consumers with arrest or imprisonment; (2) falsely claiming that consumers were legally obligated to pay the debts when they were not; (3) making false threats to take legal action that they could not take; (4) repeatedly calling consumers at work; (5) using abusive and profane language; and (6) disclosing consumers' purported debts to third parties.  Under the terms of the settlement, the defendants had to pay $970,125 in consumer redress for distribution by the FTC and $29,875 to the State of Nevada.  They are enjoined from, in connection with

---

[34] *United States v. Acad. Collection Serv., Inc.,* No. 2:08-cv-01576-KJD-GWF (D. Nev. Sept. 9, 2009).  *See* Press Release, Federal Trade Commission, *Debt Collection Supervisors Settle FTC Charges* (Jan. 7, 2010), available at http://www.ftc.gov/opa/2010/01/academy.shtm.

[35] *Federal Trade Commission and State of Nevada v. Cash Today, Ltd.,* No. 3:08-cv-00590 (D. Nev. Oct. 27, 2009).  *See* Press Release, Federal Trade Commission, *Internet Payday Lenders Will Pay $1 Million to Settle FTC and Nevada Charges; FTC Had Challenged Defendants' Illegal Lending and Collection Tactics* (Sept. 21, 2009), available at http://www.ftc.gov/opa/2009/09/cash.shtm.  Because the defendants were creditors collecting their own debts, they were not charged with violating the FDCPA.

debt collection, making misrepresentations or engaging in unfair practices in violation of the FTC Act.

In February 2010, the FTC settled an action against Credit Bureau Collection Services and two of its officers to resolve allegations that the defendants violated the law in the course of collecting debts from consumers.[36]  Among other things, the complaint alleged that the defendants violated the FDCPA by misrepresenting both to consumers and to consumer reporting agencies ("CRAs") that consumers owed the debts and by failing to inform the CRAs that those debts were disputed by consumers.  The complaint also alleged that the defendants violated the FTC Act by misrepresenting that consumers owed debts or by failing to have a reasonable basis for such representations.  The consent decree filed requires the defendants to pay a $1,095,000 civil penalty.  Among other things, it also prohibits violations of the FDCPA, and requires the defendants to have a reasonable basis for representations that a consumer owes a debt, and requires them to conduct a reasonable investigation when the truth of those representations is cast in doubt.

## CONSUMER AND INDUSTRY EDUCATION

The FTC's consumer and industry education efforts are the second prong of its FDCPA program.  Consumer education informs consumers nationwide of their rights under the FDCPA and its requirements on debt collectors.  With this knowledge, consumers can determine whether collectors are violating the FDCPA and exercise their rights under the statute.  An informed public that enforces its rights under the FDCPA operates as a powerful mechanism for deterring law violations.  Industry education informs collectors on various FDCPA issues.  With this knowledge, industry members can take all necessary steps to comply with the FDCPA.

**TOOL FOR BOTH CONSUMERS AND INDUSTRY:** The Staff Commentary on the FDCPA is useful in both the consumer and industry education initiatives.  The Commentary, issued in 1988, provides the staff's detailed analysis of every section of the FDCPA and gives guidance to consumers, their attorneys, courts, and members of the collection industry.[37]  The Commentary is available on the FTC's FDCPA web page, located at http://www.ftc.gov/os/statutes/fdcpajump.shtm.

---

[36]  *United States v. Credit Bureau Collection Servs.*, No. 2:10-cv-00169-ALM-NMK (S.D. Ohio filed February 24, 2010).

[37]  53 Fed. Reg. 50,097 (1988).

13

**TOOLS SPECIFICALLY FOR CONSUMERS:** The FTC informs consumers about their rights and responsibilities under the FDCPA by means of written materials, one-to-one guidance, and speeches and presentations.

First, the FTC provides written materials for consumers, including a "Facts for Consumers" brochure entitled "Debt Collection FAQs: A Guide for Consumers" that explains the FDCPA in plain language.[38] In 2009, the FTC distributed 123,500 paper copies of the brochure to consumers in response to inquiries to the FTC and through non-profit consumer groups, state consumer protection agencies, Better Business Bureaus, and other sources of consumer assistance. In addition, online users accessed the brochure on the FTC's website 456,162 times in 2009.

The FTC also publishes Spanish-language versions of the "Debt Collection FAQs: A Guide for Consumers" brochure and several related consumer brochures, including "Credit and Your Consumer Rights" and "Knee Deep in Debt."[39] The FTC distributed 12,400 paper copies of the Spanish version of "Debt Collection FAQs: A Guide for Consumers" in 2009. Online users accessed the brochure in Spanish 7,792 times in 2009.

In addition, in September 2009, the FTC released a video explaining consumer rights regarding debt collection. The video can be found at http://www.ftc.gov/debtcollection and www.youtube.com/ftcvideos.

Second, the FTC provides consumer education through its Consumer Response Center, whose highly trained contact representatives respond to telephone calls and correspondence (in both paper and electronic form) each weekday from consumers. A toll-free number, 1-877-FTC-HELP, makes it very easy for consumers to contact the CRC. As discussed above, a large percentage of consumer contacts with the FTC relate to debt collection. For those consumers who complain about the actions of third-party collectors, the CRC contact representatives provide essential information about the

---

[38] The FTC's "Debt Collection FAQs: A Guide for Consumers" brochure is accessible at http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre18.shtm.

[39] The Spanish-language version of "Debt Collection FAQs: A Guide for Consumers" ("Preguntas Frecuentes sobre Cobranza de Deudas: Una Guía para Consumidores") is accessible at http://www.ftc.gov/bcp/edu/pubs/consumer/credit/scre18.shtm; "Credit and Your Consumer Rights" ("El Crédito y Sus Derechos como Consumidor") is accessible at http://www.ftc.gov/bcp/edu/pubs/consumer/credit/scre01shtm; and "Knee Deep in Debt" ("Endeudado Hasta el Cuello") is accessible at http://www.ftc.gov/bcp/edu/pubs/consumer/credit/scre19.shtm.

FDCPA's self-help remedies, such as the right to obtain written verification of the debt and the right to demand that the collector cease all communications about the debt.[40]

Third, the FTC extends the reach of its consumer education initiatives through public speaking engagements to groups across the country. In all types of venues, the FTC informs consumers of their rights under the FDCPA and other consumer finance statutes and responds to a wide range of questions and concerns.

TOOLS SPECIFICALLY FOR THE COLLECTION INDUSTRY: The FTC also delivers speeches and participates in panel discussions at industry conferences throughout the year. In addition, the staff maintains an informal communications network with the leading debt collection trade associations and consumer groups, which permits staff members to exchange information and ideas and discuss problems as they arise. The FTC also provides interviews to general media and trade publications. These interviews serve as yet another vehicle to make agency positions known to the nation's debt collectors.

ADVISORY OPINIONS: The FTC, where appropriate, responds to requests for formal advisory opinions regarding the application or interpretation of the FDCPA.[41] In June 2009, the FTC issued an advisory opinion to ACA International regarding a potential conflict between FDCPA § 805(c) and one provision of the FTC's new Furnisher Rule, 16 CFR § 660.4(e)(3). Section 805(c) prohibits debt collectors from continuing to contact a consumer after receiving a "cease communication" notice from that consumer. The Furnisher Rule requires that if a consumer has disputed directly to the furnisher the accuracy of information that the furnisher has provided to a consumer reporting agency, then the furnisher must report back to the consumer the results of its investigation of the consumer's dispute. Debt collectors were concerned that they could not comply with the Furnisher Rule without violating the FDCPA if a consumer had sent a cease communication notice and then subsequently disputed the debt to the furnisher, triggering the requirement that the dispute be investigated and the result reported to the consumer. The advisory opinion concluded that a debt collector does not violate the FDCPA if a consumer directly disputes information after sending a written "cease communication" notice to the collector, and the collector responds to the consumer with

---

[40] For those consumers who contact the CRC seeking only information about the FDCPA, the contact representatives answer any urgent questions and then either mail out the "Fair Debt Collection" brochure and any other responsive consumer education materials, or refer the consumer to the appropriate web pages within the FTC's website, located at http://www.ftc.gov.

[41] The FTC issues advisory opinions pursuant to Sections 1.1-1.4 of the FTC's Rules of Practice, 16 C.F.R. §§ 1.1-1.4.

a communication that has no purpose other than stating: (1) the results of the collector's investigation; or (2) the collector's belief that the communication is frivolous or irrelevant.[42]

## RESEARCH AND POLICY INITIATIVES

The third prong of the FTC's FDCPA enforcement program is research and policy initiatives. In the past year, the FTC has continued to monitor and evaluate the debt collection industry and its practices.

In February 2009, the FTC issued a report[43] setting forth findings, conclusions, and recommendations derived from an October 2007 FTC Workshop assessing the need for change in the debt collection system. In that report, the FTC recommended amendments to the FDCPA, including a grant of rulemaking authority to promulgate rules to implement the FDCPA. The FTC continues to advocate the recommendations in the report.

In the wake of the issuance of the FTC's debt collection workshop report, FTC staff has undertaken a comprehensive review of debt collection litigation and arbitration. In 2009, the FTC hosted a series of regional roundtables relating to these issues.[44] These events brought together debt collector representatives, consumer advocates, academics, government officials, arbitration providers, judges, and others to discuss consumer protection problems arising in debt collection litigation and arbitration as well as possible solutions to those problems. To supplement the record compiled from the roundtable discussions, the FTC also solicited comments from the public. The FTC anticipates that in the near future it will issue a report setting forth findings, conclusions, and recommendations related to debt collection litigation and arbitration.

---

[42] The text of the advisory opinion can be accessed at http://www.ftc.gov/os/statutes/andersonbeatoletter.pdf.

[43] *Collecting Consumer Debts: The Challenges of Change – A Workshop Report*, available at http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf.

[44] The roundtables were held in Chicago, San Francisco, and Washington, D.C. *See* Announcement, Federal Trade Commission, *Protecting Consumers in Debt Collection Litigation and Arbitration: a Roundtable Discussion* (December 4, 2009), available at http://www.ftc.gov/bcp/workshops/debtcollectround/index.shtm.

The FTC's 2009 debt collection workshop report also noted major problems in the flow of information among creditors, debt buyers, and collection agencies, which may be resulting in attempts to collect debts from the wrong consumers or in the wrong amounts. To learn more about such problems, the FTC issued orders in December 2009 to nine of the nation's largest debt buying companies, requiring them to produce information about their practices in buying and selling consumer debt. The FTC anticipates issuing a report with possible recommendations upon completion of this study.

## CONCLUSION

Through its debt collection program of enforcement, education, and policy initiatives, the FTC encourages collectors who comply with the law to continue to do so, and provides strong incentives for those who are not complying to conform their future practices with the dictates of the law. Vigorous federal and state law enforcement in this area is essential to stop those debt collectors who fail to follow the FDCPA.

SHORT APPENDIX 194

## **CERTIFICATE OF SERVICE**

I, Daniel A. Edelman, certify that on January 28, 2013, the short appendix was filed with the Court electronically, and that a copy of the same was served upon counsel for all appellees, David M. Schultz and Stephen R. Swofford, by operation of the Court's electronic filing system, and also by U.S. Mail, as follows:

David M. Schultz
Stephen R. Swofford
Hinshaw & Culbertson LLP
222 N. LaSalle Street, Suite 300
Chicago, IL 60601
dschultz@hinshawlaw.com
sswofford@hinshawlaw.com

                                   s/Daniel A. Edelman
                                   Daniel A. Edelman